

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

**ENTERED**
**07/31/2015**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **JOSE SR. TREVINO, TERESA TREVINO** | § | **CASE NO: 10-70594** |
| **Debtor(s)** | § | |
| | § | **CHAPTER 13** |
| | § | |
| **TERESA TREVINO,** *et al* | § | |
| **Plaintiff(s)** | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 13-07031** |
| | § | |
| **HSBC MORTGAGE SERVICES, INC.,** *et al* § | | |
| **Defendant(s)** | § | |

## AMENDED MEMORANDUM OPINION

Defendants, U.S. Bank Trust, N.A., Caliber Home Loans, Inc., and HSBC Mortgage Services, Inc. have filed motions to dismiss Jose and Teresa Trevino's complaint for failure to state a claim upon which relief may be granted. (Case No. 13-07031; ECF Nos. 79 and 80).  The motions are granted in part and denied in part.  The following claims are dismissed:

- Count I: Abuse of process claims against HSBC.

- Count IV: Relief pursuant to Fed. R. Bankr. P. 3002.1(i).

- Count V: Claim objection to Proof of Claim No. 21.

- Count VIII: The claims against HSBC pursuant to 15 U.S.C. §§ 1692e(2) and 1692e(10).

- Count IX: The claim against Caliber pursuant to 15 U.S.C. § 1692e(12).  No other claims contained in Count IX are dismissed.

- Count X: All claims under the Texas Debt Collection Act.

- Count XI: Unreasonable debt collection claims against all Defendants

- Count XVI: The request for sanctions under 11 U.S.C. § 105(a) against HSBC.

- Count XXI: All negligence claims against HSBC.

The motions to dismiss are denied with respect to all other claims.

## Procedural Background

On August 25, 2010, Jose and Teresa Trevino filed a Chapter 13 bankruptcy petition. (Case No. 10-70594, ECF No. 1). On December 30, 2013, the Trevinos initiated this adversary proceeding against Defendants HSBC Mortgage Services, Inc. ("HSBC"), U.S. Bank Trust, N.A. ("U.S. Bank"), and Caliber Home Loans, Inc. ("Caliber"). (Case No. 13-07031, ECF No. 1).

On February 3, 2014, U.S. Bank and Caliber filed a motion to dismiss Plaintiffs' suit. (ECF No. 13). On March 19, 2014, Plaintiffs filed a response to the motion to dismiss. (ECF No. 22). A scheduling conference was held on April 21, 2014. At the hearing, the Court asked the movants to file a brief in support for their argument that a transferee of a loan in bankruptcy can be a holder in due course. (ECF No. 28 at 12–14). The movants submitted a brief on May 5, 2014. (ECF. No. 29). Plaintiffs filed a reply brief on May 19, 2014. (ECF. No. 32). On August 18, 2014, HSBC filed a motion for judgment on the pleadings. (ECF No. 38).

On August 26, 2014, the Court held a hearing on Defendants' motions and allowed the Trevinos until October 15, 2014 to file an amended complaint. After timely filing the amended complaint, the Trevinos filed a motion for leave to file a second amended complaint on November 4, 2014. (ECF No. 59). On February 27, 2015, the Court held a hearing on the motion to amend and ordered that several claims be stricken from the complaint. The Court granted the Trevinos until March 13, 2015 to file a compliant second amended complaint. The Trevinos filed the second amended complaint March 12, 2015. (ECF No. 78). On April 1, 2015, HSBC filed a motion to dismiss. (ECF No. 79). U.S. Bank and Caliber filed a joint motion to dismiss on the same day. (ECF No. 80).

The Trevinos assert the following claims against U.S. Bank and Caliber: (i) a claim objection for a claim for payment of 2010 real estate taxes; (ii) violations of the Fair Debt Collection Practices Act; (iii) the common law tort of unreasonable debt collection; (iv) violations of the Texas Debt Collection Act; (v) breach of contract; (vi) abuse of process; and (vii) claim objections. (ECF No. 78).

The Trevinos assert the following claims against HSBC: (i) abuse of process; (ii) violations of the automatic stay; (iii) relief pursuant to Fed. R. Bankr. P. 3001; (iv) claim objections; (v) violations of the FDCPA; (vi) violations of the Texas Debt Collection Act; (vii) unreasonable debt collection; (viii) breach of contract; and (ix) negligence and gross negligence.

The Trevinos have requested injunctive relief, declaratory relief, sanctions, and actual and punitive damages.

## Factual Background

On February 21, 2005, the Trevinos executed a note, secured by a mortgage against their home, payable to Crevecor Mortgage, Inc.  The Trevinos contend the mortgage was transferred to HSBC on July 10, 2009. (ECF No. 78 at 6).  HSBC alleges the mortgage was transferred on March 31, 2005.  (ECF No. 79-3).  The Trevinos filed a chapter 13 petition and a Uniform Plan and Motion for Valuation of Collateral on August 25, 2010.  The plan was confirmed on November 18, 2010.  (Case No. 10-70594; ECF No. 34).  The chapter 13 plan provided that the regular monthly mortgage payment would be paid by the Trustee to HSBC.  (ECF No. 78 at 6).  The plan also provided that the trustee would pay HSBC the arrearages on the note totaling $14,521.19 throughout the lifetime of the plan.  *Id.*

Notably, the plan *did not* provide for the payment of real estate taxes.  The Edinburg Independent School District, South Texas Independent School District, South Texas College, and

Hidalgo County filed various proofs of claim totaling $1,878.76 in unpaid 2010 real estate taxes. *Id.* at 7.  HSBC filed its own proof of claim on December 20, 2010, listing arrearages, fees, and other charges of $19,685.50.  *Id.*  The Trevinos allege that HSBC did not provide sufficient documentation of its claim for pre-petition fees and charges.

On January 24, 2011, the Trustee filed her notice of intent to pay the claims.  (ECF No. 78-1 at 113).  The notice showed that the Trustee would make monthly mortgage payments to HSBC as well as pay the $19,685.50 in arrearages and other charges.  *Id.*  The notice also showed that the Trustee would pay the *ad valorem* tax claims of Edinburg CISD, South Texas ISD, South Texas College, and Hidalgo County.[1]  *Id.* at 114.  This was an error by the Trustee. The confirmed plan did not provide for payment of the *ad valorem* tax claims.  According to the Trustee's record of payments, the Trustee began paying the tax claims on April 21, 2011.  *Id.* at 126.

On April 13, 2011, the Property Tax Department of HSBC mailed a letter to the Trevinos claiming that their 2010 property taxes to Hidalgo County were severely delinquent and requesting proof of payment.  *Id.* at 173.  The letter requested proof of payment in the form of a canceled check, tax payment receipt, or a copy of a confirmed chapter 13 plan.  It went on to state:

> This is our final request.  If we do not receive the above requested proof of payment within 15 days of this letter, we may advance payment on your behalf, pursuant to the terms of your mortgage.  The payment will then be added to your loan and will be billed after discharge of the Chapter 13 Bankruptcy Plan.

*Id.*

On May 17, 2011, the Trevinos allege that HSBC made a request for permission to pay 2010 property taxes to Hidalgo County in the amount of $2,057.80 and for $641.59 to Edinburg

---

[1] There is no dispute that this document was served on HSBC.

City.  HSBC sent the funds to the Hidalgo County Tax Office on June 1, 2011.  On June 9, 2011,

HSBC sent an almost identical letter to the Trevinos informing them that their Edinburg City

property taxes for 2010 were seriously delinquent and requested proof of payment.  *Id.* at 176.

Another letter followed on July 13, 2011.  *Id.* at 154.  HSBC then advanced an additional

$777.01 to Edinburg City on August 10, 2011.  As of that date, HSBC had advanced a total of

$3,476.40 on behalf of the Trevinos to taxing authorities.

     After having learned of HSBC's tax payments, Cindy Boudloche, the chapter 13 Trustee,

sent a letter to HSBC informing it that "[s]ome or all, of the past due assessments that you have

referenced may have already been scheduled for repayment through the chapter 13 plan.  This

may preclude you from recovering funds that you intend to advance. . . ."  *Id.* at 153.  The letter

asked HSBC to carefully review the Trevinos' chapter 13 plan.

     Starting in October of 2011, Hidalgo County began refunding to HSBC the property tax

payments.  As of October 2012, HSBC had been refunded the entire $3,476.40 in 2010 property

taxes.  Despite having received a full refund for the 2010 taxes, on April 16, 2013, HSBC again

requested from the county permission to pay the 2010 taxes.  HSBC disbursed $4,450.15 to

Hidalgo County on April 22, 2013.[2]  Hidalgo County then refunded $2,960.66 to HSBC through

two checks dated June 24, 2013 and June 27, 2013.

     On July 24, 2013, pursuant to Federal Rule of Bankruptcy Procedure 3002.1(c), HSBC

filed a Notice of Post-Petition Mortgage Fees, Expenses and Charges as a supplement to its prior

proof of claim. (ECF No. 78 at 12).  The notice indicates that on April 22, 2013, HSBC paid

$2,933.83 for 2010 real property taxes, and $1,516.32 for 2012 real property taxes on the

Trevinos' principal residence. (Case No. 10-70594, ECF No. 82).  HSBC admits that the Rule

---

[2] $1,516.32 of this sum was for 2012 tax payments.

3002.1(c) notice erroneously included funds that had twice been refunded by Hidalgo County. (ECF No. 79 at 7).

The Trustee began reimbursing HSBC pursuant to its 3002.1(c) notice on October 24, 2013. (ECF No. 78 at 13). On September 21, 2013, the Trustee filed a motion to dismiss the Trevinos' bankruptcy case on the grounds that the bankruptcy plan was no longer feasible given HSBC's 3002.1(c) notice. *Id.* The Trevinos subsequently amended their Chapter 13 plan to account for the supplemental HSBC claims, and the Trustee withdrew her motion to dismiss. (Case No. 10-70594, ECF No. 106 and ECF No. 107).

On November 18, 2013, U.S. Bank Trust, N.A. and Caliber Home Loans, Inc. filed a transfer of claim with the Court, providing notification that HSBC transferred the Trevino Mortgage to U.S. Bank and Caliber. (Case No. 10-70594, ECF No. 90). As a result, the Trustee began making the required payments to movants, including payments pursuant to the 3002.1(c) notice filed by HSBC. (ECF No. 78 at 13).

## Jurisdiction and Authority

Jurisdiction over this proceeding is proper pursuant to 28 U.S.C. § 1334. Bankruptcy courts have jurisdiction over all cases under title 11, as well as "civil proceedings arising under title 11, or arising in or related to cases under title 11." A matter is "related to" a case under title 11 if the adversary proceeding's outcome may "both (1) alter the rights, obligations, and choices of the action of the debtor, and (2) have an effect on the administration of the estate." *Bass v. Denney (In re Bass),* 171 F.3d 1016, 1022 (5th Cir. 1999). An adversary proceeding falls within the court's "related to" jurisdiction if the "outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987). The possibility that the outcome of the lawsuit would have no effect

on the bankruptcy estate is not enough to conclude that there would be no conceivable effect. "Certainty or even likelihood of such an effect is not a requirement." *Arnold v. Garlock,* 278 F.3d 426, 434 (5th Cir. 2001).

The Trevinos' claims for violation of the automatic stay as well as its objections to Defendants' proofs of claim "arise under" title 11. The automatic stay is imposed by 11 U.S.C. § 362(a). Objections to proofs of claim are governed by 11 U.S.C. § 502. Many of the Trevinos' claims, however, exist independently from the Bankruptcy Code and do not arise under title 11. The Court has jurisdiction over these proceedings because they are "related to" a bankruptcy proceeding. The Trevinos are currently debtors before this Court and have not obtained their discharge. Any recovery by them could augment the bankruptcy estate for the benefit of all creditors. Accordingly, the Trevinos' potential FDCPA, TDCA, and common law claims fall within the Court's "related to" jurisdiction. *See Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP,* 462 B.R. 457, 463 (S.D.N.Y. 2011).

Although subject-matter jurisdiction is proper in this Court, questions regarding the constitutional authority of an Article I bankruptcy judge must also be addressed. Under *Stern v. Marshall*, the question of whether a bankruptcy court may enter a final judgment in a case depends on whether the cause of action stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process. 131 S. Ct. 2594, 2618 (2011). This adversary proceeding contains state law claims and non-bankruptcy federal claims which would not necessarily be resolved in the claims allowance process. However, the Supreme Court recently held that parties may consent to the bankruptcy court's adjudication of a so-called *Stern* claim without implicating Article III issues "when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge." *Wellness Int'l Network v. Sharif*, 2015 WL 2456619 at *3

(U.S. May 26, 2015).   Assuming all parties consent, this Court would have authority under *Wellness* to enter a final judgment.

Even if the parties do not consent, the Court may still issue interlocutory orders in proceedings in which the Court does not have authority to issue a final judgment.   The entry of an order dismissing fewer than all of the claims contained in a litigant's complaint is considered interlocutory.   *O'Toole v. McTaggert (In re Trinsum Grp., Inc.)*, 467 B.R. 734, 737-38 (Bankr. S.D.N.Y.).   *Stern* does not alter a bankruptcy court's authority to issue interlocutory orders. *Hernandez v. Hernandez (In re Hernandez)*, 2013 WL 705351 at *1 (Bankr. S.D. Tex. Feb. 25, 2013).

### Rule 12(b)(6) Standard

The Court reviews motions under Rule 12(b)(6) by "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs."   *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007) (per curiam).   However, the Court "will not strain to find inferences favorable to the plaintiff." *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (internal quotations omitted).

To avoid dismissal for failure to state a claim, a plaintiff must meet Fed. R. Civ. P. 8(a)(2)'s pleading requirements.   Rule 8(a)(2) requires a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).   In *Ashcroft v. Iqbal,* the Supreme Court held that Rule 8(a)(2) requires that "the well-pleaded facts" must "permit the court to infer more than the mere possibility of misconduct." 556 U.S. 662, 679 (2009) (quoting Rule 8(a)(2)). "Only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "[A] complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for

entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (internal quotation marks removed).

## Analysis

I.    General Defenses

As a threshold matter, both HSBC, U.S. Bank and Caliber have asserted various general defenses as to all claims in their respective briefs.   The Court will address these arguments before turning to the arguments against specific counts of the complaint.

*This Action Was Properly Filed as an Adversary Proceeding*

Defendants each argue that it was inappropriate for the Trevinos to bring this action as an adversary proceeding rather than following the procedures established under Federal Rule of Bankruptcy Procedure 3002.1.   Defendants object to the increased court costs and delays incurred by the filing of a "full-blown" adversary proceeding.   (ECF No. 80 at 2).   The Bankruptcy Rules do provide for an objection to a 3002.1(c) notice without the need for an adversary proceeding.   Rule 3002.1(e) states that "[o]n motion of the debtor or trustee filed *within one year* after service of a notice under subdivision (c) of this rule, the court shall, after notice and hearing, determine whether payment of any claimed fee, expense, or charge is required by the underlying agreement. . . ."

The Court fails to understand, however, how not making a 3002.1(e) objection resulted in increased costs or delay.   HSBC filed the 3002.1(c) notice—the notice at the heart of many of the Trevinos' claims—on July 24, 2013.   The Trevinos commenced this adversary proceeding on December 30, 2013, well within the one year time frame established in Rule 3002.1(e). Furthermore, Defendants' argument (even if incorrect) would make sense if this adversary

proceeding were limited to a claim objection, which it is not. The Trevinos have asserted violations of the FDCPA and TDCA, as well as breach of contract and negligence claims based on the 3002.1(c) notice. The Trevinos seek monetary damages based on these claims. Defendants of course believe they will ultimately be successful in defending these claims, but the Trevinos still have a right to assert them. While the Trevinos could have utilized either a Rule 3002.1(e) contested matter or an adversary proceeding to object to the to the 3002.1(c) notice, a proceeding to recover money or property *must* be filed as an adversary proceeding. Fed. R. Bankr. P. 7001(1). Would Defendants really have preferred the Trevinos object to the 3002.1(c) notice under Rule 3002.1(e) and then bring a separate adversary proceeding for damages?

By consolidating this action into a single adversary proceeding, rather than making a Rule 3002.1(e) objection and then commencing an adversary proceeding, the Trevinos acted in the interest of judicial economy. Defendants have not been denied due process. The differences between contested matters and adversary proceedings are procedural. *Cirillo v. Valley Baptist Health Syst.*, 2014 WL 1347326, at *6 (Bankr. S.D. Tex. Apr. 3, 2014). "To dismiss on procedural grounds alone would be to elevate form over substance. This is particularly true where—as here—an adversary proceeding provides more procedural protection for the defendant than does a contested matter brought by way of motion." *Motichko v. Premium Asset Recovery Corp.*, 395 B.R. 25, 33 (Bankr. N.D. Ohio 2008). "The Defendants may not complain that this adversary proceeding is improper when they are receiving additional protections." *Cirillo*, 2014 WL 1347326 at *6. Dismissal because the Trevinos did not object to the 3002.1(c) notice by way of a contested matter is inappropriate.

*U.S. Bank and Caliber Are Not Holders in Due Course*

U.S. Bank and Caliber contend they are holders in due course with regards to the Trevino Mortgage acquired from HSBC, and therefore should be free of any claims or defenses the Trevinos may have against HSBC. A holder in due course is not subject to personal defenses, which are not against the note *per se* but are *defenses arising from the underlying transaction. NCNB Tex. Nat. Bank v. Campise*, 788 S.W.2d 115, 118 (Tex. App.—Houston 1990, writ denied) (holding that "[p]ersonal defenses, such as failure of consideration and usury, are not truly defenses against the note itself, but rather, are defenses or claims stemming from the underlying transaction."). The Court is unaware of any personal defenses asserted by the Trevinos against movants' right to enforce the mortgage. The Trevinos are asserting claims relating to violations of the Bankruptcy Code and Rules, and are objecting to movants' attempts to collect amounts through the bankruptcy process that they allege are in excess of what is actually owed pursuant to the terms of the note.

In any event, movants are not holders in due course. A holder is presumed to be a holder in due course unless there is evidence to the contrary. *Id.* at 295. This presumption may be overcome. If the presumption is defeated, the person claiming the rights of a holder in due course has the burden to establish his status. *IFC Credit Corp. v. Specialty Optical Sys.*, 252 S.W.3d 761, 767 (Tex. App.—Dallas 2008, no pet.) (citing *Jones v. Mo. Sav. Ass'n*, 756 S.W.2d 423, 424 (Tex. App.—Dallas 1988, no pet.)).

U.S. Bank and Caliber cannot be holders in due course because they knew that the mortgage was overdue when they acquired it from HSBC. *See Williams v. Stansbury*, 649 S.W.2d 293, 295 (Tex. 1983) (citing Tex. Bus. & Com. Code § 3.302) ("A holder in due course is a holder who takes a negotiable instrument for value in good faith and ***without notice that it is***

*overdue* or that it has been dishonored or paid or that a defense or claim against the instrument exists on the part of any person.") (emphasis added).

U.S. Bank and Caliber argue that once the Trevinos' Chapter 13 plan was confirmed by the Court, their mortgage with HSBC became current and was therefore not overdue when movants acquired the mortgage from HSBC. The Court rejects this novel argument. Section 3.304 of the Texas Business and Commercial Code states: "if the principal is payable in installments and a due date has not been accelerated, the instrument becomes overdue on default under the instrument for nonpayment of an installment, and the instrument remains overdue until the default is cured." Tex. Bus. & Com. Code § 3.304(b)(1).

A purchaser of a note has constructive notice that the note is overdue if it has reason to know that any part of the principal amount is overdue. *Id.* U.S. Bank and Caliber purchased the Trevinos' mortgage from HSBC during the Trevinos' bankruptcy. The mortgage was overdue at the time of their bankruptcy filing. HSBC's proof of claim states that the Trevinos owed $19,685.50 in arrearages at the time of filing. (ECF No. 1 at 8). Although the Trevinos are attempting to cure the default over 55 months of their chapter 13 plan, their mortgage was not yet cured when it was acquired by movants.

Nor do they cite to any authority supporting the position that confirmation of a debtor's chapter 13 bankruptcy plan cures the mortgage for purposes of determining holder in due course status.[3] Instead, movants cite *Wells Fargo Bank, N.A. v. Jones*, where the Court stated that Wells Fargo should have "treated the [debtor's] loan current as of the petition date." *Wells Fargo Bank, N.A. v. Jones*, 391 B.R. 577, 604 (E.D. La. 2008). The *Jones* court was simply stating that payments for the debtor's mortgage arrearages should be paid through the chapter 13 trustee,

---

[3] The Court also fails to understand how, as U.S. Bank and Caliber argue, the default could have been cured for the purpose of determining holder in due course status, yet the Trevinos' should still be considered in default for the purposes of barring a breach of contract claim.

while payments for the ongoing, post-petition mortgage payments should be deemed current as long as the debtor made all of those payments. U.S. Bank and Caliber also cite *In re Mendoza* to support their holder in due course argument. *Mendoza v. Temple-Inland Mortg. Co. (In re Mendoza)*, 111 F.3d 1264, 1267 (5th Cir. 1997). In *Mendoza*, the Fifth Circuit stated that a debtor's proposed plan modification should "comport with § 1322(b)(5)'s requirement that such a cure be effected within a reasonable time and simultaneously maintain current payments on any long term secured loan." *Id.* The Fifth Circuit's statement that a "cure be effected within a reasonable time" indicates that performance under the plan, not confirmation of the plan, effects a cure.

The Chapter 13 plan is meant to allow debtors to cure overdue mortgages, while keeping their homes and making ongoing mortgage payments. It is settled law that the mortgage is not cured until the plan is fully performed. *See Rodriguez v. Countrywide Home Loans, Inc. (In re Rodriguez)*, 396 B.R. 436, 442 (Bankr. S.D. Tex. 2008) (stating "[w]hen the plan is fully performed according to its terms, the arrearage has been cured and the ongoing mortgage payments have been maintained."). Accordingly, the Court finds that U.S. Bank and Caliber are not holders in due course with respect to the Trevino Mortgage.

*The Complaint Has Alleged Improper Conduct on the Part of U.S. Bank and Caliber*

U.S. Bank and Caliber seem to argue that any wrongful action was due to HSBC and that they were merely "passive recipients" of any money distributed by the trustee. (ECF No. 80 at 17). They further contend that they cannot form a proper defense because the complaint fails to allege what improper actions they supposedly took. The Court rejects this argument. Paragraph 67 of the complaint states:

> To complicate matters, HSBC Mortgage Services, Inc. transferred all of its home mortgage claims against the Debtors to U.S. Bank Trust, N.A. ("U.S. Bank

Trust") as Trustee for LSF8 Master Participation Trust, and Caliber Home Loans, Inc. ("Caliber"), as its attorney in fact, on November 20, 2013.  Defendants U.S. Bank Trust and Caliber have accepted funds from the Chapter 13 Trustee on HSBC's improper Claim No./Docket No. 82.

(ECF No. 78 at 13).

The complaint further alleges that U.S. Bank and Caliber have not withdrawn the proof of claim and continue to assert they are entitled to payment.  Essentially, the complaint states that U.S. Bank and Caliber accepted money based on an invalid claim, have thus far not given the money back, and continue to demand further payments.  Regardless of whether they were "passive recipients," as detailed below, U.S. Bank and Caliber can potentially be held for these actions.

*Texas's Comparative Fault Statute Does Not Mandate Dismissal of the Trevinos' State Law Claims*

U.S. Bank and Caliber argue next that all of the Trevinos' state law claims must be dismissed pursuant to Tex. Civ. Prac. & Rem. Code § 33.001.  Section 33.001 states that "[i]n an action to which this chapter applies, a claimant may not recover damages if his percentage of responsibility is greater than 50 percent."  They claim that because the Trevinos' chapter 13 plan failed to provide for payment of the 2010 and 2012 property taxes, HSBC was forced to pay the taxes on its own initiative to prevent the taxing authorities from foreclosing.

 Although the Trevinos undoubtedly share some culpability in the events leading to this dispute, U.S. Bank and Caliber's argument fails for two reasons.  First, Tex. Civ. Prac. & Rem. Code § 33.002 states that the comparative fault provisions only apply to "any cause of action based in tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of harm. . . [and] any action brought under the Deceptive Trade Practices-Consumer Protection Act."  It *does not* apply to statutory tort claims where the statute contains

its own separate and conflicting legislative fault-allocation scheme. *Challenger Gaming Solutions, Inc. v. Earp*, 402 S.W.3d 290, 293 (Tex. App.—Dallas 2013, no pet.) (citing *Sw. Bank v. Info. Support Concepts, Inc.*, 149 S.W.3d 104, 111 (Tex. 2004)). The Trevinos' breach of contract and TDCA claims are not affected by the comparative fault statute. Second, the apportionment of fault is a pure question of fact. *See Roberts v. City of Grapevine*, 923 S.W.2d 169, 173 (Tex. App.—Fort Worth 1996, writ denied). At the motion to dismiss stage, the Court is required to accept all well-pleaded allegations of the plaintiffs as true. The purpose of a motion to dismiss is to decide the sufficiency of the complaint, not to speak to the underlying merits of the case. *Gibson v. Chi.*, 910 F.2d 1510, 1522 (7th Cir. 1990). Whether the Trevinos were more than 50% at fault is a question of fact and not appropriately addressed at this point.

## II.    The Trevinos' Claims

*Claim Objection to Original Claim No. 21*

In their original complaint, The Trevinos objected to proof of claim No. 21, originally filed by HSBC, pursuant to 11. U.S.C. § 502(b)(1). The Trevinos objected to the $19,685.50 amount owed in arrearages, which includes $11,221.89 for late fees and other charges, including hazard insurance, taxes, attorney's fees, inspection fees, and other fees and costs.

The Trevinos objected to the specific amounts in question, and asserted that further documentation is needed to substantiate the amounts being claimed by movants. The Trevinos' mortgage contract only allowed movants to collect fees that are "reasonable and or appropriate to protect Lender's interest in the Property." (ECF No. 1-1 at 17). The Trevinos alleged that the $11,221.89 in fees were not reasonable or appropriate under Texas law. In their amended complaint, the Trevinos now claim that Defendant HSBC did not provide additional documentation evidencing its proof of claim until August 18, 2014, more than eight months

after this adversary proceeding was commenced.  In addition, they continue to claim that HSBC

has failed to provide sufficient evidence documenting the portion of its claim for $11,221.89 in

pre-petition amounts due for "Late Fees and Other Charges."

Rule 3001(c) requires that any party submitting a proof of claim must include certain

supporting information to evidence the proof of claim.  The relevant portions of Rule 3001(c)

are as follows:

> (1) Claim based on a writing. . . . [W]hen a claim, or an interest in property of the
> debtor securing the claim, is based on a writing, a copy of the writing shall be
> filed with the proof of claim. . . .
> …
> (A) If, in addition to its principal amount, a claim includes interest, fees,
> expenses, or other charges incurred before the petition was filed, an
> itemized statement of the interest, fees, expenses, or charges shall be filed
> with the proof of claim.

A proof of claim which complies with the requirements of Rule 3001, "shall constitute prima

facie evidence of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f).  If a debtor

objects to a claim which is afforded prima facie validity, he must provide evidence sufficient to

rebut the presumption of validity and establish that the claim should be disallowed pursuant to 11

U.S.C. § 502(b).  *In re Depugh*, 409 B.R. 125, 135 (Bankr. S.D. Tex. 2009).

In the Second Amended Complaint, the Trevinos admit that HSBC filed a copy of the

note and deed of trust as well as an itemized list of interest, fees, expenses, and other charges.

(ECF No. 78 at 8).  The Trevinos urge the Court to punish HSBC's failure to attach additional

documents evidencing the pre-petition fees and charges, but the Bankruptcy Rules impose no

such requirement.  The Court recognizes that the Trevinos have incurred expenses objecting to

the proof of claim.  However, by requiring debtors to overcome the presumption of validity, the

Bankruptcy Rules plainly contemplate this scenario. Accordingly, the Trevinos' request for attorney's fees under Rule 3001(2)(D)(ii) must be dismissed.

In addition, the Second Amended Complaint merely provides conclusory allegations that Claim No. 21 is not "reasonable or payable pursuant to the note and security agreement, and Texas law." They have failed to plead any specific facts to rebut the presumption of prima facie validity. The Trevinos' objection to Claim No. 21 is dismissed.

*Claim Objection to the 3002.1(c) Claim No. 82*

The Trevinos also object to the 3002.1(c) Notice of Post-Petition Mortgage Fees, Expenses, and Charges filed by HSBC. The Trevinos allege that U.S. Bank and Caliber have continued to accept payments pursuant to the 3002.1(c) notice. They contest the $2,933.83 amount claimed for the 2010 real property taxes. The Trevinos assert that they have double paid for the 2010 taxes: the Trustee has been making payments to both the taxing authorities and to HSBC and movants for the same $2,933.83 tax obligation.

Bankruptcy rule 3002.1(e) provides a mechanism for objecting to supplemental claims filed under Bankruptcy rule 3002.1(c):

> On motion of the debtor or trustee filed *within one year after service of a notice* under subdivision (c) of this rule, the court shall, after notice and hearing, determine whether payment of any claimed fee, expense, or charge is required by the underlying agreement and applicable nonbankruptcy law to cure a default or maintain payments in accordance with § 1322(b)(5) of the Code.

Fed. R. Bankr. P. 3002.1(e).

On July 24, 2013, HSBC filed a rule 3002.1 notice that it paid $2,933.83 in 2010 county taxes and $1,516.32 in 2012 county taxes. On October 24, 2013, the Chapter 13 Trustee began making payments pursuant to HSBC's notice. On December 30, 2013, the Trevinos objected to

the $2,933.83 in 2010 county taxes included in the rule 3002.1 notice by bringing this adversary complaint.  Accordingly, the objection was timely filed.

The Trevinos have sufficiently stated a claim for objection to the 3002.1(c) Notice of Post-Petition Mortgage Fees and Expenses.

*Rule 3002.1(i)*

The Trevinos seek a declaration under Fed. R. Bankr. P. 3002.1(i) that they do not owe Defendants any amount for pre-petition tax payments and an injunction barring Defendants from taking further action to collect such pre-petition tax payments.  Rule 3002.1(i) states that "[i]f the holder of a claim fails to provide any information as required by subdivision (b), (c), or (g) of this rule, the court may, after notice and hearing," award any appropriate relief.  The Trevinos have not alleged that any party failed to comply with the formal requirements of subdivisions (b), (c), or (g), but rather that the notice in question was incorrect.  Because Rule 3002.1(i) provides relief in situations involving a *lack* of notice, rather than incorrect notice, this claim must be dismissed.  *See, e.g.*, *In re Guitierrez*, 2012 WL 5355964 at *4 (Bankr. D.N.M. Oct. 30, 2012) (holding that Rule 3002.1(i) provides sanctions for a creditor's failure to provide information).

*Abuse of Process*

The Trevinos allege that by filing a Rule 3002.1(c) notice with knowledge that the funds claimed had already been refunded, HSBC's actions constituted an abuse of process.  They further allege that U.S. Bank and Caliber committed abuse of process by continuing to assert the legitimacy of the 3002.1(c) notice.  The Trevinos ask the Court to use its 11 U.S.C. § 105(a) powers to sanction Defendants and provide whatever relief the Court deems necessary.  HSBC argues that in order to sanction a party under §105(a), a bankruptcy court must make a finding of

bad faith.  According to HSBC, because the complaint does not demonstrate how Defendants acted in bad faith, the abuse of process claims must be dismissed.

Bankruptcy Rule 3002.1 was implemented in 2011 and requires a creditor secured by a principal residence to file a detailed notice setting forth all post-petition fees, expenses, and charges that it seeks to recover.  *In re Fuentes*, 509 B.R. 832, 835 (Bankr. S.D. Tex. 2014).  The purpose of Rule 3002.1 is to aid in implementation of 11 U.S.C. § 1322(b)(5), which requires that a debtor be allowed to cure a default on and maintain payments on a home mortgage over the life of a chapter 13 plan.  Fed. R. Bankr. P. 3002.1 Advisory Committee's Note.

11 U.S.C. § 105(a) states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  The Fifth Circuit has held that § 105(a) grants bankruptcy courts the power to sanction 'vexatious' conduct.  *Placid Refining Co. v. Terrebonne Fuel and Lube, Inc. (In re Terrebonne Fuel and Lube, Inc.)*, 108 F.3d 609, 612-13 (5th Cir. 1997).  "One of the primary functions of § 105(a) is to 'prevent an abuse of process.'"  *In re Jacobson*, 2009 WL 3245418 at *13 (Bankr. E.D. Tex. Sep. 30, 2009).  A bankruptcy court has broad authority to take necessary or appropriate actions to prevent an abuse of process.  *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375 (2007).  However, the use of sanctions must be accompanied by a specific finding of bad faith conduct.  *Leonard v. Luedtke (In re Yorkshire, LLC)*, 540 F.3d 328, 332 (5th Cir. 2008).  *See also Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766 (1980).

A finding of bad faith must be based on clear and convincing evidence.  *Crowe v. Smith*, 151 F.3d 217, 236 (5th Cir. 1998).  To impose sanctions based on bad faith, a court must find that the "very temple of justice" has been defiled by a party's conduct.  *In re Stomberg*, 487 B.R. 775, 817-18 (Bankr. S.D. Tex. 2013) (citing *Goldin v. Bartholow*, 166 F.3d 710, 722 (5th Cir.

1999)).   In other words, a party's bad faith may be established if it "deliberately abused the judicial process." *The Cadle Co. v. Moore (In re Moore)*, 739 F.3d 724, 730 (5th Cir. 2014). Because the Trevinos' complaint does not set forth a plausible case that HSBC acted in bad faith, the abuse of process claim must be dismissed.

The Second Amended Complaint alleges that HSBC paid the 2010 property taxes in June and August of 2011.   It then received a refund from Hidalgo County starting in October of 2011 and was refunded in full by October of 2012.   After receiving this refund, HSBC again paid the 2010 taxes on April 22, 2013.   The Trevinos allege that by June 27, 2013, Hidalgo County had refunded the second payment of 2010 taxes in full.[4]   In fact, HSBC states that the check was returned as early as June 7, 2013.   (ECF No. 38 at 8).   Then, on July 24, 2013, HSBC filed a Rule 3002.1(c) notice which included a claim for $2,933.83 earmarked as "County Tax (2010)." (Case No. 10-70594; ECF No. 82).

In essence, the Trevinos allege that HSBC filed a 3002.1(c) notice seeking repayment of monies to which it knew it was not entitled.   They further allege that HSBC has in place an automatic system wherein HSBC files 3002.1(c) notices regardless of whether a refund was received.   HSBC does not contest that it received a refund of the 2010 taxes *before* it filed the 3002.1(c) notice and can be charged with knowledge of that refund.   It is a basic tenet of agency law that knowledge of an agent may be imputed to the principal.   *Poth v. Small, Craig & Werkenthin, L.L.P.*, 967 S.W.2d 511, 515 (Tex. App. 1998) (citing *Wellington Oil Co. v. Maffi*, 150 S.W.2d 60, 63 (Tex. 1941)).   The implied knowledge rule of agency does not, however, apply in the converse.   It is well settled that the principal's undisclosed knowledge is not imputed to the agent.   *See, e.g.*, *S.O.G.-San Ore-Gardner v. Mo. Pac. R. Co.*, 658 F.2d 562, 567 (8th Cir.

---

[4] HSBC claims that after the April 22, 2013, check was refunded, it attempted to pay the 2010 taxes for a third time. (ECF No. 38 at 8).   This does not change the analysis, however, because the 3002.1(c) notice specifically references payment made on April 22, 2013.   In any event, this third check was never cashed by Hidalgo County.

1981); *Cirillo v. Valley Baptist Health Sys. (In re Cirillo)*, 2014 WL 1347362 at *7 n. 8 (Bankr. S.D. Tex. Apr. 3, 2014).

The Trevino's complaint plausibly sets forth a scenario wherein one department of HSBC determines when to send a check for property taxes to a government agency.  As soon as a check is sent, an automatic notice is sent to a separate department or independent contractor for them to file a 3002.1(c) notice.  There appears to have been no system in place to notify the department or independent contractor responsible for the 3002.1(c) notices if a check was eventually refunded.  HSBC filed the 3002.1(c) notice in error.  It had actual knowledge that the April 22, 2013 was refunded by the county yet filed a notice with this Court seeking reimbursement of the funds.  But such an error cannot be said to have defiled the "temple of justice."

If HSBC had created an "unconscionable plan or scheme" to deceive the Court and the chapter 13 trustee into giving HSBC ill-gotten gains, as the Trevinos allege, then the 3002.1(c) filing would have been in bad faith.[5]  The complaint sets forth no facts to support such an allegation.  Even accepting all well-pleaded allegations as true, there is nothing in the complaint to suggest that the HSBC employee or independent contractor who filed the 3002.1(c) notice had knowledge of the prior refund.  Moreover, the Trevinos admit that tax payments and 3002.1(c) notices were processed in entirely separate departments at HSBC.  Agency law dictates that while the bank itself had knowledge of the refund, its knowledge cannot be imputed to the agent who filed the 3002.1(c) notice, absent specific disclosure.  The Trevinos have made no such allegation.  Absent any allegation that the HSBC employee or independent contractor who filed the 3002.1(c) notice had knowledge of the refund, the Court cannot infer bad faith.  Because the

---

[5] If, for example, HSBC intentionally insulated its 3002.1(c) department to ensure that filings would be made regardless of refunds in order to seek double recovery.  Such a scenario is not plausible given the facts set forth in the complaint.

Trevinos' complaint does not permit the Court to plausibly infer bad faith on the part of HSBC, its abuse of process claims must be dismissed.

This is not to say a creditor can *never* have committed an abuse of process unintentionally.   In *In re Schuessler*, a bankruptcy court found the defendant guilty of abuse of process where it filed a motion requesting relief from the automatic stay.   386 B.R. 458, 462 (Bankr. S.D.N.Y. 2008).   Although the defendant had no actual knowledge that the motion was erroneous, its actions suggested a scheme designed to insulate it from the truth.   The mortgage servicer, Chase Home Finance, LLC, filed a lift stay motion without undertaking analysis as to whether an equity cushion existed or even whether the debtors' were current on property taxes. *Id.* at 463.   The only factor that Chase appeared to consider when filing the lift stay motion was whether the property was in arrears, which was all the more troubling to the court because Chase had refused a missing payment tendered by the debtors.   *Id.*   Finally, the lift stay motion was filed after the chapter 7 trustee had already filed a no-asset report in the case and requested a discharge, an action which would have statutorily terminated the stay under 11 U.S.C. § 362(c)(2)(C).   *Id.*   Chase filed a lift stay motion where (1) the debtors had a $120,000 equity cushion in the house; (2) were at worst only one payment in arrears; and (3) had made monthly payments in a manner acceptable to Chase for years.   The court determined that Chase's actions were designed to "stand[] in the way of important rights afforded to debtors under the Bankruptcy Code, including the . . . essential concept of a 'fresh start.'"   *Id.* at 491.

HSBC's conduct can be distinguished from Chase's in *Schuessler* in two important ways. First, HSBC's erroneous filing of the 3002.1(c) notice was, at least in part, caused by a mistake on the part of the Trevinos and the trustee.   The Trevinos' chapter 13 plan never provided for the payment of real estate taxes under the plan.   Regardless of whether the trustee began paying the

taxes, as the Court noted, "HSBC had . . . no duty to monitor to see that the Chapter 13 Trustee was doing her job right. . . . They had a duty to look at the plan."  (ECF No. 75 at 11).  In fact, when the trustee sent a letter to HSBC informing them that it might be double paying the taxes, she asked HSBC to "[p]lease take the time to carefully review the chapter 13 plan that has been filed in this case. . . ."  (ECF No. 78-1 at 153).  Reviewing the plan would have impressed upon HSBC the need to pay the taxes, as it appeared that they would not be paid otherwise.  Under the deed of trust, if the Trevinos failed to pay the taxes, HSBC could "pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount."  (ECF No. 78-1 at 15).  HSBC merely excercised its contractual right to pay real estate taxes that it assumed were not being repaid, and then sought reimbursement through the bankruptcy process.

The second consideration is the actual text of Rule 3002.1 itself.  The Trevinos interpret HSBC's system of automatically filing such notices without verifying whether the funds have been refunded as an intentional attempt to obtain a double recovery.  But the plain language of Rule 3002.1 encourages creditors to file notices as quickly as possible.  Under Rule 3002.1(c), a "notice shall be served within 180 days after the date on which the fees, expenses, or charges are incurred."  If a creditor files late, it could potentially forfeit its right to repayment.  Because an expense is incurred at or before the date when a check is actually issued, a creditor cannot afford to wait to determine if the check is cashed before filing a 3002.1(c) notice.  *See In re Simbaki, Ltd.*, 2015 WL 1593888 at *4 (Bankr. S.D. Tex. Apr. 6, 2015) (holding that an expense is incurred as soon as there is a liability to pay).

HSBC erred by filing the 3002.1(c) notice.  Nevertheless, HSBC's conduct does not comprise an abuse of process as discussed in *In re Schuessler*.

The same cannot be said of the actions of U.S. Bank and Caliber.  The Trevinos do not allege that U.S. Bank or Caliber knew or should have known that HSBC's 3002.1(c) notice was improper when they purchased the mortgage claims from HSBC.  However, U.S. Bank and Caliber continue to assert the legitimacy of the 3002.1(c) notice and have failed to withdraw it.  The 3002.1(c) notice does contain claims for 2012 property taxes, also paid by HSBC, which the Trevinos do not allege were refunded.  Assuming this portion of the notice is valid, then U.S. Bank and Caliber would be entitled to at least some of the money they received from the trustee.  But it is undisputed that the 3002.1(c) notice is in error with regards to the 2010 property taxes.  U.S. Bank and Caliber have no good faith basis upon which to continue to demand payment for these taxes.  By failing to amend or withdraw the 3002.1(c) notice and continuing to demand payment, U.S. Bank and Caliber's actions may have been in bad faith.  The motion to dismiss based on the abuse of process claims against U.S. Bank and Caliber is denied.

*Violations of the Fair Debt Collection Practices Act as to the 3002.1(c) Notice*

The Trevinos allege that by filing a notice before this Court attempting to collect amounts not authorized by the Note or Deed of Trust and continuing to assert its validity, Defendants have violated the Fair Debt Collection Practices Act.  The FDCPA was enacted to "eliminate abusive debt collection practices, to ensure that debt collectors who abstain from such practices are not competitively disadvantaged, and to promote consistent state action to protect consumers." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA,* 559 U.S. 573, 577 (2010).  A debt collector who fails to comply with any FDCPA provision is liable for actual damages, costs, reasonable attorney's fees, and statutory "additional" damages. 15 U.S.C. § 1692k(a).

Specifically, the Trevinos allege that Defendants violated 15 U.S.C. § 1692e(2) by misrepresenting the character and amount of the debt and § 1692(e)(5) by taking an action which could not legally be taken, i.e., filing a proof of claim for monies not owed. They allege further that Defendants violated § 1692f(1) by attempting to collect debts not authorized by the Note or Deed of Trust. Finally, the Trevinos allege that U.S. Bank and Caliber violated 15 U.S.C. § 1692e(12) by representing to the court that they were innocent purchasers for value.

a. HSBC Is a Debt Collector Under the FDCPA

HSBC argues that the Trevino's FDCPA claims must fail because it cannot qualify as a debt collector within the meaning of the statute. The statute defines the term debt collector, in part, as:

> [A]ny person who uses any instrumentality of interstate commerce or the mails in any in any business the principal purpose of which is the collection of debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. . . . The term does not include—
> . . .
> (F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . (iii) concerns a debt which was not in default at the time it was obtained by such person. . . .

15 U.S.C. §1692a(6). "The legislative history of § 1692a(6) indicates conclusively that a debt collector does not include the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not in default at the time it was assigned." *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985). As a mortgage servicing company, HSBC would not qualify as a debt collector if it obtained the note from Crevecor Mortgage, Inc. while it was not in default.

The Second Amended Complaint states "[o]n information and belief, Defendant HSBC acquired the loan and/or the servicing rights on or about July 10, 2009. Upon information and belief, the loan was delinquent when HSBC acquired the loan and/or the servicing rights." (ECF

No. 78 at 6).  HSBC has provided a declaration of Dana J. St. Clair-Hougham, a Vice President and Assistant Secretary of HSBC, stating that HSBC purchased the note and deed of trust on March 31, 2005.  (ECF No. 79-3).  The fact is disputed.  *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007) (per curiam).  At this stage, particularly in light of HSBC's Answer (as set forth in the next paragraph), the Court must assume that the allegations in the Second Amended Cmplaint are true. Accordingly, HSBC must be considered a debt collector under the FDCPA.

HSBC admitted in its Original Answer to Plaintiffs' Complaint that it acquired the loan while it was delinquent.  (ECF No. 23 at ¶ 23).  "Factual assertions in pleadings . . . are considered to be judicial admissions conclusively binding on the party who made them."  *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983).  Facts that are admitted in the pleadings "are no longer at issue." *Ferguson v. Neighborhood Housing Services, Inc.,* 780 F.2d 549, 551 (6th Cir. 1986).  HSBC has not filed an amended answer retracting its admission.  At the 12(b)(6) stage, HSBC may not eliminate a factual dispute by attempting to rebut its own judicial admission.  *See Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 108 (5th Cir. 1987).

b.  The Trevinos' FDCPA Claims Are Not Time Barred

U.S. Bank and Caliber argue that any FDCPA claims predicated on the July 24, 2013 notice must be dismissed due to the statute of limitations.  The FDCPA has a one-year statute of limitations.  15 U.S.C. § 1692k.  The Trevinos did not assert any FDCPA violations until they filed the first amended complaint on October 15, 2014.  However, the relation back doctrine provides that an amendment to a pleading relates back to the date of the original pleading when the amendment asserts claims which arose out of the same conduct, transaction, or occurrence set out in the original pleading.  Fed. R. Civ. P. 15(c).  It is undisputed that the FDCPA claims relate

to the same 3002.1(c) notice complained of in the Trevinos' original pleading.  Accordingly, the FDCPA claims were timely filed.

    c.   The Bankruptcy Code Does Not Preempt Relief Under the FDCPA

HSBC argues in the alternative that the filing of a 3002.1(c) notice cannot be considered a violation of the FDCPA because the Bankruptcy Code preempts any remedial scheme imposed under the FDCPA.  Federal courts have held that specific provisions of the Bankruptcy Code may preclude a simultaneous claim under the FDCPA.  *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 510 (9th Cir. 2002); *Simmons v. Roundup Funding, LLC*, 622 F.3d 93, 95 (2d Cir. 2010); *In re Pariseau*, 395 B.R. 492, 494 (Bankr. M.D. Fla. 2008).  In *Middlebrooks v. Interstate Credit Control, Inc.*, the court reasoned that while typically the Bankruptcy Code and the FDCPA coexist peacefully, permitting an FDCPA action based on a false proof of claim could "could potentially undermine the Bankruptcy Code's specific provisions for administration of the debtor's estate." 391 B.R. 434, 437 (D. Minn. 2008).

An FDCPA claim, however, can only be precluded by the Bankruptcy Code if the two statutes are in direct conflict.  "When two federal statutes address the same subject in different ways, the right question is whether one implicitly repeals the other—and repeal by implication is a rare bird indeed."  *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004).  *See also J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Intern., Inc.*, 534 U.S. 124, 143-44 (2001) ("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").  The *Randolph* court found that because the automatic stay provisions of the Bankruptcy Code and the FDCPA did not explicitly conflict, a creditor's action which violated the automatic stay could also yield liability under the FDCPA.  *Randolph*, 368 F.3d at 728.  Similarly, in *Simon v. FIA Card Serv., N.A.*, the

Third Circuit held that absent a specific conflict between the Code and the FDCPA, the FDCPA is not preempted.  732 F.3d 259, 279 (3d Cir. 2013).

The Court finds that the FDCPA and Bankruptcy Code provisions applicable to proofs of claim are not in conflict.[6]  Section 1692e of the FDCPA provides that "a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  Section 1692f states that a "debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt."  *Id.* § 1692f.  Outside of bankruptcy, federal courts have routinely held that threatening to sue or suing over a time-barred debt or other 'false debts' violates §§ 1692e and 1692f of the FDCPA.  *See, e.g.*, *Castro v. Collecto, Inc.*, 634 F.3d 779, 783 (5th Cir. 2011); *Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 32-33 (3d Cir. 2011); *Jenkins v. Gen. Collection Co.*, 538 F.Supp. 2d 1165, 1172 (D. Neb. 2008).

As noted above, however, multiple courts have held that the filing of a proof of claim in a bankruptcy proceeding cannot be actionable under the FDCPA.[7]  11 U.S.C. § 501(a) states that a "creditor . . . may file a proof of claim."  The Code defines 'claim' as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, disputed, undisputed, legal, equitable, secured, or unsecured."  *Id.* § 101(5)(A).  Section 502(b) then provides that the court, after notice and hearing, determines whether a claim will be allowed and to what extent.  It is important to note that filing a proof of claim is voluntary.  If the Code *required* holders of a debt on which the statute of limitations to run to file proofs of claim, this might conflict with the FDCPA.  As discussed above, threatening

---

[6] A 3002.1(c) notice is "filed as a supplement to the holder's proof of claim."  Fed. R. Bankr. P. 3002.1(d).  It is not afforded the prima facie validity of the proof of claim itself.  *Id.*

[7] Certainly, there are also numerous courts who have found that proofs of claim *can* yield liability under the FDCPA.  *See Price v. Am.'s Servicing Co. (In re Price)*, 403 B.R. 775, 790 n. 14 (Bankr. E.D. Ark. 2009); *Kline v. Mortg. Elec. Sec. Sys.*, 659 F. Supp.2d 940, 949–51 (S.D. Ohio 2009); *Crawford v. LVNV Funding, LLC*, 758 F.3d 1254 (11th Cir. 2014); *Smith v. Asset Acceptance, LLC*, 510 B.R. 225 (S.D. Ind. 2013).

to sue on a time barred debt can be a FDCPA violation.  However, there is no such requirement.

Because the filing of a proof of claim is an entirely voluntary process, there is no conflict with

the FDCPA.  *See Smith v. Asset Acceptance LLC*, 510 B.R. 225, 226 (S.D. Ind. 2013).

Courts who have found that a proof of claim is not actionable under the FDCPA

generally have found that because the Code contains a mechanism for disallowing proofs of

claim, it 'contemplates' the filing of false proofs of claim.  *See Williams v. Asset Acceptance,*

*LLC (In re Williams)*, 392 B.R. 882, 886 (Bankr. M.D. Fla. 2008) (stating that the Code permits

debtors to file objections to proofs of claim); *Elliott v. Cavalry Inv., LLC*, 2015 WL 133745 at *6

(S.D. Ind. Jan. 9, 2015) ("The Bankruptcy Code itself contemplates that a debtor may object to

such unenforceable proofs of claim.").  The mere fact that the Code contains safeguards designed

to protect against false proofs of claim, however, does not mean that a creditor who files such

claims is shielded from liability under the FDCPA.[8]  The proof of claim process is designed to

determine the amount and validity of claims to ensure the orderly distribution of assets.  *In re*

*Chan*, 355 B.R. 494, 498 (Bankr. E.D. Pa. 2006).  It does not exist to discipline those who file

erroneous proofs of claim.

Indeed, despite some courts holding that a debtor "can only attack a proof of claim in the

bankruptcy court, and only by using the remedies provided in the Bankruptcy Code," there is

some dispute as to what remedies are actually available under the Code.  *Gray-Mapp v. Sherman*,

100 F. Supp. 2d 810, 813 (N.D. Ill. 1999).  Courts are split as to whether § 105 allows a

bankruptcy court to sanction a creditor for filing an erroneous proof of claim.  *Compare Knox v.*

*Sunstar Acceptance Corp.*, 237 B.R. 687, 699 (Bankr. N.D. Ill. 1999) (holding that Congress did

not intend to create a private right of action to sue based on fraudulent proofs of claim under

---

[8] An additional safeguard can be found in 11 U.S.C. § 1302(b), which states "a trustee shall . . . perform the duties specified in section[] . . . 704(a)(5)."  Section 704(a)(5) requires a trustee to examine proofs of claim and object "if a purpose would be served."

§ 105(a)), *with In re Dansereau*, 274 B.R. 686, 689-90 (Bankr. W.D. Tex. 2002) (using § 105(a) to sanction a creditor for filing false proofs of claim).  In addition to § 105(a), a party may move for sanctions against a creditor under Rule 9011(c), which allows a party to be sanctioned for submitting false documents to the court.

Regardless of whether remedies exist under the Code, there is nothing to suggest that these are the only remedies available.  "Whether overlapping and not entirely congruent remedial systems can coexist is a question with a long history at the Supreme Court, and an established answer: yes."  *Randolph v. IMBS, Inc.*, 368 F.3d 726, 731 (7th Cir. 2004).  For example, in *Humana Inc. v. Forsyth*, the Supreme Court held that an insurer could be held liable both under RICO and applicable state law because the application of the federal statute would not 'impair' state law.  525 U.S. 299, 311 (1999).  *Heintz v. Jenkins* stands for the proposition that a lawyer can be held liable under the FDCPA for collecting debts through litigation, despite the existence of procedural rules designed to punish attorney misconduct.  514 U.S. 291 (1995).  In fact, *Randolph* involved a provision of the Code (the automatic stay) where Congress provided an express remedy for the objectionable conduct.  11 U.S.C. § 362(k).  Here, where there is no such express remedy, the argument that the Bankruptcy Code should provide the only remedy is even weaker.

"Rule 9011 . . . like its counterpart Fed. R. Civ. P. 11, has never been an exclusive remedy for an aggrieved party; rather, nothing precludes a party from pursuing other causes of action aimed at remedying the same wrong. . . ."  *Watson v. Stonewall Jackson Mem'l Hosp. Co. (In re Watson)*, 2010 WL 4496837, at *5 (Bankr. N.D. W. Va. Nov. 1, 2010).  With regards to the improper issuance of a subpoena under Rule 2004, the Third Circuit held, "[n]or is there a conflict between the remedies for noncompliance available in a bankruptcy court and the

remedies available under the FDCPA.  The fact that the bankruptcy court has other means to enforce compliance with the subpoena rules does not conflict with finding liability or awarding damages under the FDCPA. . . ."  *Simon v. FIA Card Serv., N.A*, 732 F.3d 259, 279 (3d Cir. 2013).

The Real Estate Settlement Procedures Act (RESPA) provides further insight into how a federal statute can coexist with the Bankruptcy Code.  RESPA is a consumer protection statute enacted in 1974.  *Conley v. Ctr. Mortg. Co.*, 414 B.R. 157, 158 (E.D. Mich. 2009).  It provides that mortgage servicers must, upon receipt of a written request for information regarding a mortgage or a notice of error asserting a mistake, provide a written response acknowledging receipt of the notice within five days.   12 U.S.C. § 2605(e)(1)(A); 12 C.F.R. § 1024.35.  The servicer must then conduct an investigation and provide appropriate corrections or provide a written statement of reasons as to why it believes the account is correct.   *Id.* § 2605(e)(2).  Failure to comply with these provisions results in liability for actual damages and, if the plaintiff can show a pattern of noncompliance, additional damages not to exceed $2,000.  *Id.* § 2605(f)(1).

Section 502 of the Bankruptcy Code provides a similar scheme as RESPA for resolving claim disputes with regards to a home mortgage.  Instead of submitting a notice of error to a mortgage servicer, a debtor could simply file an objection to a proof of claim under Bankruptcy Rule 3007.  Despite the existence of separate remedial schemes, the vast majority of courts to examine the issue have determined that a claim under RESPA is not precluded by the Code.  *See Miller v. Ameriquest Mortg. Co. (In re Laskowski)*, 384 B.R. 518 (Bankr. N.D. Ind. 2008); *Conley v. Ctr. Mortg. Co.*, 414 B.R. 157 (E.D. Mich. 2009); *Figard v. PHH Mortg. Corp. (In re Figard)*, 382 B.R. 695 (Bankr. W.D. Pa. 2008).[9]  Just as the separate remedial provisions of

---

[9] One of the few cases to hold that RESPA and the Bankruptcy Code are incompatible, *In re Nosek*, held that the Bankruptcy Code "occup[ied] the field of bankruptcy proceedings," thus preempting RESPA.  354 B.R. 331, 339

RESPA can coexist with the Code, the FDCPA provides an alternative avenue for aggrieved debtors to challenge creditors' actions.

Because the Bankruptcy Code and the FDCPA do not conflict with regards to the filing of a proof of claim, relief under the FDCPA is not preempted by the Code.

d. The Trevinos Have Stated a Claim Under the FDCPA

The Trevinos have alleged violations of §§ 1692e(2), 1692e(5), 1692e(12), and 1692f(1) of the FDCPA.  Section 1692e(2) prohibits the false representation of the character, amount, or legal status of any debt.  Section 1692e(5) prohibits a threat to take action that cannot legally be taken, while § 1692e(12) prohibits the false representation or implication that accounts have been turned over to innocent purchasers of value.  Finally, § 1692f(1) prohibits the collection of any amount (including fees, charges, and incidental expenses) unless such amount is expressly authorized by the agreement creating the debt or is otherwise permitted by law.  The complaint alleges that the Note and Deed of Trust did not authorize Defendants to collect fees based on the 2010 property taxes once they had been refunded by the taxing authorities.  As it is required to accept these well-pleaded allegations as true, the Court is satisfied that the Trevinos have set forth a claim under §§ 1692e(2), 1692e(5), and 1692f(1).

However, the complaint has not established that U.S. Bank and Caliber violated § 1692e(12).  Section 1692e only prohibits false statements or misrepresentations "in connection with the collection of any debt."  U.S. Bank and Caliber incorrectly asserted holder in due course as a *defense* to the Trevinos' complaint, rather than an active attempt to collect a debt.  This is in contrast to *Hartman v. Asset Acceptance Corp.*, where the debt collector filed a complaint in

---

(D. Mass. 2006).  As discussed below in the section dealing with the Texas Debt Collection Act, the *Nosek* court applied the wrong standard.  The preemption doctrine is based on the Supremacy Clause of the U.S. Constitution and does not apply to conflicting federal statutes.  *Britt v. The Grocers Supply Co.,* 978 F.2d 1441, 1446 (5th Cir.1992).

state court *seeking a judgment* by claiming they were a holder in due course.  467 F. Supp.2d 769, 778 (S.D Ohio).  The court in that case sustained the § 1692e(12) claims, noting it was concerned that the debtors testified they could not understand this term until they consulted with a lawyer.  Because U.S. Bank and Caliber did not misrepresent or falsely claim holder in due course status in connection with the collection of a debt, but rather in an attempt to escape liability, the Trevinos' §1692e(12) claim is dismissed.

*Violation of the FDCPA as to the March 20, 2013 Letter*

The Trevinos further assert violations of the FDCPA based on a letter sent by HSBC to the Trevinos on March 20, 2013.  HSBC again argues that this claim must fail because HSBC is not a debt collector as defined by the FDCPA.  As discussed above, because the Court must accept well-pleaded allegations as true, HSBC is considered a debt collector for the purposes of the motion to dismiss.  Although the Trevinos did not provide a copy of the letter as an exhibit to their original complaint, they subsequently provided a copy as an exhibit to their response to HSBC's motion to dismiss.  (ECF No. 87-1 at 10).  The letter states that the Trevinos had not paid $636.36 in property taxes to Hidalgo County for 2010.  It goes on to state that if the Trevinos did not send proof of payment to HSBC, "[t]he payment will then be added to your loan and will be billed after discharge of the Chapter 13 Bankruptcy Plan."

This letter indicated that the Trevinos were delinquent in paying their 2010 property taxes. Although the Trevinos began paying the 2010 taxes through the trustee on April 21, 2011, as of March 20, 2013, the property taxes were still delinquent.  According to the trustee's records, the Hidalgo County taxes were not fully paid until September 18, 2014.  (ECF No. 78-1 at 130).  Because the letter correctly indicated that the property taxes were in default, HSBC

cannot be held liable for mischaracterizing the amount and character of a debt or using false and deceptive misrepresentations per 15 U.S.C. §§ 1692e(2) and 1692e(10).

It further threatened to charge the Trevinos for property tax payments after they had received their bankruptcy discharge, an action which would potentially violate the provisions of the Trevinos' confirmed plan.  Chapter 13 bankruptcy gives debtors the opportunity to remain in their homes and emerge from bankruptcy current on their mortgage payments with a fresh start. *Rodriguez v. Countrywide Home Loans, Inc. (In re Rodriguez)*, 421 B.R. 356, 365 (Bankr. S.D. Tex. 2009).  Section 1322(b)(5) allows mortgage payments to be cured and maintained through a bankruptcy plan while a case is pending.  *Id.*  Section 1327(a) further provides that "the provisions of a confirmed plan bind the debtor and each creditor. . . ."

The Trevinos, in their bankruptcy plan, proposed to cure their mortgage arrears under § 1322(b)(5) by paying $14,521.19 in arrears with 10% interest for 55 months.  (Case No. 10-70594; ECF No. 2 at 2).  HSBC received notice of the confirmation hearing and failed to object to the exclusion of past due property taxes in the plan.  (Case No. 10-70594; ECF No. 22).  In its letter, HSBC stated that it would bill the Trevinos for the unpaid property taxes after they received their discharge.  By that point in time, under the terms of the confirmed plan, all mortgage arrearages would have been cured.  When the Trevinos complete their final plan payment, they should be unfettered by arrearages on their home mortgage.  *Cano v. GMAC Mortgage Corp. (In re Cano)*, 410 B.R. 506, 518 (Bankr. S.D. Tex. 2009).  HSBC has in effect given notice of its intent to violate the terms of the plan.  The Trevinos have stated a claim that HSBC threatened to take an action it could not legally take in violation of 15 U.S.C. § 1692e(5). In addition, the Trevinos have stated a claim that the letter constituted a violation of 15 U.S.C. § 1692f(1) by attempting to collect a debt not permitted by law.

*The Texas Debt Collection Act*

    a.  State Law Claims Based on the 3002.1(c) Notice Are Preempted by the Bankruptcy Code

The Trevinos assert that Defendants violated several provisions of the Texas Debt Collection Act. Section 392.304(a)(8) of the TDCA prevents a debt collector from "misrepresenting the character, extent, or amount of a consumer debt, or misrepresenting the consumer debt's status in a judicial or governmental proceeding." Tex. Fin. Code § 392.304(a)(8). Section 392.304(a)(19) prevents a debt collector from "using any other false representation or deceptive means to collect a debt or obtain information concerning a consumer." *Id.* Finally, § 392.303(a)(2) prevents a debt collector from "collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer."

HSBC allegedly violated the above provisions of the TDCA by filing the erroneous 3002.1(c) notice and by sending the March 20, 2013 letter. U.S. Bank and Caliber allegedly violated the TDCA by refusing to withdraw the 3002.1(c) notice and continuing to demand payment of the 2010 taxes claimed in that Notice.

HSBC argues that the 3002.1(c) notice cannot be the basis for a TDCA claim because the Bankruptcy Code's comprehensive scheme for resolving claim objections preempts state law debt collection claims when it is based on filing an allegedly false proof of claim. Although this argument is at first blush similar to HSBC's FDCPA argument, the preemption analysis differs with regard to state law. *See Britt v. Grocers Supply Co.*, 978 F.2d 1441, 1446 (5th Cir. 1992)

("Because the root of the preemption doctrine lies in the tension of federal and state regulation, . . . the analysis of the tension between two conflicting federal statutes is somewhat different."). State law is preempted under the supremacy clause of the United States Constitution in three circumstances.  U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land. . . .").  First, Congress can explicitly define to what extent its enactments preempt state law.  *English v. GE Co.*, 496 U.S. 72, 78 (1990).  "Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively."  *Id.*  Third, state law is preempted to the extent that it actually conflicts with federal law.  *Id.*  Congressional intent is key to determining whether federal law preempts state law.  *California Fed. Sav. & Loan v. Guerra*, 479 U.S. 272, 280 (1987).

The Bankruptcy Code does not explicitly preempt state law causes of action regarding debt collection.  Nor does the TDCA appear to actually conflict with the Code.  Nevertheless, it is apparent that Congress has enacted a comprehensive regulatory scheme to regulate bankruptcy proceedings and state law remedies for abuse of bankruptcy provisions are preempted.  *See* U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power To . . . establish . . . uniform Laws on the subject of Bankruptcies throughout the United States. . . .)."  The 'vast majority' of courts to consider the issue have held that the Bankruptcy Code preempts state law claims arising from abusive bankruptcy filings or other wrongful conduct committed during a bankruptcy case.  *Pariseau v. Asset Acceptance, LLC*, 395 B.R. 492, 495 (Bankr. M.D. Fla. 2008).[10]  In *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, the Ninth Circuit noted that:

---

[10] *See also Glannon v. Garrett & Assocs., Inc.*, 261 B.R. 259, 264 (D. Kan. 2001); *Holloway v. Household Auto. Fin. Corp.*, 227 B.R. 501 (N.D. Ill. 1998); *In re Old Carco LLC*, 442 B.R. 196 (S.D.N.Y. 2010); *E. Equip. and Serv. Corp. v. Factory Point Nat. Bank, Bennington*, 236 F.3d 117 (2d Cir. 2001).

> a mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy Code ... demonstrates Congress's intent to create a whole system under federal control which is designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike. While it is true that bankruptcy law makes reference to state law at many points, the adjustment of rights and duties within the bankruptcy process itself is uniquely and exclusively federal.

74 F.3d 910, 913 (9th Cir. 1996).

Congress has granted exclusive jurisdiction over bankruptcy to the federal courts.  *See* 28 U.S.C. § 1334(a) ("Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all cases under title 11").  If the filing of a proof of claim could be subject to collateral attack in state court based on state law causes of action, it could disrupt the bankruptcy process.  "State courts are not authorized to determine whether a person's claim for relief under a federal law, in a federal court, and within that court's exclusive jurisdiction, is an appropriate one."  *Gonzales v. Parks*, 830 F.2d 1033, 1035 (9th Cir. 1996). Federal, not state law, must be the basis of claims stemming from filings under a federal statutory scheme.  To hold otherwise could allow state courts to develop standards "as to when persons could properly seek relief in federal court for claims which Congress has specifically precluded the state courts from adjudicating themselves."  *Koffman v. Osteoimplant Tech., Inc.*, 182 B.R. 115, 125 (D. Md. 1995).

Congress's intent to "create a whole system under federal control" is also demonstrated through the comprehensive array of remedies available to debtors complaining of erroneous proofs of claim in federal courts.  As noted above, 11 U.S.C. § 502(b) sets forth the process for challenging erroneous proofs of claim.  A debtor may also move for Rule 9011 sanctions and can bring suit under the FDCPA.  In cases of bad faith, § 105(a) sanctions could be appropriate. Where Congress has provided numerous federal remedies to combat a particular wrong, it

"suggests that Congress has considered the need to deter misuse of the process and has not merely overlooked the creation of additional deterrents." *MSR Exploration*, 74 F.3d at 915. *See also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987) (holding that in the ERISA context, "[t]he policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected under ERISA").

Finally, allowing state law causes of action to interfere in this manner will undercut the need for uniformity in the administration of bankruptcy laws. The Constitution grants Congress the power to create "uniform laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8. "There can be no doubt that Congress *did* place considerable weight on the need for a uniform bankruptcy process. . . ." *MSR Exploration*, 74 F.3d at 914. If a state legislature or court could decide what type of filing in a bankruptcy case is acceptable and what is not, the uniformity of the bankruptcy system would be endangered. *See Hanover Nat. Bank v. Moyses*, 186 U.S. 181, 188 (1902) ("The laws passed on [bankruptcy] must, however, be uniform throughout the United States, but that uniformity is geographical, and not personal. . . ."). The filing of a proof of claim cannot constitute a violation of the TDCA.

In the interest of clarity, the Court will distinguish between "field preemption" and "conflict preemption." The Trevino's TDCA claims based on the 3002.1(c) notice are preempted not because state and federal laws are in conflict, but because Congress has occupied the field. The TDCA allows plaintiff's to sue for actual damages, injunctive relief, and attorney's fees and also awards statutory damages of $100 for certain violations. Tex. Fin. Code § 392.403. Like the FDCPA, these provisions do not conflict with the Bankruptcy Code. In fact, the damages provisions of the FDCPA are more stringent because actual damages are not

required and courts may award up to $1,000 for each violation.  15 U.S.C. § 1692k.  Because field preemption does not apply to overlapping federal statutes, however, only the state statute can be said to have been preempted.  *See Lozano v. City of Hazleton*, 724 F.3d 297, 303 ("Field pre-emption occurs when Congress intends *federal* law to occupy the field.") (emphasis added) (internal quotation marks omitted).  Accordingly, the TDCA claims with regards to the 3002.1(c) notice are preempted by the Bankruptcy Code and must be dismissed.[11]

> b. The Trevinos Have Stated a Claim For Relief as to the March 20, 2013 Letter Pursuant to Tex. Fin. Code § 392.303(a)(2)

The Trevinos further allege that the letter sent by HSBC on March 20, 2013 violated §§ 392.304(a)(8) and 392.304(a)(19) of the TDCA.  Because HSBC sent his letter directly to the Trevinos independent of the bankruptcy process, preemption analysis does not apply here.  Instead,  HSBC argues that these claims must fail because the Trevinos have not identified any damages caused as a result of the letter.  The TDCA generally requires a showing of actual damages in order to receive a monetary award other than attorney's fees.  Tex. Fin. Code § 392.403(a).  But this is a 12(b)(6) motion to dismiss.  The Trevinos are not required to prove actual damages at this stage.  The Court need only review the amended complaint to determine whether it can withstand a 12(b)(6) motion to dismiss. *See Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000).  Because the Trevinos have stated in their complaint that they suffered actual damages as a result of the letter, they have satisfied the general pleading requirements for damages.  *See  Am. Realty Trust, Inc. v. Matisse Capital Partners, LLC*, 2001

---

[11] The Trevinos point to a recent decision by the Fifth Circuit in support of their assertion that the TDCA is not preempted by the Bankruptcy Code.  *Barzelis v. Flagstar Bank, F.S.B.* held that the TDCA is not preempted by the Home Owners' Loan Act of 1933.  2015 WL 1849650 at *4 (5th Cir. Apr. 22, 2015).  The Fifth Circuit found that state consumer protection laws have no more than an incidental impact on lending and therefore escape preemption. *Id.*  This is in direct contrast to bankruptcy, where making a filing in a bankruptcy proceeding actionable under state consumer protection laws would have a severe impact on bankruptcy in general.  Accordingly, the Trevinos' reliance on *Barzelis* is misplaced.

WL 1343765 at *2 (N.D. Tex. Oct. 26, 2001) ("[G]eneral damages [are] subject to no particularized pleading requirement.").

Nevertheless, the Trevinos' §§ 392.304(a)(8) and 392.304(a)(19) claims regarding the March 20, 2013 letter must fail for the same reason as their FDCPA claims.  HSBC did not misrepresent the character and amount of the debt or use a false representation or deceptive means to collect the debt because the property taxes were in fact in default.  These claims must be dismissed.

The Trevinos have also alleged violations of § 392.303(a)(2) of the TDCA.  Section 392.303(a)(2) prohibits debt collectors from attempting to collect fees or expenses incidental to the original obligation to the debt collector which are not expressly authorized by the agreement creating the obligation.  The deed of trust states that "[i]f Borrower is obligated to pay Escrow Items [which includes the property taxes in question], pursuant to a waiver, and Borrower fails to pay the amount due . . ., Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount."  (ECF No. 78-1 at 15).  In 2013, when HSBC filed the 3002.1(c) notice based on the 2010 property taxes, the Trevinos had been paying the taxes for two years through the chapter 13 trustee. However, in its letter, HSBC informed the Trevinos that it *may* charge the Trevinos in the future if they failed to provide proof of payment.  Section 392.303(a)(2) requires an actual attempt unauthorized fees or expenses, not merely the threat of possible future action.  *See Shin v. Chase Home Fin., LLC*, 2014 WL 2993815, at *3 (Tex. App.—Dallas June 30, 2014, reh'g overruled) (holding that in order violate § 392.303(a)(2), the creditor must make a request for payment). Accordingly, the Trevinos claim under § 392.303(a)(2) of the TDCA is dismissed.

*Violations of the Automatic Stay as to Letters Sent to the Trevinos*

The Trevinos allege that by sending the letters dated March 10, 2011, April 13, 2011, June 9, 2011, July 13, 2011, and March 20, 2013, HSBC violated the automatic stay provisions of the Bankruptcy Code.  11 U.S.C. § 362(a)(3) states that a bankruptcy petition operates as a stay against "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  Although not specifically alleged, the complaint also sets forth an obvious § 362(a)(6) claim.[12]  Section 362(a)(6) prevents "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title."  HSBC's argument against the inclusion of an automatic stay violation is threefold.  First, it alleges that § 362(a)(3) is an 'anti-grab' which prohibits only those acts which physically take possession of estate property.  Second, it argues that because the claim for delinquent property taxes was not a prepetition claim, it does not fall within the ambit of § 362(a)(6).  Finally, it argues that because the Trevinos were not damaged by merely receiving the letters, their claims must fail.

a.  11 U.S.C. § 362(a)(3)

HSBC is correct in characterizing § 362(a)(3) as an anti-grab statute.  *See Padilla v. Wells Fargo Home Mortg., Inc. (In re Padilla)*, 379 B.R. 643, 665 (Bankr. S.D. Tex. 2007) ("Section 362(a)(3) is essentially an 'anti-grab' law statute."); 3 Collier on Bankruptcy ¶ 362.03(5)(a) (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014) ("It . . . requires that no entity grab non-estate property *from* the estate. . . ."); *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 979 (1st Cir. 1995) ("Bankruptcy Code § 362(a) . . . protects . . . the debtor and its property from creditor 'grab-law' tactics after 'the race to the courthouse.'").  Put another way, § 362(a)(3) is "generally viewed as a provision designed to prevent the 'dismemberment' of the

---

[12] The federal pleading rules "do not countenance dismissal of a complaint for an imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby*, 135 S.Ct. 346, 346 (2014).

bankruptcy estate until the bankruptcy process permits either a financial reorganization of the debtor or an orderly liquidation of the assets of the bankruptcy estate." *Allentown Ambassadors, Inc. v. N.E. Am. Baseball, LLC (In re Allentown Ambassadors, Inc.)*, 361 B.R. 422, 435-36 (Bankr. E.D. Pa. 2007). *See also SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 439 (5th Cir. 1981) (stating that, in the context of § 362(a)(3), the automatic stay "applies to prevent dismemberment of the estate").

The Trevinos have provided copies of the five letters dated March 10, 2011, April 13, 2011, June 9, 2011, July 13, 2011, and March 20, 2013.  As each of the letters is quite similar, quoting from one will suffice.  The July 13 letter states in part:

> We recently mailed you a letter informing you that the taxes on the property securing the above referenced loan are seriously delinquent. . . .  It is critical that proof of payment, in the form of either a canceled check or tax payment receipt, or copy of a confirmed Chapter 13 Bankruptcy Plan be forwarded to the address listed on the coupon below or facsimile to (817)-XXX-XXXX. . . .
>
> This is our final request.  If we do not receive the above requested proof of payment within 15 days of this letter, we may advance payment on your behalf, pursuant to the terms of your mortgage.  The payment will then be added to your loan and will be billed after discharge of the Chapter 13 Bankruptcy Plan.

(ECF No. 78-1 at 72).  , HSBC did not act to "obtain possession of property of the estate or of property from the estate."[13]  Accordingly, in order for the Trevinos to state a claim for relief under § 362(a)(3), HSBC must have "exercise[d] control over property of the estate."

When first enacted, § 362(a)(3) only applied to acts to obtain property of the estate or property from the estate.  In 1984, Congress expanded § 362(a)(3) to forbid any act to "exercise

---

[13] By stating that it would bill the Trevinos after the dismissal of the Chapter 13 case, HSBC potentially acted to obtain property.  However, because it threatened to act only after the end of the case, it did not act to obtain *estate* property.  This Court has adopted the 'reconciliation approach' with regards to estate termination in a chapter 13, holding that plan confirmation the estate continues to accumulate property until a case is "closed, dismissed, or converted."  *Rodriguez v. Countrywide Home Loans, Inc.*, 421 B.R. 356, 374 (Bankr. S.D. Tex. 2009).  Once the case ends, the estate is terminated.

control" over the estate, but did not provide an explanation of the amendment.  *Harchar v. United States*, 393 B.R. 160, 169 (Bankr. N.D. Ohio 2008).  The term control is not generally defined by the Bankruptcy Code.  Accordingly, the 1984 amendment has been subject to conflicting interpretations by the courts and has been deemed ambiguous.  *See, e.g.*, *In re Young*, 193 B.R. 620 (Bankr. D.D.C. 1996) (compiling various interpretations of "exercise control" and finding the phrase ambiguous); *Beker Indus. Corp. v. Fla. Land and Water Adjudicatory Comm'n*, 57 B.R. 611, 626 (Bankr. S.D.N.Y. 1986) (acknowledging that its interpretation of "exercise control" was contrary to how the statute is worded on its face); *Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 707 (7th Cir. 1994).

Black's defines control as "to exercise power or influence over" or "to regulate or govern."  *Black's Law Dictionary* 330 (7th ed. 1990).  Of course, by obtaining possession of property one can also be said to have exercised control over it.  However, this cannot be what control means in the context of § 362(a)(3), because an elementary canon of construction is to avoid an interpretation which renders a portion of a statute superfluous.  *United States v. Campbell*, 49 F.3d 1079, 1086 (5th Cir. 1995).  Control, therefore, must be exercised in manner that does not include possession.  Control without possession can be seen in *Beker Industries*, where a state regulatory agency attempted to put a halt, pursuant to a Florida statute, to the debtor's practice of transporting phosphate ore by truck.  57 B.R. at 615-17.  By regulating the transport of ore from the mine, the state agency had exercised control over estate property by ordering it to cease.[14]  *Id.* at 626.  The right to cancel an insurance policy of the debtor is also stayed by §362(a)(3) because it is an act to exercise control over estate property.  *In re Minoco*

---

[14] Despite having exercised control, however, the court found that the government's action fell within the exemption for the good faith exercise of police and regulatory power under § 362(b)(4) and could not constitute a violation of the automatic stay.  *Id.* at 626.

*Grp. of Companies, Ltd.*, 799 F.2d 517, 519 (9th Cir. 1986).  An insurance company who cancelled a policy did not obtain possession of the policy, but by cancelling the policy it exercised its power or influence over the policy.

By directing the Trevinos to pay money to a third party, HSBC arguably used threats in an attempt to take property away from the estate.[15]   The three letters provided by the Trevinos show that HSBC directed them to pay a total of $1,204.14 to Edinburg City and Hidalgo County. At the time HSBC sent the letters, these claims were being paid in an orderly fashion out of the bankruptcy estate under court supervision.   HSBC's attempts to force payment in a lump sum would have dismembered the estate and endangered the ability of the Trevinos to successfully reorganize.   This is precisely the type of activity that § 362(a)(3) is designed to curtail.   The complaint plausibly sets forth a scenario where HSBC attempted to exercise control over property of the estate.   Accordingly, the Trevinos have stated a claim for violations of § 362(a)(3).

b.  11 U.S.C. § 362(a)(6)

HSBC argues that its letters could not have violated § 362(a)(6) because the claims in question arose post-petition.   Section 362(a)(6) only applies to pre-petition claims.   *Padilla v. Wells Fargo Home Mortg., Inc.*, 379 B.R. 643, 662 (Bankr. S.D. Tex. 2007).   The Trevinos filed for bankruptcy on August 25, 2010.   Because HSBC did not make any payments on the property taxes until June of 2011, it argues that any claim for reimbursement must be post-petition.   The Trevinos argue instead that because their obligation to pay the 2010 property taxes arose on

---

[15] HSBC never specifically directed that payments should be made out of estate property.  However, according to the Trevinos' bankruptcy schedules, the entirety of their income was derived from wages.  (Case No. 10-70594; ECF No. 1 at 24).  They scheduled no savings accounts.  Post-petition wages are property of the estate in a chapter 13 case.  11 U.S.C. § 1306(a)(2).  Accordingly, any attempt to take money from the Trevinos post-petition would be, necessarily, an attempt to take money out of the estate.  *See Rodriguez v. Countrywide Home Loans, Inc. (In re Rodriguez)*, 421 B.R. 356, 379-80 (Bankr. S.D. Tex. 2009) (holding that in the context of Rule 2016 fees, fees charged to a debtor post-petition would come out of property of the estate because the debtor's income is property of the estate).

January 1, 2010, HSBC's claim must be pre-petition.  The question of when a property tax obligation arises is determined by state law.  *Midland Cent. Appraisal Dist. v. Midland Indus. Serv. Corp. (In re Midland Indus. Serv. Corp.)*, 35 F.3d 164, 167 (5th Cir. 1994).  Under Texas law, a property owner's liability for taxes in a given year arises on January 1 of that year, regardless of when the taxes are assessed.  *Id.* (citing Tex. Tax Code § 32.01).  A tax lien attaches to the property on that date.  Tex. Tax Code § 32.01.  Neither argument applies the correct standard for when a claim accrues as articulated by the Fifth Circuit.  Although the Court rejects the Trevino's assertion that the claim arose as soon as the tax lien arose on January 1, 2010, they are nevertheless correct that the claim arose pre-petition.

Section 101(5)(A) of the Bankrupty Code defines claim as a "right to payment, whether or not such right is reduced to judgment, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).  The definition of claim is as broad as possible.  *Penn. Dept. of Pub. Welfare v. Davenport*, 495 U.S. 552, 558 (1990).  The question of just how broad that definition is with regards to unaccrued claims is, however, a "complex one."  *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1275 (5th Cir. 1994).

Courts have adopted three different tests for determining when a claim for tort or breach of contract accrues under the Bankruptcy Code.  *Lycoming Engines v. Superior Air Parts, Inc. (In re Superior Air Parts, Inc.*, 486 B.R. 728, 739 (Bankr. N.D. Tex. 2012).  The "accrual test" holds that a cause of action does not accrue until it accrues under state law, meaning that no claim exists until a right to payment accrues under state law.  *In re M. Frenville Co.*, 744 F.2d 332, 337 (3d Cir. 1984).  Due to the accrual's approach inequitable results with regards to

indemnification claims, it has been 'universally rejected.'[16]  *Grossman's Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 120 (3d Cir. 2010) (overturning *Frenville*).  The 'conduct test' instead holds that a bankruptcy claim arises when the debtor's conduct giving rise to the alleged liability occurred.  *Grady v. A.H. Robins Co. (In re A.H. Robins Co.)*, 839 F.2d 198, 203 (4th Cir. 1988).  This test has been criticized as being too broad, because claimants who have had no prepetition contact with the debtor would be subject to the bankruptcy discharge potentially before their injury even manifested.  *Superior Air Parts*, 486 B.R. at 739.

The Fifth Circuit has adopted the 'pre-petition relationship' test, which attempts to strike a middle ground between the accrual and conduct tests.  *Id.*  Under this test, in order for a future claimant to have a pre-petition claim under the Code, "there must be some prepetition relationship, such as contact, exposure, impact, or privity, between the debtor's prepetition conduct and the claimant."  *Levelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1277 (5th Cir. 1994) (quoting *In re Piper Aircraft Corp.*, 162 B.R. 619, 627 (Bankr. S.D. Fla. 1994)).  "[T]he debtor's conduct must take place pre-petition, but the future claimant must also have some pre-petition relationship with the debtor."  *Superior Air Parts*, 486 B.R. at 739 (emphasis omitted).  In order for a claim to arise under the Code, it must have been within the "fair contemplation of the parties" at the time of bankruptcy.  *Cal. Dep't of Health Serv. v. Jensen (In re Jensen)*, 995 F.2d 925, 930 (9th Cir. 1993).

Courts applying the pre-petition relationship test to an indemnification claim have found that the operative date for a bankruptcy claim is when the agreement was executed, not when the

---

[16]  A&B prepared certain financial filings for M. Frenville Co in 1978 and 1979. *Frenville*, 744 F.2d at 333. Creditors forced Frenville into bankruptcy in 1980.  Certain third parties then sued A&B in state court for negligently and recklessly preparing the financial statements in 1981.  *Id.*  In 1983, A&B attempted to lift the automatic stay in the Frenville case to join Frenville as a third-party defendant in order to obtain indemnification or contribution from Frenville.  The court held that because a cause of action for indemnification does not accrue until the actual payment of a judgment flowing from the initial act, the indemnification claim was post-petition and not subject to the automatic stay.  *Id.* at 337.

facts giving rise to actual liability occurred.  For example, in *Colonial Sur. Co. v. Weizman*, Weizman and Colonial had entered into an indemnification agreement in 1998.  564 F.3d 526, 528 (1st Cir. 2009).  Weizman filed bankruptcy in 2005 and received a discharge in 2006.  *Id.*  In 2007, Colonial sued Weizman on the indemnification contract relating to a construction project which began in September 2006, after Weizman had received a discharge.  *Id.*  Weizman objected to the judgment against him, arguing that his obligation under the indemnification agreement had been discharged in bankruptcy.  The court held that "Weizman's position is correct and that Colonial's claims rested on an earlier obligation that comprised a contingent claim capable of being discharged by his later bankruptcy."  *Id.* at 530.  Even though the project which gave rise to the indemnification claim did not occur until after Weizman had obtained a discharge, the signing of the indemnification agreement itself gave rise to a contingent claim.  *Id.*

Similarly, in *Superior Air Parts*, Superior and Lycoming Engines entered into an indemnification agreement in 1999 whereby Superior indemnified Lycoming for any liability resulting from design defects.  486 B.R. at 731.  Superior filed for bankruptcy in 2008, confirmed a plan, and obtained a final decree in September of 2010.  *Id.* at 733.  In 2012, Lycoming sued Superior in state court based on Superior's failure to indemnify Lycoming for lawsuits filed against it post-confirmation. *Id.* at 738.  Superior argued its obligations under the indemnification agreement had been terminated following plan confirmation.  Again, even though the conduct giving rise to the indemnification claim occurred post-petition, the court found that because the indemnification agreement was executed pre-petition, the right to indemnification was a pre-petition claim.  *Id.* at 739.

In the present case, the Trevinos and HSBC entered into a contract on February 21, 2005. The deed of trust states: "[i]f Borrower is obligated to pay Escrow Items directly, pursuant to a

waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated . . . to repay any such amount."  (ECF No. 78-1 at 15).  There is no question that the parties had a pre-petition relationship or that a potential breach of the contract was within the fair contemplation of the parties at the time of bankruptcy.  Indeed, the contract contained language specifying HSBC's remedies if the Trevinos failed to pay property taxes.  Regardless of when the actual breach occurred, the breach was a foreseeable outcome of the pre-petition contract.  Accordingly, HSBC's claim against the Trevinos is pre-petition.

Although the claim was pre-petition, HSBC's letter must still have constituted an "act to collect, assess, or recover" to constitute a violation of the statute.  Unlike the TDCA, the mere threat of future action can be considered an act to collect.  "The language in Section 362(a)(6) is extremely broad in scope and encompasses any act to collect a pre-petition claim from a debtor." *Rosas v. Monroe Cnty. Tax Claim Bureau*, 323 B.R. 893, 898 (Bankr. M.D. Pa. 2004).  Eventual, or even planned, collection of a debt may constitute a violation of § 362(a)(6).  *United States v. Harchar*, 371 B.R. 254, 269 n. 19 (N.D. Ohio 2007).  The Trevinos' complaint alleges that HSBC threatened to bill them on account of a pre-petition claim after they had obtained a bankruptcy discharge if they did not provide proof of payment.  They have stated a claim for a violation of the automatic stay per 11 U.S.C. § 362(a)(6).

c.   Damages

HSBC's final argument against a claim based on the violation of the automatic stay is that the Trevino's have not suffered an actual injury.  The Trevinos do not allege that they made any payments based on the letters sent by HSBC.  11 U.S.C. § 362(k) states that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages,

including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages."  Actual damages are a prerequisite to any damages award.  *Turner v. First Cmty. Credit Union (In re Turner)*, 462 B.R. 214, 224 (Bankr. S.D. Tex. 2011).  HSBC claims that the Trevinos will not be able to prove actual damages because its alleged violations of the stay were ultimately unsuccessful.

This argument must fail.  The Trevinos have pled that they were forced to retain counsel as a result of HSBC's actions and incurred reasonable and necessary attorney's fees.  By the use of the word 'including' in the statute, Congress clearly indicated that attorney's fees are to be considered actual damages.  *See Sternberg v. Johntson*, 595 F.3d 937, 946 (9th Cir. 2009) ("Without a doubt, Congress intended §362(k)(1) to permit recovery as damages of fees incurred to prevent violation of the automatic stay.").  Because attorney's fees are actual damages, once a plaintiff alleges that they incurred fees as a result of the violation, there is no need to plead additional damages.  *See Vázquez Laboy v. Doral Mortg. Corp. (In re Vázquez Laboy)*, 647 F.3d 367, 376 (1st Cir. 2011) ("The Debtors claim injury: they have expended court costs and attorneys' fees in order to vindicate the automatic stay, and the statute mandates that they may recover both as actual damages.").  Having pled attorney's fees, there is no need for the Trevinos to do more.

*Negligence*

a. The Trevinos' Negligence Claims Are Properly Characterized as Negligent Misrepresentation Claims

The Trevinos allege that HSBC breached a duty owed to them by demanding they pay amounts not actually owed.  They further allege that HSBC's actions constituted gross negligence because HSBC's conduct involved an extreme degree of risk and a high probability of substantial harm to the Trevinos.  Because HSBC allegedly knew or should have known that

the property taxes had been refunded, it was foreseeable that the Trevinos would be severely prejudiced by the filing of the 3002.1(c) notice. HSBC responds that the negligence and gross negligence claims must fail because the Trevinos cannot establish that HSBC owed them a legal duty.

Under Texas law, a successful negligence claim requires a showing of a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by that breach. *D. Houston, Inc. v. Love,* 92 S.W.3d 450, 454 (Tex. 2002). A gross negligence claim, in addition to the elements of a simple negligence claim, requires a plaintiff to prove that "(1) viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others." *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001).

The threshold inquiry in any negligence case is duty. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987). To impose a duty in tort upon parties to a contract, the court must first find that a special relationship exists between them. *Farah v. Mafrige & Kormanik, P.C,* 927 S.W.2d 663, 675 (Tex. App.—Houston 1996, no writ); *Carrington v. Bank of Am., N.A.,* 2013 WL 265946, at *7 (S.D.Tex. Jan. 17, 2013). No such relationship exists under a contract between mortgagor and mortgagee. *Carrington*, 2013 WL 265946 at *7; *FDIC v. Coleman*, 795 S.W.2d 706, 709 (Tex. 1990); *UMLIC VP LLC v. T&M Sales and Envtl. Sys., Inc.*, 176 S.W.3d 595, 612 (Tex. App.—Corpus Christi 2005, no pet.).

The duty analysis does not end there. Despite the general rule against imposing a duty in the context of a mortgagor-mortgagee relationship, a lender may still owe a borrower the duty to

exercise reasonable care to avoid a foreseeable risk of injury to the borrower.  *Hurd v. BAC Loan Servicing, LP*, 880 F. Supp.2d 747, 763 (N.D. Tex. 763) (citing *Thrash v. Ocwen Loan Servicing, LLC*, 433 B.R. 585, 598-97 (Bankr. N.D. Tex. 2010).   Every person has a duty to exercise reasonable care to avoid a *foreseeable* risk of injury to others.  *Lukasik v. San Antonio Blue Haven Pools, Inc.*, 21 S.W.3d 394, 403 (Tex. App.—San Antonio 2008, no pet.) (citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987)).   When the case law has not imposed a clear legal duty, courts must examine the facts surrounding the event in question.  *Pichardo v. Big Diamond, Inc.*, 215 S.W.3d 497, 501 (Tex. App.—Fort Worth 2007, no pet.).   In determining whether the defendant was under a duty to the plaintiff, a court must balance several factors, including the risk, foreseeability, and likelihood of the injury weighed against the social utility of the actor's conduct, the cost of guarding against the injury, and the consequences of placing the burden on the defendant.  *Otis Eng'g Corp. v. Clark*, 688 S.W.2d 307, 312 (Tex. 1983).

No such risk-utility balancing is necessary here, however, because numerous courts applying Texas law have held that even without a special relationship giving rise to a duty of care, there is always a duty to correct one's own prior false or misleading statement.  *Hurd v. BAC Loan Servicing, LP*, 880 F. Supp.2d 747, 763 (N.D. Tex. 2012) (citing *Trustees of the Nw. Laundry & Dry Cleaners Health & Welfare Trust Fund v. Burzynski*, 27 F.3d 153, 157 (5th Cir. 1994); *Nazareth Int'l, Inc. v. J.C. Penney Corp.*, 2005 WL 1704793 at *6 (N.D. Tex. July 19, 2005).   The Restatement (Second) of Torts imposes a duty to correct untrue statements made under similar circumstances:

> § 551. Liability for Nondisclosure
> ….
> (2) One Party to a business transaction is under a duty to exercise reasonable care to disclose to other before the transaction is consummated,
> ….

> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so. . . .

Restatement (Second) of Torts § 551 (1977).

The Trevinos have alleged that HSBC made a statement which it knew—or should have known—was false.  If these allegations are correct, then HSBC had a duty to correct the 3002.1(c) notice.

Nevertheless, the cases listed above have only imposed an affirmative duty to correct prior false statements for *negligent misrepresentation* claims, a separate tort from ordinary negligence.  *See Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (holding that the remedy for breach of the duty to use reasonable care in providing information is negligent misrepresentation). A claim for negligent misrepresentation consists of four elements: (1) the defendant made a misrepresentation in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation.  *Id.*  To the extent that the Trevinos can pursue any causes of action based on negligence, it must be for negligent misrepresentation rather than ordinary or gross negligence.

b.  Economic Loss Doctrine

HSBC urges that regardless of the existence of a duty, the Trevinos' negligent misrepresentation claims must fail because the Trevinos have not pled non-economic damages. "The law has long limited the recovery of purely economic damages in an action for negligence." *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 238 (Tex. 2014).  The justification for

this rule is simple: while the physical consequences of negligence are usually limited, its economic consequences "may be far wider, indeed virtually open-ended." *Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1022 (5th Cir. 1985) (quoting Fleming James, Jr., *Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal*, 25 Vand. L. Rev. 43, 45 (1972). The Restatement provides as a general rule that "there is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract between the parties." Restatement (Third) of Torts: Liability for Economic Harm § 3 (2012).

The Texas Supreme Court has applied the economic loss "only in cases involving defective products or failure to perform a contract." *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011). In those two situations, the parties' economic losses are more appropriately addressed through statutory warranty actions or common law breach of contract claims. *Id.* If a party's negligent misrepresentation claim "sounds only in contract," rather than tort, then the economic loss rule will apply and bar recovery of economic damages. *D.S.A., Inc. v. Hillsboro Indep. School Dist.*, 973 S.W.2d 662, 663 (Tex. 1998). "In determining whether a tort claim is merely a repackaged breach of contract claim, a court must consider: 1) whether the claim is for breach of duty created by the contract, as opposed to a duty imposed by law; and 2) whether the injury is only the economic loss to the subject of the contract itself." *Hurd v. BAC Loan Servicing, LP*, 880 F. Supp.2d 747, 763 (N.D. Tex. 2012) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.,* 960 S.W.2d 41, 45–47 (Tex. 1998)).

As previously mentioned, HSBC's duty to correct its false statement did not come from the contract, but is an independent duty imposed by the common law. Furthermore, the damages

the Trevinos are attempting to recoup are the expenses they incurred in fighting the potential dismissal of their bankruptcy case based on the 3002.1(c) notice.  Just as in *Hurd*, where the plaintiff attempted to recover attorneys' fees and out-of-pocket expenses based on erroneous notices of acceleration, the damages sought here are completely separate from "damages constituting the benefit of her contract with the defendant."  *Hurd*, 880 F. Supp.2d at 764.  The Trevinos' negligent misrepresentation claim does not sound in contract and accordingly is not subject to the economic loss doctrine.

   c.  Reliance

   HSBC argues additionally that because the Trevinos have failed to plead justifiable reliance, their negligent misrepresentation claim must be dismissed.  Actual and justifiable reliance is an essential element of a negligent misrepresentation claim. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010).  The Trevinos have in no way alleged that they relied on HSBC's erroneous statement.  While the trustee relied on the 3002.1(c) notice by disbursing money based on that notice, the Trevinos have not explained how they have standing to sue based on a third party's reliance.  A defendant may be liable for fraud if it makes a representation to a third party with the intention that it be repeated to the plaintiff, but that is not the situation presented here.  *See Rutherford v. Atwood*, 2003 WL 22053687, at *5 (Tex. App.—Houston Aug. 29, 2003, no pet.).    Because the Trevinos have failed to plead justifiable reliance, the negligent misrepresentation claim is dismissed with prejudice.

*Unreasonable Debt Collection*

   The Trevinos assert that the actions of Defendants constitute unreasonable debt collection under Texas law.  Texas recognizes the common law tort of unreasonable collection, but courts have apparently had some difficulty settling on a precise standard.  *See EMC Mortg. Co. v.*

*Jones*, 252 S.W.3d 857, 868 (Tex. App.—Dallas 2008, no pet.) ("The method of submission to a jury is as varied as the conduct giving rise to the tort.").  The Trevinos urge the Court to adopt the standard used in *EMC Mortgage*: "Did [defendant] make any unreasonable efforts to collect to the loan. . . .?"  Although the court did uphold that standard which was submitted to the jury, it appeared to do so with great reluctance.  Because neither party objected to the jury instruction at the proper time, the appellate court was barred from reviewing any error in the instruction.  *EMC Mortg.*, 252 S.W.3d at 869.  The court noted that a more 'precise' standard as "efforts that amount to a course of harassment that was willful, wanton, malicious, and intended to inflict mental anguish and bodily harm."  *Id.* (citing *Montgomery Ward & Co. v. Brewer*, 416 S.W.2d 837, 844 (Tex. Civ. App.—Waco 1967, writ ref. n.r.e.).  *See also Vanderbilt Mortg. and Fin., Inc.*, 746 F. Supp.2d 819, 837 (S.D. Tex. 2010) (applying the *Montgomery Ward* standard).  The Court adopts the *Montgomery Ward* standard.

The Trevinos have failed to plead the willful, wanton, and malicious intent necessary to sustain an unreasonable debt collection claims against Defendants.  As discussed above, HSBC did not act in bad faith.  At most, the Trevinos have alleged that US Bank and Caliber filed transfers of claim with this Court and have accepted payments from the trustee on the 3002.1(c) notice.  This does not rise to the level of willful, wanton, and malicious.  Accordingly, the unreasonable debt collection claims must be dismissed as to all defendants.

*Breach of Contract*

Count 12 of the Second Amended Complaint alleges that HSBC and US Bank breached certain contractual provisions of the note and deed of trust.  Although the complaint does not specifically allege which contractual provisions were violated, it states that "Defendants breached the contract by demanding that Plaintiffs pay amounts not due under the contract, and

accepting payments of property of the estate from the Trustee for amounts not due under the contract." (ECF No. 78 at 28).  HSBC and US Bank argue that the breach of contract claim must be dismissed because the Trevinos failed to allege which contractual provisions were allegedly breached and further that the Trevinos were in default under the note and deed of trust.[17]  The Court will address these arguments in turn.

In Texas, the elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App.—Forth Worth 2010, no pet.).  Federal courts in this circuit, applying the pleading standards of Rule 8(a), have consistently held that a plaintiff must identify the specific contract provisions that the defendant allegedly breached. *See, e.g.*, *Baker v. Great N. Energy, Inc.*, 2014 WL 6805483, at *4 (N.D. Tex. Dec. 3, 2014) (stating that the general rule is that a plaintiff must point to a specific provision in the contract that was breached by the defendant); *Innova Hosp., San Antonio, L.P. v. Blue Cross and Blue Shield of Ga., Inc.*, 995 F. Supp.2d 587, 602 (N.D. Tex. 2014); *Chapa v. Chase Home Fin. LLC*, 2010 WL 5186785 at *5 (S.D. Tex. Dec. 15, 2010).

The Trevinos acknowledge that the complaint fails to comply with this general rule, but they contend that the oversight was trivial due to the lack of confusion.  The Court agrees.  In

---

[17] Defendants also argue in the alternative that "any state law breach of contract [claim] based on filing an erroneous claim in the bankruptcy court is equally preempted by the Bankruptcy Code."  Although the Court previously held that the Trevino's TDCA claims were preempted by the Code, the breach of contract claim is distinguishable.  If plaintiffs were allowed to assert state law claims objecting to the procedures followed in a bankruptcy court, then a state could effectively override federal bankruptcy law.  But with regards to the breach of contract claim, the Trevinos are not objecting to the procedures used during the bankruptcy proceeding, rather they are objecting to Defendants collecting money in a manner not authorized by the contract.  "[A] federal bankruptcy court should take whatever steps are necessary to ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued." *Butner v. United States*, 440 U.S. 48, 56 (1979).  In the absence of a conflict with the Code, state law governs the interpretation and application of a mortgage contract. *In re Gifford*, 256 B.R. 661, 664 (Bankr. D. Conn. 2000).  Because the inquiry here is limited to whether Defendants violated the terms of the note and deed of trust, there is no danger that state law could override the Bankruptcy Code.

*Chapa v. Chase Home Finance*, the district court dismissed the breach of contract complaint because the plaintiffs "failed to provide the loan documents and failed to indicate which loan documents—let alone which provisions—were breached. . . ." *Chapa*, 2010 WL 5186785 at *5. Here, there is no question that the Trevinos are alleging breaches of the note and deed of trust— both executed on February 21, 2005—which were attached as exhibits to the complaint. (ECF No. 78-1 at 6-38).

In addition, *Baker v. Great Northern Energy*, a case cited by Defendants, makes clear that the purpose behind the general rule of pointing to a specific contract provision is to prevent "vague and conclusory allegations" which deprive defendants of fair notice. 2014 WL 6805483 at *4. The allegations in the complaint may have been vague and conclusory, but it is apparent that Defendants had fair notice. In its motion to dismiss, HSBC argues that the deed of trust specifically required the Trevinos to pay the property taxes, and if they did not, HSBC could "pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount." (ECF No. 79 at 5). This is the exact contractual provision that the Trevinos claim *did not* authorize HSBC to seek repayment.[18] Section 9 of the agreement then allows the Lender to "do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument. . . ." (ECF No. 1-1 at 17). The Trevinos argue that because HSBC was reimbursed for the property taxes, the contract did not allow it to then seek a second reimbursement from the Trevinos. Because there does not seem to be any

---

[18] The Trevinos claim that Defendants sought and received repayment to which they were not entitled under the terms of the contract. This is still a breach of contract claim, although no specific contractual provisions were violated. For example, in *Nance v. Resolution Trust Corp.*, the defendant allegedly retained more than the 10% of certain advances it was entitled to under the contract. 803 S.W.2d 323, 327 (Tex. App. 1990). The court held that, "[t]o support the jury's finding of breach of contract, there must be more than a scintilla of competent evidence showing that Alamo's actions were not authorized by the loan agreement. Stated conversely, there must be some evidence that Nance's claims to the 10% retainage and the line item requests were justified by the agreement." *Id.* at 328.

confusion with regards to the pertinent contractual provisions, granting a motion to dismiss due to a trivial defect is not appropriate.

Defendants' second argument for dismissal of the breach of contract claim is that the Trevino's were in default under the deed of trust. "It is a well established rule that a party to a contract who is himself in default cannot maintain a suit for its breach." *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990) (citing *Gulf Pipe Line Co. v. Nearen*, 138 S.W.2d 1065, 1068). In *Walker v. BAC Home Loans Servicing, LP*, the court dismissed the plaintiff's breach of contract claims against a mortgage servicing company where the plaintiff had defaulted on the mortgage and faced a foreclosure. 2014 WL 2863758 at *1 (S.D. Tex. June 24, 2014). This strict rule has been ameliorated, however, by the concept of a material breach. "Generally, one party's breach does not excuse the other's performance *unless the breach is material*." *Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 755 (Tex. 2013) (emphasis added) (citing Restatement (Second) of Contracts § 237 (1981) ("[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.").

In determining whether a breach of contract is material, the following factors are significant: (1) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (2) the extent to which the injured party can be adequately compensated for the breach; (3) the extent to which the party failing to perform will suffer forfeiture; (4) the likelihood that the breaching party will cure its breach, taking into account all of the circumstances including any reasonable assurances; and (5) the extent to which the behavior of the breaching party comports with standards of good faith and fair dealing. *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 n.2 (Tex. 1994) (citing Restatement (Second) of Contracts §

241 (1981)).  "The less the non-breaching party is deprived of the expected benefit, the less material the breach."  *Hernandez*, 875 S.W.2d at 693.  Whether a breach is material is a question of fact.  *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex. 1983).

After examining the relevant factors, it is apparent the Trevinos have set forth a plausible claim that their breach was non-material.  It is undisputed that prior to filing for bankruptcy the Trevinos had failed to make payments under the note.  According to the Trevinos' chapter 13 plan, the note was $18,249.14 in arrears as of the date they filed bankruptcy.  (Case No. 10-70594; ECF No. 2 at 7).  In its proof of claim, HSBC indicated the arrearages were $19,685.50.  The Trevinos proposed to cure these arrearages through their bankruptcy plan.  11 U.S.C. § 1322(b)(3) provides that a plan may "provide for the curing or waiving of any default."  The confirmed plan proposed to cure these arrearages through pro rata payments over 55 months.  (Case No. 10-70594; ECF No. 2 at 7).  Defendants do not contest the fact that the Trevinos have continued to make payments under plan for more than four years following confirmation.  In truth, the Trevinos have paid *more* than their fair share due to the erroneous 3002.1(c) notice.[19]  As of October 2014, the Trevinos had made payments of $14,772.12 on the arrearages and $34,192.20 on the underlying mortgage.  (ECF No. 78-1 at 140).

The non-breaching parties have not been denied the benefits which they reasonably expected because they are receiving payments under the bankruptcy plan.  This is not a scenario where the mortgagor defaulted and has no hope of becoming current on payments.  Given that less than a year remains on the Trevino's 60-month bankruptcy plan, it is highly likely that they will cure all defaults and make Defendants whole.  Furthermore, the behavior of the Trevinos comports with standards of good faith and fair dealing.  They filed bankruptcy to save their home

---

[19] Although it is not clear specifically how much the Trevinos paid under the 3002.1(c) notice, according to the chapter 13 trustee's report, as of October 1, 2014, the Trevinos had paid $765.11.  (ECF No. 78-1 at 143).

and have continued to make good faith payments under the plan—despite the obstacles put in place by Defendants—for over four years.  Because the Trevinos are not in material breach, they may bring a claim against Defendants for breach of contract.

### Conclusion

The Court will enter an order consistent with this Memorandum Opinion.

SIGNED **July 31, 2015.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE