# EXHIBIT B

1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
2                      MCALLEN DIVISION

3    IN RE:                        §
                                   § BANKRUPTCY CASE NO.
4    JOSE TREVINO, SR., and        § 10-70594
     TERESA TREVINO,               §
5                                  § CHAPTER 13
     DEBTORS                       §
6    _____

7    JOSE TREVINO and TERESA       §
     TREVINO,                      §
8                                  §
     PLAINTIFFS,                   §
9                                  §
     v.                            § ADVERSARY NO. 13-07031
10                                 §
     1) HSBC MORTGAGE SERVICES,    §
11      INC.,                      §
                                   §
12   2) U.S. BANK TRUST, N.A. as   §
        Trustee for LSF8 MASTER    §
13      PARTICIPATION TRUST, and   §
                                   §
14   3) CALIBER HOME LOANS,        §
        INC.,                      §
15                                 §
     DEFENDANTS.                   §

16

17        *********************************

18             ORAL DEPOSITION OF

19        JAMAR HARRIS (CALIBER HOME LOANS)

20             JULY 27, 2016

21                Volume 1

22        *********************************

23

24

25

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

---

**Page 2**

1   ORAL DEPOSITION OF JAMAR HARRIS, produced as a
2   witness at the instance of the Plaintiffs, and duly
3   sworn, was taken in the above-styled and -numbered cause
4   on July 27, 2016, from 9:06 a.m. to 7:02 p.m., before
5   Betty Lynn Cade, CSR, in and for the State of Texas,
6   reported by machine shorthand, at the Law Offices of
7   Franklin Hayward, LLP, 10501 North Central Expressway,
8   Suite 106, Dallas, Texas  75231, pursuant to the Federal
9   Rules of Civil Procedure.
10      A P P E A R A N C E S
11   FOR THE PLAINTIFFS, JOSE TREVINO and TERESA TREVINO:
12      Ms. Karen L. Kellett
        Ms. Megan F. Clontz
13      KELLETT & BARTHOLOW PLLC
        11300 North Central Expressway, Suite 301
14      Dallas, Texas  75243
        (214) 696-9000
15      (214) 696-9001
        kkellett@kblawtx.com
16
     FOR THE DEFENDANTS, U.S. BANK TRUST, N.A., as Trustee
17   for LSF8 MASTER PARTICIPATION TRUST and CALIBER HOME
     LOANS, INC.:
18
        Ms. Melissa S. Hayward
19      FRANKLIN HAYWARD LLP
        10501 North Central Expressway, Suite 106
20      Dallas, Texas  75231
        (972) 755-7100
21      (972) 755-7110
        mhayward@franklinhayward.com
22
     ALSO PRESENT:
23
        Mr. Chris Bass
24      Mr. Clint Burton
        Mr. Tye McWhorter
25      Mr. Tony McGough, Videographer

---

**Page 4**

EXHIBIT INDEX

| Number | Description | Page Marked |
|---|---|---|
| Exhibit 17 | Plaintiffs' Amended Motion to Compel Caliber Home Loans, Inc., And U.S. Bank Trust, N.A., to Produce Documents | 184 |
| Exhibit 18 | Customer Letter of 3-5-2014 | 195 |
| Exhibit 19 | Advance History Spreadsheet | 200 |
| Exhibit 20 | Payment History Spreadsheet | 200 |
| Exhibit 21 | Spreadsheet | 203 |
| Exhibit 22 | Spreadsheet | 203 |
| Exhibit 23 | HSBC Screenshots | 203 |

---

**Page 3**

INDEX

|  | Page |
|---|---|
| Appearances. . . . . . . . . . . . . . . . . . . | 2 |
| Preliminary Proceedings. . . . . . . . . . . . . | 5 |
| JAMAR HARRIS |  |
| Examination by Ms. Kellett. . . . . . . . . | 5 |
| Examination by Ms. Hayward. . . . . . . . . | 212 |
| Further Examination by Ms. Kellett. . . . . | 226 |
| Reporter's Certification . . . . . . . . . . . . | 233 |

* * * * *

EXHIBIT INDEX

| Number | Description | Page Marked |
|---|---|---|
| Exhibit 1 | Amended Notice of Intent to Conduct Oral Deposition of Defendant Caliber Home Loans, Inc. | 21 |
| Exhibit 2 | Screenshots | 27 |
| Exhibit 3 | Notes History Spreadsheet | 33 |
| Exhibit 4 | Spreadsheet | 35 |
| Exhibit 5 | Spreadsheet | 36 |
| Exhibit 6 | Spreadsheet | 39 |
| Exhibit 7 | Spreadsheet | 39 |
| Exhibit 8 | Spreadsheet | 41 |
| Exhibit 9 | History Transaction Code Table CS-500.085 | 45 |
| Exhibit 10 | Transaction History Spreadsheet | 54 |
| Exhibit 11 | Transaction Notes Spreadsheet | 63 |
| Exhibit 12 | Notice of Post-Petition Mortgage Fee, Expenses, and Charges | 68 |
| Exhibit 13 | Notice of Post-Petition Mortgage Fee, Expenses, and Charges | 68 |
| Exhibit 14 | Notice of Postpetition Mortgage Fees, Expenses, and Charges | 136 |
| Exhibit 15 | Notice of Withdrawal of Notice of Post-Petition Fees, Expenses, And Charges | 137 |
| Exhibit 16 | Letter of 12-16-2014 from Caliber Home Loans | 148 |

---

**Page 5**

P R O C E E D I N G S

(It is further agreed that Rule 30(b)(5) is waived by agreement of the parties.)

THE VIDEOGRAPHER:  We're on the record at 9:06 a.m., July 27th, 2016, in the deposition of corporate representative of Defendant, Caliber Home Loans Incorporated, Jamar Harris.

JAMAR HARRIS,
having been first duly sworn, testified as follows:

EXAMINATION

BY MS. KELLETT:

Q. Mr. Harris, please state your full name for the record.

A. Yes, Jamar Harris.

Q. And can you spell that again.

A. J-A-M-A-R, last name Harris, H-A-R-R-I-S.

Q. Okay.  And have you ever had your deposition taken before? `

A. Yes.

Q. Okay.  How many times?

A. Once.

Q. And was that while you were working for Caliber?

A. Yes.

Q. Was that in connection with a lawsuit?

---

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 6

1    A. No.
2    **Q. Okay. How long have you been working for**
3    **Caliber?**
4    **A. Approximately three years.**
5    **Q. Okay. And what's your title?**
6    **A. Default servicing officer.**
7    **Q. When you started at Caliber, was that your**
8    title, or have you had different jobs?
9    A. I've had different jobs.
10   **Q. Okay. What was the first one at Caliber?**
11   A. The first title was single point of contact
12   specialist.
13   **Q. Okay. And after that?**
14   A. After that, it's property preservation
15   specialist.
16   **Q. Okay. And after that?**
17   A. Default servicing officer.
18   **Q. Okay. So those are the three different jobs**
19   you've had?
20   A. Yes.
21   **Q. Okay. And your offices are here in the**
22   Metroplex; is that correct?
23   A. That is correct.
24   **Q. Out by D/FW?**
25   A. In the -- within the D/FW.

Page 7

1    **Q. Okay. Is it by the airport, near the airport?**
2    A. Fairly close.
3    **Q. Okay. Prior to being at Caliber, where did**
4    you work?
5    A. Stewart Title.
6    **Q. Okay. And what did you do at Stewart Title?**
7    A. I did document review.
8    **Q. How long were you there?**
9    A. I was there for approximately a year.
10   **Q. Okay. Was that here in the Dallas area?**
11   A. Yes.
12   **Q. Okay. And prior to Stewart Title, where did**
13   you work?
14   A. AT&T.
15   **Q. Okay. And what did you do for AT&T?**
16   A. Staff representative.
17   **Q. What did that entail?**
18   A. That entailed reconciling reports, I mean, in
19   a nutshell.
20   **Q. Okay. Prior to AT&T?**
21   A. I don't recall.
22   **Q. Okay.**
23   A. I was at AT&T for quite some time.
24   **Q. Do you remember how long you were at AT&T?**
25   A. Approximately 11 years.

Page 8

1    **Q. Okay. And where were you located when you were**
2    with AT&T?
3    A. Arlington.
4    **Q. Arlington? Okay. All right. And where did**
5    you go to high school?
6    A. James Bowie High School.
7    **Q. And where is that?**
8    A. That is in Arlington.
9    **Q. And did you go to college?**
10   A. Yes.
11   **Q. Okay. Where did you go to college?**
12   A. University of Texas at Arlington.
13   **Q. Did you get a degree?**
14   A. No.
15   **Q. Okay. How many years did you go to UTA?**
16   A. Approximately two.
17   **Q. Okay. In connection with being with Caliber,**
18   what did the single point of contact specialist entail,
19   that job?
20   A. We served kind of as a front line to speak with
21   customers to mitigate accounts.
22   **Q. Was that in connection with the HAMP**
23   modification program?
24   A. It was in connection to several programs,
25   including HAMP.

Page 9

1    **Q. Okay. What were the other programs?**
2    A. In-house modifications, short sale, deed in
3    lieu, payment plans.
4    **Q. All right. And who did you report to when you**
5    were in that job?
6    A. I reported directly to Moses Meza.
7    **Q. Moses Meza?**
8    A. Yeah.
9    **Q. M-E-Z-A?**
10   A. Yeah. I believe so.
11   **Q. Okay. Okay. And then in the next job that you**
12   had, which was property preservation specialist, what
13   did that entail?
14   A. That entailed preserving properties and
15   protecting our investments, preventing the property from
16   losing value.
17   **Q. And how did you do that?**
18   A. We would review pictures and address issues by
19   ordering contractors out there to correct the issues.
20   **Q. Somebody would do a property inspection, and**
21   then you would review that?
22   A. (Moving head up and down.)
23   **Q. Is that correct?**
24   A. Correct.
25   **Q. Okay. And who did you report to in that job?**

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 10

1    A. I reported to Craig.
2    Q. Okay.  Do you recall his last name?
3    A. It's hard to pronounce.  I can spell it for
4  you.
5    Q. Okay.
6    A. I think I can spell it for you.
7    Q. All right.
8    A. R-O-U-T-E-R.
9    Q. Okay.  And then default servicing officer, how
10  long have you been a default servicing officer?
11   A. For approximately eight months.
12   Q. Okay.  And who do you report to?
13   A. I report directly to Michael Betson.
14   Q. And who does he report to?
15   A. Michael reports to Juan, Juan Aguirre.
16   Q. Okay.  And do you know who he reports to?
17   A. I believe Juan reports to Kathy.
18   Q. Do you know Kathy's last name?
19   A. I believe it's Shields, but I'm not sure.
20   Q. Do you know who she reports to?
21   A. It's kind of getting higher up there.  I'm not
22  sure who she reports to honestly.
23   Q. Okay.  What do you do -- excuse me.  -- in your
24  job as default servicing?
25   A. In a nutshell, I review accounts in preparation

Page 11

1  for trial, depositions, mediations.
2    Q. Okay.  Are you in the legal department?
3    A. No.
4    Q. Okay.  Has this been your job the whole time
5  you've been in default services, to review accounts for
6  trial, depositions, and mediations?
7    A. No.
8    Q. Okay.  What --
9    A. It has not been my job.
10   Q. Okay.  What else have you done?
11   A. Well, as we've discussed, I've done property
12  preservation and also single point of contract.
13   Q. Right.  But while you've been in default
14  servicing, have you done anything else besides help prep
15  for trial, depositions, and mediations?
16   A. All three of those titles are under default
17  servicing.
18   Q. Okay.  How many people are -- do default
19  servicing on behalf of Caliber?
20   A. I have no clue.
21   Q. Okay.  Do you -- do you work in the office, or
22  do you work from home?
23   A. I do half and half.
24   Q. Okay.  When you're in the office, are there --
25  do you know of other people who are in default

Page 12

1  servicing?
2    A. Absolutely.
3    Q. Okay.  Can you tell me some of those people?
4      MS. HAYWARD:  Objection, form.
5    A. Can you clarify the question?
6    Q. (By Ms. Kellett)  Just can you tell me the
7  names of other people that you know at Caliber who work
8  in default servicing?
9      MS. HAYWARD:  Objection, form.
10   A. Yes, I could.
11   Q. (By Ms. Kellett)  Okay.
12   A. But that's a broad question.  I could name you
13  20 names.
14   Q. So do -- do all of those 20 people help prep
15  for trial, deposition, and mediation, or do they do
16  different things?
17   A. They may do different things.
18   Q. Okay.  What other kind of things do they do?
19   A. Well, as I mentioned, I've been in three
20  different departments, so everything that I mentioned
21  before are the things that they would do, so...
22   Q. Well, I'm talking about default servicing in
23  particular.
24   A. Right, and as I mentioned, all three of those
25  titles are under default servicing.

Page 13

1    Q. Oh, okay.  So property preservation is under
2  default servicing.  All right.  Do you know how many
3  other people help prep for trial, depos, and mediations?
4      MS. HAYWARD:  Objection, form.
5    A. No.  I don't have a specific number.
6    Q. (By Ms. Kellett)  Okay.  Do you attend
7  mediations?
8    A. Yes.  I have attended mediations both
9  telephonically and physically.
10   Q. Okay.  And is that for cases in both state and
11  federal court?
12   A. I believe just state court.
13   Q. Okay.  Do you ever testify at hearings or at
14  trial?
15   A. Yes, I do.
16   Q. Okay.  How many trials have you testified in?
17   A. I haven't kept count.
18   Q. Are these trials in state court or federal
19  court or both?
20   A. As I mentioned, it's state court, I believe.
21   Q. Okay.  Do you recall ever testifying in federal
22  court?
23   A. No.
24   Q. Okay.  Have you ever testified in bankruptcy
25  court?

In Re: Jose Trevino, Sr., et al vs.                          Jamar Harris (Caliber Home Loans)
HSBC Mortgage Services, Inc., et al                                               07/27/2016

Page 14

1    A.  No.  The -- any trial I've gone to hasn't been
2    a bankruptcy-related trial.
3        Q.  Okay.  And what kind of things have you
4    testified about when you're at trial on behalf of
5    Caliber?
6        A.  Testimony could be regarding the note, the
7    mortgage, documents concerning the loan.
8        Q.  The -- the borrower's pay history, would that
9    be something you would testify about?
10       A.  Yes, history included.
11       Q.  Okay.  Looking at the -- Caliber's account
12   records?
13       A.  Yes.
14       Q.  Is that what you look at to determine --
15       A.  Account records as well.
16       Q.  Okay.  And when you're looking at a borrower's
17   account records, what do you do physically to see a
18   particular borrower's account records?
19           MS. HAYWARD:  Objection, form.
20       A.  Please elaborate on that question, as far as
21   what do I do physically?  Like --
22       Q.  (By Ms. Kellett)  How do you access a
23   borrower's account?
24       A.  Start out by entering the account number into
25   our servicing system.

Page 15

1        Q.  Okay.  And what is your servicing system?
2        A.  It is Fiserv, is our main platform.
3        Q.  Okay.  And do you do that from a computer
4    monitor?
5        A.  Yes.
6        Q.  Okay.  You hesitated a little bit.  Is there
7    some other device that you use besides a computer to get
8    into Fiserv?
9        A.  No.  I'm just taking my time answering.  That's
10   all.
11       Q.  Okay.  And is that a server that you access
12   through the Web, or is it proprietary to Caliber?
13       A.  This particular system -- when you say "Web,"
14   do you mean like a normal Web browser?
15       Q.  Yeah.  Do you access it by going to -- to a Web
16   browser to get into the Fiserv system to start with?
17       A.  I would -- to answer both questions, yes, it is
18   a proprietary system, and, yes, we do access it through
19   some type of Web browser.
20       Q.  Okay.  So the system is proprietary to Caliber?
21       A.  I'm sure our version is proprietary to Caliber,
22   but I've seen within our records it being used by
23   another company, so...
24       Q.  Okay.  And what other company have you seen it
25   being used by?

Page 16

1        A.  HSBC.
2        Q.  Okay.
3        A.  Specifically to this case, I've seen it.
4        Q.  Okay.
5        A.  Screenshots from HSBC.
6        Q.  All right.  And after you enter a borrower's
7    account number into -- after you've logged in and
8    entered the account number, what do you see on the
9    computer screen?
10       A.  It could be -- it just depends on what screen I
11   was on before I logged the borrower's account number, so
12   it could be several different screens.
13       Q.  Okay.  What -- can you describe the different
14   screens that you can pull up in -- in Fiserv?
15       A.  It's kind of a broad question.  There's many
16   screens in Fiserv, many that I don't even know about,
17   so...
18       Q.  And why -- why don't you just describe the ones
19   you do know about.
20       A.  I'm not sure what type of description you're
21   looking for.  I mean, it -- it brings up account
22   information once we put the account number in.
23       Q.  Okay.  But what kind of account information
24   does it bring up?
25       A.  It could be the address, the subject property

Page 17

1    mailing address.  It could be amounts due.
2        Q.  Okay.  Is that a particular screen, amounts
3    due?
4        A.  It's not a particular screen.  It's just
5    information that's available on several particular
6    screens.
7        Q.  Okay.  And when you're accessing an account, do
8    you use one monitor or several different monitors at a
9    time?
10       A.  I could be using one or two monitors.
11       Q.  Okay.  If you wanted to know the account
12   history on a loan, what screen would you pull up?
13       A.  Please clarify account history.  There's
14   different types of account history.
15       Q.  Well, why don't you describe the different
16   types of account histories.
17       A.  There's notations.  There's inspections, to
18   name a few.
19       Q.  Okay.  Can you name some other ones?
20       A.  Sure.  There's transaction history.
21       Q.  Okay.
22       A.  There's payment history.  Shall I continue?
23       Q.  Yes, please.
24       A.  What goes into escrow history, just a few off
25   the top of my head.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 18

1      Q. Is there a history that shows fees that have
2  been added to the account?
3      A. Absolutely.
4      Q. Okay. Are the fees separate from the escrow?
5      A. Yes. I believe so.
6      Q. Okay. And so when you're reviewing this
7  information, you're seeing it on a -- in fields on a
8  computer monitor; is that correct?
9      A. Repeat the question, please.
10     Q. When you're seeing this information, you're
11 seeing it in various fields on your computer monitor,
12 correct?
13     A. That is correct. Information is displayed in
14 various fields.
15     Q. All right. Have you ever been asked to run any
16 reports from Fiserv?
17     A. Not that I recall.
18     Q. Okay. Have you ever asked anybody to run
19 reports from Fiserv?
20     A. I'm sure, yes.
21     Q. And who -- who have you asked?
22        MS. HAYWARD: Objection, form.
23     A. I've asked the legal department to run a report
24 from Fiserv.
25     Q. (By Ms. Kellett) Have you ever asked anybody

Page 19

1  in the information technology department to run any
2  information from Fiserv?
3      A. Not that I recall.
4      Q. Have you ever printed any of the screenshots
5  from Fiserv?
6      A. Have I printed -- I'm sorry. Please repeat the
7  question.
8      Q. Have you ever printed any of the screens?
9      A. From Fiserv. Not that I recall.
10     Q. Okay. Have you ever seen any -- any screen
11 prints of information on Fiserv?
12     A. Yes, I have.
13     Q. All right. And in connection with what matter
14 did you see screen prints from Fiserv?
15     A. In connection to today's matter, I've seen
16 screen -- screenshots from Fiserv.
17     Q. Okay. And those were screenshots of the
18 Trevinos' account?
19     A. Yes. They were screenshots of a period of the
20 Trevinos' account, but the screenshots that I saw was
21 from a HSBC file.
22     Q. Okay. The screenshots that you saw, though,
23 did it -- like, say, of the note, did it look familiar,
24 just what you're normally seeing when you open Fiserv?
25     A. It looked familiar, but what I saw wasn't a

Page 20

1  note screen.
2      Q. Okay. What -- what did you see?
3      A. I'm not sure exactly what I saw because it was
4  a HSBC file, but it did resemble Fiserv.
5      Q. Okay. Well, who showed you those screenshots?
6      A. During my review with counsel, I saw those
7  screenshots.
8      Q. Okay. When was that?
9      A. Within the last week or so.
10     Q. Okay. Did you meet with counsel out at Caliber
11 or here in Ms. Hayward's office?
12        MS. HAYWARD: Objection, form.
13     A. I met with counsel at Caliber.
14     Q. (By Ms. Kellett) Okay. Is that your in-house
15 counsel?
16     A. Yes.
17     Q. And who was it?
18     A. In-house, everyone -- well, Melissa and Clint.
19     Q. Okay.
20     A. And I also met with Chris briefly as well.
21     Q. Okay. Prior to the last week, had you worked
22 on this case at all?
23     A. Prior to last week? I don't believe so. I
24 believe I got this case -- I mean, it's quite possibly I
25 got this case maybe a week and a half ago, so prior to

Page 21

1  last week, it's possible.
2      Q. Okay. But, I mean, say, two years ago, did you
3  work on this case?
4      A. No.
5      Q. Okay. Did you work on this case in even June
6  of this year?
7      A. No.
8      Q. Okay. All right.
9        MS. KELLETT: Let's mark this.
10       (Exhibit 1 marked for identification.)
11     Q. (By Ms. Kellett) Okay. We're handing you
12 what's been marked as Exhibit No. 1 to your deposition.
13     A. Okay.
14     Q. Could you review this document?
15     A. You said did I review this document?
16     Q. I said could you review this document?
17     A. Could I? Sure. Just a moment. (Peruses
18 document.) This appears to be the same document I
19 previously reviewed.
20     Q. Okay. This is your deposition notice, and
21 you've seen this before?
22     A. I have seen this before.
23     Q. All right. And when is the first time you saw
24 this document?
25     A. Within a week and a half ago.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 22

1    Q.  All right.  And you're the person at Caliber
2  with the most knowledge of the topics set out in 1
3  through 7; is that correct?
4    A.  Possibly.
5    Q.  Okay.  Who -- who might also have knowledge of
6  1 through 7?
7    A.  That's a broad question again.  There's many
8  people that may have knowledge of 1 through 7.
9    Q.  Okay.  But you have the most knowledge at
10  Caliber of 1 through 7?
11    A.  Well, that's not what I said.  I said I quite
12  possibly do, but --
13    Q.  Okay.
14    A.  -- not necessarily.
15    Q.  Okay.  With respect to topic No. 1, what did
16  you do to prepare for this deposition?
17    A.  Relating to No. 1?
18    Q.  Yes.
19    A.  Relating to No. 1, there's about a 800-page
20  booklet regarding this case that I did review.
21    Q.  All right.  Well, No. 1 just speaks
22  specifically to Caliber-produced document 1 through 102
23  and 757 through 759.
24    A.  Correct.
25    Q.  Did you look at those documents in particular?

Page 23

1    A.  Yes.
2    Q.  All right.  With respect to topic No. 2, what
3  did you do to prepare for your deposition?
4    A.  I reviewed the spreadsheet that says Fiserv.
5  It's a transaction history.
6    Q.  All right.  Who created that transaction
7  history that was produced on June 6th?
8    A.  It was created by the system.  No one in
9  particular created it.
10    Q.  Okay.  How did the system create it?
11    A.  By simply hitting the export button.
12    Q.  Uh-huh.
13    A.  And choosing which format you want the file to
14  be generated in.
15    Q.  Okay.  And what were the different formats that
16  the file can be generated in?
17    A.  The two that I dabbled with were PDF and Excel.
18    Q.  All right.  So you hit a button, and it puts
19  the information in a PDF format or an Excel format; is
20  that correct?
21    A.  Correct.
22    Q.  All right.  And when it's in Excel format, you
23  can use it like any other Excel spreadsheet, correct?
24    A.  I believe so, with the exception of I don't
25  know if it's editable.  That, I don't know.

Page 24

1    Q.  Did you ask anybody?
2    A.  No.  I didn't ask anyone if it was editable.
3    Q.  Would you be surprised to learn that I was able
4  to edit the document sent on June 6th?
5    A.  I wouldn't.  There's software out there that
6  allows you to edit documents.
7    Q.  Okay.  So are you the one that -- that hit the
8  button to produce the June 6th spreadsheet?
9    A.  No.
10    Q.  Okay.  Well, who -- who hit that button?
11    A.  Someone in our legal department hit the button.
12    Q.  Okay.  Did you talk to anybody in the IT
13  department in preparing for your deposition today?
14    A.  I did not.
15    Q.  Did you talk to anyone with respect to Cal --
16  Caliber's servicing system?
17    MS. HAYWARD:  Objection, form.
18    A.  Yes.
19    Q.  (By Ms. Kellett)  Okay.  Who -- who did you
20  talk to?
21    A.  Someone in our legal department.
22    Q.  Did you talk to anybody outside of the legal
23  department about the capabilities of Caliber's loan
24  servicing system?
25    A.  Just a moment.  Let me think about that one.

Page 25

1  Let me see if I spoke with someone regarding -- repeat
2  the question for me, please.
3    MS. KELLETT:  I'm sorry.  Could you repeat
4  the question.
5    (Requested portion was read.)
6    A.  I'm -- I'm sure I did, but --
7    Q.  (By Ms. Kellett)  Who did you talk to?
8    A.  -- I couldn't tell you who I spoke with.  I
9  mean, I might ask some general questions.
10    Q.  Well, how -- how did you know who to -- to call
11  or to go meet to ask these questions?
12    A.  It depends on the subject at hand.  I may reach
13  out to that department or may reach out to my manager to
14  ask general questions, but I'm handling more than one
15  account, so --
16    Q.  All right.
17    A.  -- it's possible.
18    Q.  All right.  Have you seen reports from the
19  Fiserv system other than what has been produced by your
20  legal department?
21    MS. HAYWARD:  Objection, form.  Are you --
22  just with respect to this particular case?
23    MS. KELLETT:  Could you repeat the
24  question.
25    (Requested portion was read.)

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

---

Page 26

1    Q. (By Ms. Kellett) No. I don't mean this
2  particular case. I mean any -- any report.
3    A. Any report? I'm sure, yes.
4    Q. Who produced those reports?
5    A. Excuse me. I couldn't tell you who produced
6  each report that I've ever seen.
7    Q. But you've never asked anybody other than legal
8  to produce any information out of the Fi -- Fiserv
9  system, correct?
10       MS. HAYWARD: Objection, form.
11    A. I can't say that I've never done that.
12    Q. (By Ms. Kellett) Do you recall any time that
13  you have asked somebody other than legal to produce
14  information out of the Fiserv system?
15    A. Actually, I recall a time back when I was in
16  the single point of contact department.
17    Q. Okay. And what kind of report did you ask for
18  or see?
19    A. That, I don't recall. I just know I couldn't
20  figure out how to do it myself, so someone showed me how
21  to do it.
22    Q. They showed you how to create a report from
23  information from the Fiserv system?
24    A. Right.
25       (Discussion off the record.)

---

Page 27

1       MS. KELLETT: Mark this.
2       MS. CLONTZ: Uh-huh.
3       (Exhibit 2 marked for identification.)
4    Q. (By Ms. Kellett) All right. I'm handing you
5  what's been marked as No. 2 to your deposition. Could
6  you review this document?
7    A. Yes. Just a moment. (Peruses document.)
8       MS. HAYWARD: I object to any questions
9  being asked about this document. This document is not
10  clear who produced it or what it is or whose record it
11  is, and it's also not Bates numbered.
12       MS. KELLETT: I know.
13       MS. HAYWARD: Just for the record. It's
14  also heavily redacted.
15    A. Okay.
16    Q. (By Ms. Kellett) Okay. Have you ever seen
17  this document before?
18    A. Not this version, no.
19    Q. All right. Do --
20    A. And --
21    Q. Go ahead.
22    A. And I -- the document I saw didn't have this
23  many pages either, so --
24    Q. All right. When you pull up the notes for a
25  borrower on Fiserv, do the notes look like this on a

---

Page 28

1  screen?
2    A. You're referring to the front page? It looks
3  similar, similar to this, yes.
4    Q. Okay. Do you ever actually enter any
5  information into a borrower's account?
6    A. Yes, I do.
7    Q. Okay. And what kind of information do you
8  enter?
9    A. It's information regarding the loan, regarding
10  activity I've -- I've done on the loan.
11    Q. What type of activities?
12    A. Regarding my job today, it could be regarding
13  the final judgment on -- on a loan at trial.
14    Q. So would you be entering that into the -- the
15  notes screen?
16    A. It could be the notes screen.
17    Q. Okay. Where else could it be?
18    A. It could be a task screen where we set out
19  tasks.
20    Q. And would the tasks also appear on the notes
21  screen?
22    A. Yes. They would appear on the notes screen.
23    Q. Okay. And how do you -- how do you set up a
24  task physically?
25    A. You would access the task screen, enter the

---

Page 29

1  tasks that you would like to initiate. There's a few
2  other codes you got to put in there, and then hit the
3  enter button.
4    Q. Do you ever enter or adjust any financial
5  information with respect to a borrower's account?
6    A. Today's job, no.
7    Q. Okay. Did you ever?
8    A. Yes.
9    Q. Okay.
10    A. I did.
11    Q. And -- and what kind of in -- loan information
12  would you enter or adjust?
13    A. Well, when you say "financial information,"
14  I've entered, like, the borrower's income amounts,
15  expenses, stuff like that, so I can review for a
16  possible payment plan or a modification.
17    Q. Okay. Do you ever -- have you ever adjusted
18  the account, like added money to the account or
19  subtracted money to the account?
20    A. No.
21    Q. Okay. All right. But there are places you can
22  look to see if money's been paid on an account or taken
23  off an account, correct?
24    A. Yes. There's places we can visit to see what
25  activity has taken place.

---

STEVEN H. GENTRY & ASSOCIATES, INC.  (214) 321-5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 30

1    Q.  Okay.  All right.  So with respect to payments,
2    when payments are posted to an account, where is
3    information about that accessed?
4        A.  It would be in our transaction screen.
5        Q.  Okay.  When a payment comes in, is there any
6    notation about it in the notes or the tasks as well?
7        A.  Yes.  When payments come in, there is a
8    notation.
9        Q.  Are the notation of payments coming in made by
10   the cash department or by which department?
11       A.  It depends how the payment comes in.  It could
12   be more than one ways or -- or departments or places
13   that would place a note to that account.
14       Q.  Okay.  What are those different departments?
15       A.  For example, payments that are mailed might be
16   handled by a vendor.  Bankruptcy payments or accounts
17   that are in active bankruptcy may go to the bankruptcy
18   department.
19       Q.  Okay.  And does the vendor have the ability to
20   notate in the notes that a payment has come in?
21       A.  I don't recall.
22       Q.  Okay.  Who would know the answer to that
23   question?
24       A.  Give me just a moment.  Let me see if I can
25   re -- recall that.  I'm sorry.  I don't recall.  Someone

Page 31

1    in the payment department could answer that question.
2        Q.  Okay.  There is a payment department?
3        A.  I'm not sure if that's the actual name of that
4    department, but, yes.
5        Q.  Okay.  And let me ask you this:  Is the -- the
6    bankruptcy department part of default services?
7        A.  It could be.  It could be under default
8    servicing.
9        Q.  Okay.  Do you know who the head of the
10   bankruptcy department is?
11       A.  I'd be assuming if I answered that question.
12       Q.  All right.  Is the bankruptcy department here
13   in the Dallas area?
14       A.  To my knowledge, they're in San Diego.
15       Q.  Okay.  When payments are made from or on behalf
16   of a debtor, say for an escrow item, is there a notation
17   about that made in the notes?
18       A.  Yes.  Whenever payments are made, whether it's
19   escrow, principal, interest, the payment is posted,
20   noted, to the account.
21       Q.  But would there be -- and I'm talking about
22   escrow items in particular.  Would there be some kind of
23   description of the escrow payment, not just the number,
24   but a description in the notes or in the tasks about
25   making the escrow payment?

Page 32

1        A.  Specifically escrow, I don't know.  That's not
2    my area of expertise, but if it's just a payment, then,
3    yes, it will make a note to the account.
4        Q.  Okay.  Well, who would know about the escrow
5    account?
6        A.  As far as payments posting towards an escrow
7    account, that would also be the payment department.
8        Q.  Okay.  Well, what about -- well, let's just
9    talk paying taxes on behalf of the borrower.
10       A.  Okay.
11       Q.  Who -- who makes those decisions to pay taxes?
12       A.  The -- that's kind of a vague question.  I
13   mean, the -- the borrower makes the decision to pay the
14   taxes.
15       Q.  No.  If Caliber is going to pay the taxes on
16   behalf of the borrower --
17       A.  Uh-huh.
18       Q.  -- who makes that decision?
19       A.  Okay.  That could be -- just a moment.
20       Q.  Okay.
21       A.  We have a tax department, but I'm not sure if
22   they would be making decisions whether we will make an
23   advance for taxes.
24       Q.  Okay.  Well, who -- with respect to the
25   Trevinos, the debtors in this case, who made the

Page 33

1    decisions to make tax advances on behalf of the --
2        MS. HAYWARD:  Objection, form.
3        Q.  (By Ms. Kellett)  On behalf of the debtors -- I
4    mean on -- yeah, on behalf of the debtors?
5        MS. HAYWARD:  Objection, form, assumes
6    facts not in evidence.
7        A.  Repeat that question, please.
8        MS. KELLETT:  Can you repeat the question.
9        (Requested portion was read.)
10       MS. HAYWARD:  Objection to form again.
11       A.  To my knowledge, during my review of this case,
12   it was the pre -- prior servicer that made the tax
13   advance.
14       Q.  (By Ms. Kellett)  There were no tax advances
15   made while Caliber serviced the loan?
16       A.  If there were tax advances while Caliber
17   serviced the loan, I didn't discover any during my
18   review.
19       Q.  Okay.
20       (Discussion off the record.)
21       (Exhibit 3 marked for identification.)
22       Q.  (By Ms. Kellett)  All right.  I'm handing you
23   Exhibit No. 3.  Have you seen this document before?
24       A.  (Peruses document.)  It appears to be one of
25   the documents I've reviewed.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 34

1    Q. Okay. Did you review it in paper form, or did
2  you review it as an Excel spreadsheet?
3    A. Both versions.
4    Q. Okay. Did you create the Excel spreadsheet
5  that was produced to us yesterday?
6    A. No, I did not.
7    Q. Okay. Who created that Excel spreadsheet?
8    A. Someone in our legal department.
9    Q. All right. Did you ask them to create the
10  Excel spreadsheet?
11    A. I believe I did.
12    Q. Okay. Who did you ask?
13    A. I asked Clint, at the table with us today.
14    Q. Okay. Okay. And you didn't ask anybody else
15  to produce the notes that appear in this Excel spread-
16  sheet, correct?
17    A. No. I have not asked anyone to produce notes.
18    Q. All right. Have you asked anybody if these
19  notes could be produced in a report in a different
20  format other than Excel?
21    A. I did not necessarily ask anyone. I
22  discovered, or we discovered that it could be produced
23  in multiple formats.
24    Q. And when you say "we," who is we?
25    A. Myself and counsel.

Page 35

1    Q. What are the other formats?
2    A. The two that I worked with were PDF and Excel.
3    Q. Okay. But what other formats are you aware of?
4    A. I didn't -- I didn't really take those to
5  memory when I saw those. I saw several other formats,
6  two that I was familiar with, so I used those.
7    Q. All right.
8    (Discussion off the record.)
9    (Exhibit 4 marked for identification.)
10    Q. (By Ms. Kellett) Okay. We're showing you
11  what's been marked as Exhibit No. 4 to your deposition.
12  Could you review that document?
13    A. Yes. Just a moment. (Peruses document.)
14  Okay.
15    Q. All right. Have you seen Exhibit No. 4 before?
16    A. I've seen something that appears to be a copy
17  of Exhibit No. 4.
18    Q. All right. These are documents that were
19  produced by Caliber in this lawsuit. Do you understand
20  that?
21    A. I understand that these are copies that you
22  brought today, correct?
23    Q. Yeah, but I'm asking if you've seen these
24  before.
25    A. I've seen something that appears to be the same

Page 36

1  as this.
2    Q. So you've seen something that appears to be
3  Caliber's production pages Bates labeled 27 through 45,
4  correct?
5    A. I've seen similar to this, correct.
6    Q. Okay. What information does this tell us about
7  the Trevinos?
8    A. (Peruses document.) This tells me nothing
9  about the Trevinos.
10    Q. All right.
11    (Exhibit 5 marked for identification.)
12    Q. (By Ms. Kellett) I'm handing you Deposition
13  Exhibit No. 5. Could you review that?
14    A. Sure. (Peruses document.)
15    Q. Do you recognize the documents that comprise
16  Exhibit No. 5?
17    A. Yes. It looks familiar.
18    Q. All right. These are the documents that
19  Caliber produced as Bates labeled 46 through 64; is that
20  correct?
21    A. Possibly. This is a document, again, that you
22  provided, correct?
23    Q. Yes.
24    A. Right.
25    Q. Did you look at what Caliber produced as Bates

Page 37

1  labeled 46 through 64 in connection with preparing for
2  your deposition?
3    A. Yes.
4    Q. All right. What do the documents that comprise
5  Exhibit No. 5 tell us about the Trevinos' account?
6    A. After reviewing this, it doesn't tell me
7  anything about Trevinos' account.
8    Q. All right. Do you know who prepared these
9  documents for production?
10    A. I believe they were prepared by the legal
11  department.
12    Q. Okay. And why do you believe that?
13    A. I received my prep package from the legal
14  department.
15    Q. Okay. And were these documents in the prep
16  package?
17    A. Yes.
18    Q. Okay.
19    A. Appeared to be.
20    Q. Did you ask anybody if the legal department
21  actually prepared the documents?
22    A. Did I ask anyone if the legal department
23  actually prepared the documents?
24    Q. Yes.
25    MS. HAYWARD: I'm going to object to that

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 38

1  question and instruct the witness not to answer, his
2  discussions with the legal department and questions he
3  may have asked the legal department with Caliber.
4        MS. KELLETT:  I'm sorry.  Could you read
5  the question again.
6        (Requested portion was read.)
7        MS. HAYWARD:  I'm going to instruct the
8  witness not to disclose any attorney-client
9  communications between Caliber, himself, and the legal
10  department.  To the extent that the answer does not
11  include discussions with an attorney or someone within
12  the legal department, then the witness can answer.
13        THE WITNESS:  Repeat the question one more
14  time, please.  Thank you.
15        (Requested portion was read.)
16     A.  Just a moment.  I didn't actually -- with
17  reference to this specific document?
18     Q.  (By Ms. Kellett)  Yes.
19     A.  No.  I did not ask anyone.
20     Q.  Okay.  And you weren't involved with this case
21  when these documents were originally produced in this
22  case, correct?
23     A.  I don't believe so.  The previous documents,
24  that June 6th, I was not involved at that time.
25     Q.  Okay.  These were produced a long time before

Page 39

1  that.
2     A.  Yeah.  I don't think so, no.
3        (Discussion off the record.)
4        (Exhibit 6 marked for identification.)
5     Q.  (By Ms. Kellett)  Okay.  We're showing you what
6  has been labeled as Exhibit 6 to your deposition.  Can
7  you review this document, please?
8     A.  Sure.  Just a moment.  (Peruses document.)
9  Okay.
10     Q.  All right.  Did you review the production of
11  Caliber Bates label 65 through 83 prior to today?
12     A.  Yes, I did.
13     Q.  What can you tell us about the Trevinos'
14  account from the documents produced as Bates label 65
15  through 83?
16     A.  The only thing that I can tell you here is that
17  they were transactions -- well, no.  I can't even say
18  that these were transactions.  There's not a lot I can
19  tell you about this document.
20        MS. HAYWARD:  I'm going to object to the
21  form with respect to Exhibits 4, 5, and 6 under the rule
22  of optimal completeness.
23        (Exhibit 7 marked for identification.)
24     Q.  (By Ms. Kellett)  We're handing you what's been
25  now marked as Exhibit 7 to your deposition.  Can you

Page 40

1  review this document?
2     A.  Yes.  Just a moment, please.  (Peruses
3  document.)  Okay.
4     Q.  All right.  Did you review what was produced as
5  Caliber 84 through 102 to prepare for your deposition?
6     A.  Yes.
7     Q.  All right.  And what does Caliber 84 through
8  102 tell us about the Trevinos' account?
9        MS. HAYWARD:  I'm again going to object to
10  the rule of optimal completeness.  I'm also going to
11  object to the fact that these questions are very
12  misleading and that you're presenting these as separate
13  exhibits when they are, in fact, one document;
14  therefore, you're misleading this witness.
15        MS. KELLETT:  That's not true, Melissa,
16  and -- and I'll ask you not to give instructions to the
17  witness.  Can you repeat the question.
18        (Requested portion was read.)
19        MS. HAYWARD:  Repeat my --
20     Q.  (By Ms. Kellett)  You have to answer --
21        MS. HAYWARD:  I repeat my objection.
22     Q.  (By Ms. Kellett)  Okay.  You still have to
23  answer the question.
24     A.  It doesn't tell me much of anything about the
25  account.

Page 41

1     Q.  Okay.  And the documents that you reviewed
2  actually were Bates labeled with Caliber 000084,
3  correct, and Caliber 000085 correct?
4     A.  00084, 85 through 102, correct.
5     Q.  Okay.  Did you review these documents in paper
6  form or on computer screen?
7     A.  This -- this document in particular?
8     Q.  Yes.
9     A.  I reviewed on a computer screen.
10     Q.  Okay.  On any -- did Exhibit 6, did you review
11  on a computer screen?
12     A.  Yes.
13     Q.  Okay.  And when you reviewed it, it had -- it
14  was an exact picture of the document that was produced,
15  right, with the Bates label on it?
16     A.  Yes, the Bates label.
17     Q.  Okay.  You weren't reviewing in an Excel
18  format, correct?
19     A.  I was not reviewing it in an Excel format,
20  correct.
21     Q.  Okay.
22        (Exhibit 8 marked for identification.)
23     Q.  (By Ms. Kellett)  We're handing you
24  what's been marked as Exhibit 8.
25     A.  (Peruses document.)  Okay.

Page 42

1  Q.  Had you reviewed the production labeled Caliber
2  8 through 26 prior to today's deposition?
3  A.  Yes.
4  Q.  Okay.  And the documents that you reviewed had
5  the Bates label at the bottom of the document; is that
6  correct?
7  A.  Yes, they did.
8  Q.  Okay.  What can you tell us about the Trevinos'
9  account from Exhibit No. 8?
10       MS. HAYWARD:  Objection, form, based on the
11  rule of optimal completeness.
12  A.  Just a moment.  (Peruses document.)  This is
13  rather unclear.  There's not a lot I can tell you about
14  this document.
15  Q.  (By Ms. Kellett)  All right.  Did you print out
16  these documents and paste them together, Exhibits 8, 6,
17  7, 4, and 5?
18  A.  I did not.
19  Q.  Did you look at them all at once on five
20  different monitors?
21  A.  No, I did not.
22  Q.  Okay.  So after reviewing --
23       MS. KELLETT:  Let me strike that.
24  Q.  (By Ms. Kellett)  How long did you review
25  Exhibits 4, 5, 6, 7, and 8?

Page 43

1  A.  (Peruses documents.)  I don't have a set amount
2  of time, but I review documents for cases.  I review
3  them over a course of days, so it could -- a few days.
4  Q.  Okay.  And what did you learn having reviewed
5  Exhibits 4, 5, 6, 7, and 8?
6  A.  Well, in reviewing those, information was quite
7  vague.
8  Q.  You really couldn't tell anything about the
9  Trevinos' account by reviewing the documents that
10  comprise Exhibits 4, 5, 6, 7, and 8, correct?
11       MS. HAYWARD:  Objection, form.
12  A.  There was very little that I could decipher
13  from those items.
14  Q.  (By Ms. Kellett)  Do you know why those
15  documents were produced in this case?
16  A.  Not specifically.  I don't know -- excuse me.
17  -- specifically why.
18  Q.  Okay.  Let's go back to Exhibit No. 3.  Okay.
19  If you could turn to the very last page.
20  A.  Okay.
21  Q.  If you look, the first set of transactions, it
22  looks like, appear on November 9th, 2013; is that
23  correct?
24  A.  Yes.  At the bottom of the page, if you were to
25  put it in chronological order, yes, 11-9.

Page 44

1  Q.  Okay.  And when did Caliber take over the
2  servicing of this loan?
3  A.  I would say approximately -- well, I would have
4  to see maybe a screenshot of something.
5  Q.  Okay.  What screenshot would that be?
6  A.  I can give you what I recall.
7  Q.  Okay.
8  A.  Honestly, I can't remember if it was 2013 or
9  2014 without reviewing the screenshot.
10  Q.  Okay.  Do you know the name of the screen that
11  you'd want to look?
12  A.  It's a floating screen.  I believe you can see
13  it on every page of Fiserv.
14  Q.  So you hit that, and then you get a screen
15  which will show you when the loan was boarded?
16  A.  Correct.
17       (Discussion off the record.)
18  Q.  (By Ms. Kellett)  All right.  So going back to
19  the entry on November 9th, 2013, on Exhibit No. 3.
20  A.  Okay.
21  Q.  All right.  So what does the entry that says
22  "70 Breach Hold Placed-Expiration Date 2-6-14," what
23  does that mean?
24  A.  I'd like to go back and answer that last
25  question.  This looks like a -- we boarded the loan in

Page 45

1  2013.  To answer this current question, the breach hold,
2  it indicates that we recently acquired a loan.
3  Q.  Okay.  What does it mean "Expiration Date
4  2-6-2014"?
5  A.  It means that on 2-6-2014, we'll proceed on the
6  account as normal.
7  Q.  Okay.  And what do the entries, or what does
8  the code 70 mean?  No.  I'm sorry.  Is that the teller?
9  A.  That appears to be the teller ID.
10  Q.  Is -- what does that mean exactly?
11  A.  Teller ID is the employee who initiated the
12  transaction.
13  Q.  All right.  All right.  Is -- is there a
14  transaction code for this breach hold?  Is it DM?
15  A.  (Peruses document.)  It appears to be DM.
16  Q.  All right.  What does that mean?
17  A.  I believe we may have provided a list of codes.
18  Once if I could review that list of codes, I may be able
19  to answer that question.
20       (Exhibit 9 marked for identification.)
21  Q.  (By Ms. Kellett)  I'm showing you what's been
22  marked as Exhibit No. 9 to your deposition.  Do you
23  recognize this document?
24  A.  (Peruses document.)  Yes.  It looks familiar.
25  Q.  All right.  Is this a document that Caliber

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 46

1  produced yesterday?
2      A.  I don't know that it was produced yesterday.
3      Q.  It has a Caliber Bates label at the bottom,
4  correct?
5      A.  Yes.
6      Q.  All right.
7      A.  And the code for DM is here in black and white.
8      Q.  Okay.  What page is it on?
9      A.  870.
10     Q.  So it says that means delinquent message from
11 delinquent loan contact; is that correct?
12     A.  This reads, "Delinquent messages from
13 delinquent loan contact," that is correct.
14     Q.  All right.  And what does the "N" next to it
15 mean?
16     A.  Just a moment.  (Peruses document.)  That
17 column indicates whether it's financial, yes or no.
18     Q.  Okay.
19     A.  The "N" stands for no.
20     Q.  Okay.  What does the next column, PM400601,
21 mean?  And we're looking at Bates label Caliber 866.
22     A.  Okay.  Are we still looking at Exhibit 3?
23     Q.  No.  I'm sorry.  We're on Exhibit 9.
24     A.  Oh, okay.
25     Q.  The codes, on Page 866.

Page 47

1      A.  Page 866.  Okay.  And I'm sorry.  Repeat the
2  question.
3      Q.  Well, there's columns on this page.  The first
4  one's labeled "HST-TRAN."  The next column is labeled
5  "Description."  The next column is labeled "Financial,"
6  and then the next column is labeled "PM400601."  What
7  does that mean?
8      A.  Let me see.  Just a moment.  (Peruses
9  document.)  It's unclear what that -- that code means.
10 I don't know.
11     Q.  All right.  What about the column next to it?
12 It says "PM400578."  What does that mean?
13     A.  It's unclear for that one as well.  I don't
14 know.
15     Q.  All right.  Let's go back to Exhibit No. 3.
16         MS. HAYWARD:  Karen, why don't we go ahead
17 and take a break.  He's been going for an hour and a
18 half.
19         MS. KELLETT:  That's fine.
20         THE VIDEOGRAPHER:  We're off the record at
21 10:28 a.m.
22         (Recess from 10:28 a.m. to 10:44 a.m.)
23         THE VIDEOGRAPHER:  We're back on the record
24 at 10:44 a.m.
25     Q.  (By Ms. Kellett)  All right.  If you could,

Page 48

1  would you look at again Exhibit No. 3?
2      A.  Sure.
3      Q.  Okay.
4      A.  All right.
5      Q.  Continuing on, there's some additional entries
6  on November 9th, 2013.  It has some information:  "Plan
7  Confirmed," and then there's "1605," and it says,
8  "Completed 11-18-10."  What does that mean?
9      A.  Plan confirmed, I can only make an assumption
10 as to what that is, this not being a Caliber document.
11     Q.  Okay.  This was produced by Caliber.  Why do
12 you say it's not a Caliber document?
13     A.  I don't see a Bates number at the bottom.
14     Q.  It was produced in electronic form yesterday at
15 2:29.
16         MS. HAYWARD:  Let me clarify that this is a
17 Caliber document that has been produced in a spreadsheet
18 form.  That's why there's no Bates number.
19         THE WITNESS:  Okay.
20     A.  Like, there's a bankruptcy involved, and a
21 bankruptcy plan was confirmed.
22     Q.  (By Ms. Kellett)  All right.  Would -- would
23 somebody at Caliber have entered this information for
24 the entries on November 9th?
25     A.  Yes.

Page 49

1      Q.  All right.  And would that again be an employee
2  with a -- a teller number of 70?
3      A.  It appears to be.
4      Q.  All right.  And what does -- the second from
5  the bottom, it says, "Approved for BKR 8-25-10."  What
6  does that mean?
7      A.  It means the loan was approved for bankruptcy
8  August 25th of 2010.
9      Q.  Well, what does loan approved from bankruptcy
10 mean?
11     A.  The borrower filed bankruptcy.
12     Q.  Okay.  The very first -- I guess it's the last
13 line on the page, but it's the first in the series.
14 What do those numbers mean?
15     A.  The very last line on the page in the bottom
16 right-hand corner?
17     Q.  Yes.
18     A.  I don't know what those mean.
19     Q.  All right.  If we go up to November 15, 2013,
20 there's two entries.  The first one, and when I say
21 "first," I'm going from the bottom up.
22     A.  Okay.
23     Q.  You understand that?
24     A.  I understand.
25     Q.  It says, "First HAZ Letter," and what does that

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 50

1  mean?
2      A.  On which date again?
3      Q.  11 -- I'm sorry, 11-12 of 2013.
4      A.  I don't recall specifically what that means.
5      Q.  Okay.  Did you ask anybody other than in the
6  legal department what that means?
7      A.  I did not.
8      Q.  All right.  Right above that on 11-15-2 --
9  2013, it says, "Section 404 notice mailed 10-30-13."
10  What does that mean?
11      A.  I don't recall what the Section 404 notice is,
12  but these are items that are mailed to the borrower when
13  we're boarding loans.
14      Q.  Okay.  So something was mailed to the borrower
15  on this day?
16      A.  Yes.
17      Q.  All right.  Do you know if that's been produced
18  in this lawsuit?
19      A.  I don't know if it's been produced.  I mean, we
20  can review the exhibits to see if there's a Section 404
21  notice in there.
22      Q.  Okay.  But you don't know without reviewing the
23  production if it's been produced or not?
24      A.  I don't know.
25      Q.  Okay.  Okay.  Above that, there's a series of

Page 51

1  entries on the date of November 19th, 2013.  Do you see
2  those?
3      A.  On which dates again?
4      Q.  November 19th, 2013.
5      A.  And in which line?
6      Q.  All the lines here, what is --
7      A.  Uh-huh.
8      Q.  -- what are these entries telling us?
9      A.  (Peruses document.)  It looks like it's giving
10  us a list of recoverable and nonrecoverable amounts.
11      Q.  Okay.  And what are recoverable amounts?
12      A.  I -- just as you mentioned, amounts that we can
13  recover.
14      Q.  Recover from the borrower?
15      A.  From the account.
16      Q.  Well, who pay -- who's paying the money?  The
17  borrower?
18      A.  Who -- well, this looks like there was a
19  bankruptcy confirmed, so we wouldn't be asking the
20  borrower to pay anything.
21      Q.  Well, I'm asking you just generally when
22  Caliber uses the word or an employee uses the word
23  "recoverable" in these notes, what does it mean to
24  Caliber that something's recoverable?
25      A.  I mean, there's amounts that are able to be

Page 52

1  recovered on the account.
2      Q.  Okay.  But who ultimately will -- will pay the
3  amounts?  Who are you recovering the amounts from?
4      A.  That's kind of a catchy question because this
5  is a bankruptcy account, so we wouldn't be recovering
6  those from the borrower in an active bankruptcy, but the
7  amounts may be due to the account.
8      Q.  Well, you're recovering money from the Chapter
9  13 trustee, correct?
10      A.  The payments come in, correct.
11      Q.  Okay.  Do you know where the Chapter 13 trustee
12  gets the money to make the payments to Caliber?
13      A.  I believe payments come from the borrower.
14      Q.  All right.  Okay.  So, ultimately, the payments
15  are coming from the borrower?
16      A.  If you put it in that way, ultimately, yes.
17      Q.  Right.  And the borrowers still make their own
18  normal monthly mortgage payment during the bankruptcy,
19  correct?
20      A.  There's a pay -- payment plan that's set out,
21  and they make their payments to the trustee, and some of
22  that goes to the mortgage, yes.
23      Q.  Now, and in this case, the Chapter 13 trustee
24  was paying both the deficiency claim of Caliber and the
25  ongoing monthly mortgage payments, correct?

Page 53

1      A.  Repeat the question, please.
2          MS. KELLETT:  Go ahead.
3          (Requested portion was read.)
4      A.  Excuse me.  I haven't reviewed the payments
5  from the trustee, so I don't know the details.
6      Q.  (By Ms. Kellett)  Okay.  Well, when it says
7  nonrecoverable $75, what does that mean?
8      A.  It just means it's nonrecoverable.
9      Q.  Okay.
10      A.  That we may never see that $75.
11      Q.  Okay.  And how is it indicated on the account
12  other than here that the amount is nonrecoverable?
13          MS. HAYWARD:  Objection, form.
14      A.  To my knowledge, all that I can recall is that
15  this is -- this is how we can determine that it's non-
16  recoverable.
17      Q.  (By Ms. Kellett)  Right.  If there is an
18  accounting item, would this be recorded?  You said --
19  you said there was a -- information on fees in the
20  Fiserv, correct?
21      A.  Right.
22      Q.  Okay.  Would you see this amount in the screens
23  looking at the screens for Fiserv?
24      A.  Yes.  You should see that amount.
25      Q.  Okay.  And is there a special code that means

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 54

1  if it's recoverable or nonrecoverable?
2    A.  That -- can I see a copy of the transaction
3  history, or do I have it?
4    Q.  No.
5    A.  Oh, okay.
6      (Discussion off the record.)
7      (Exhibit 10 marked for identification.)
8    Q.  (By Ms. Kellett)  Okay.  I'm handing you a
9  document that we've labeled Exhibit 10 for your
10  deposition.  I'll represent to you that this is a
11  printout of a spreadsheet that was produced yesterday
12  afternoon at 2:29.  Are you familiar with the
13  information on this spreadsheet?
14    A.  This looks familiar.
15    Q.  Okay.  It was under a -- tab called "CFPB
16  Format."  Are you familiar with that?
17    A.  CFPB format?
18    Q.  Format.
19    A.  TFPB -- CFPB rings a bell.
20    Q.  Okay.  What is CFPB?
21    A.  I believe it's Consumer Finance Protection
22  Bureau.
23    Q.  Okay.  Okay.  But you reviewed this spread-
24  sheet?
25    A.  Yes.  It looks similar to what I reviewed.

Page 55

1    Q.  Did you review it in spreadsheet format, or did
2  you review a printed version?
3    A.  I reviewed both.
4    Q.  All right.
5    A.  (Peruses document.)  There's a question still
6  pending?
7    Q.  Yes.  It was about the -- the $75.
8      MS. KELLETT:  Can you find that.
9      (Requested portion was read.)
10    A.  I answered that question.
11      MS. KELLETT:  Well, let me just strike it,
12  and I'll -- I'll reask.
13    A.  Okay.
14    Q.  (By Ms. Kellett)  Okay.  You said the $75 would
15  show up in the -- the fees screen, correct?
16    A.  I said it would show up in the transaction
17  history, correct.
18    Q.  Okay.  And is this the transaction history
19  that's Exhibit No. 10?
20    A.  It looks like it might be a transaction
21  history, a portion thereof.
22    Q.  All right.  Can you show me where the $75 is
23  indicated as nonrecoverable?
24    A.  (Peruses documents.)  It looks like we're
25  missing dates.

Page 56

1    Q.  What dates?
2    A.  11-19 specifically, which may not be on this
3  spreadsheet because it's a nonrecoverable.
4    Q.  All right.  But there is a place that you can
5  look and see all the recoverable and nonrecoverable fees
6  on an account, correct?
7    A.  Yeah.  I'm looking at it here on this.
8    Q.  I mean, is there a -- a database where you can
9  view just the fees on the account?
10    A.  Yes.  We do have a -- a fee review screen.
11    Q.  Okay.  And you could see -- and the fees are
12  coded as either recoverable or nonrecoverable, correct?
13    A.  I don't recall the specifics of that screen.  I
14  would actually have to go to that screen and see if that
15  information is available.
16    Q.  Okay.  Well, let's go back and look at No. 10
17  for a minute.
18    A.  Okay.
19    Q.  There's an entry on 11-9.  It says, "Amount to
20  UF, $864.72."  What does that mean?
21    A.  On which date again?
22    Q.  The first date, 11-9-2013.
23    A.  The first date at the top, correct, not from
24  the bottom?
25    Q.  Yes, at the top.

Page 57

1    A.  Okay.  All right.  The first date, 11-9, you
2  said administrative adjustments?
3    Q.  Yes.
4    A.  "Amount to UF."  Just a moment.  I think I know
5  what UF is, but let me --
6    Q.  Sure.
7    A.  (Peruses document.)  Right, unapplied.
8    Q.  Okay.  What does unapplied mean?
9    A.  There's an amount sitting on the account that
10  has not been applied to any of the balances.
11    Q.  Okay.  And who made the decision to place the
12  $864.72 into unapplied?
13    A.  I don't know.
14    Q.  Well, why would an amount not be applied?
15    A.  There was a payment that wasn't enough to cure
16  the balance.  That's one reason.
17    Q.  Is unapplied like a suspense account?
18    A.  Yes.  Unapplied is like an expense -- suspense
19  account.
20    Q.  All right.  Then there's the next line says,
21  "Uncollected interest or late charge," and then to the
22  right, it's got, "Amount to LTC, negative $1,024.80."
23  Do you see that?
24    A.  Yes, "Uncollected interest or late charge.
25  Amount to LTC."  Just a moment.  (Peruses document.)

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 62

1    Q.  Right, which, yeah, if the fee has not been
2    waived, then at the time of the payoff, the borrower
3    will pay those fees, correct?
4    A.  Correct, and then we'll release the -- the
5    mortgage.
6    Q.  Release the lien?
7    A.  The lien.
8    Q.  All right.  Okay.  So if we go down, there's
9    four entries also on 11-9.  They're entitled "Fees
10   billed."  One's for 7,845.60.  Do you see that?
11   A.  Yes.  I see it.
12   Q.  Okay.  Is that actually fees that were billed
13   by Caliber, or did those come over from the prior
14   servicer?
15   A.  Just a moment.  (Peruses documents.)
16       (Discussion off the record.)
17   A.  These will be fees that came from the prior
18   servicer.
19   Q.  (By Ms. Kellett)  And the same thing with the
20   12,649.86:  Did those come from the prior servicer?
21   A.  This would also have come from the prior
22   servicer.
23   Q.  And what about the $12.50 and the $50?  Would
24   those come from the prior servicer?
25       (Discussion off the record.)

Page 63

1    A.  $12.50 would have come from the prior servicer.
2    (Peruses documents.)  The $50 would have come from the
3    prior servicer.
4        (Discussion off the record.)
5    Q.  (By Ms. Kellett)  All right.  Let me go ahead
6    and --
7        (Discussion off the record.)
8        (Exhibit 11 marked for identification.)
9    Q.  (By Ms. Kellett)  Let me go ahead and introduce
10   Exhibit No. 11, and I'll represent that this is a
11   printout taped together of a spreadsheet that was
12   produced on June 6, 2016.  Did you review the
13   spreadsheet that was produced on June 6, 2016?
14   A.  Yes.
15   Q.  Did you review it on a computer screen or on
16   paper?
17   A.  On a mixture of both.
18   Q.  Okay.  When it was on paper, did you tape it
19   together like we've done here?
20   A.  Not now; however, the computer printout shows
21   the same information as this taped version.
22   Q.  Okay.  So you said these dollar amounts came
23   from the prior servicer.  Does it -- is it showing --
24   if an -- an amount like the 7,845.60 is in the column
25   saying "Amount to Fees," does that mean that the debtor

Page 64

1    owes those funds?
2    A.  It means that the account is due those funds.
3    Q.  Okay.  The account is due those funds?
4    A.  True.
5    Q.  Right.  And unless they're waived at -- at
6    payoff, those funds must be repaid for the lien to be
7    released, correct?
8        MS. HAYWARD:  Objection to form.
9    A.  That is correct.
10   Q.  (By Ms. Kellett)  All right.  So you said this
11   came from the prior servicer.  How does Caliber know
12   what kind of items comprise this 7,845.60?
13   A.  We receive a file from the previous servicer.
14   Q.  What's in the file?
15   A.  The detailed payment breakdowns.
16   Q.  Of the amounts that comprise the $7,845?
17   A.  Correct.  There should be something that
18   details the amount of $7,845.
19   Q.  Okay.  Did you review that file with respect
20   to the $7,845.60?
21   A.  No, I did not.
22   Q.  But you could find it and review it, correct?
23   A.  Yes, I could.
24   Q.  Do you know why that file wasn't produced in
25   this case?

Page 65

1        MS. HAYWARD:  Objection, form.
2    A.  I don't know.
3    Q.  (By Ms. Kellett)  All right.  So if you go
4    across on Exhibit No. 11 --
5    A.  Uh-huh.
6    Q.  -- there's a column that says, "Fee Code, 164"
7    and "Fee Description, Corporate ADV 3 FPTAX."  Do you
8    see that?  It's way over on the right.
9    A.  (Peruses document.)  Fee code and fee
10   description?
11   Q.  Yes.
12   A.  Yes.
13   Q.  Okay.  What -- what do those -- what does the
14   fee code and the fee description mean with respect to
15   this transaction?
16   A.  (Peruses document.)  I wonder if those codes
17   are in here.  Give me just a moment.  (Peruses
18   document.)  Is there anything in production that breaks
19   down the fee codes?
20   Q.  And what was produced yesterday that's Exhibit
21   No. 9 is the only production we received with respect to
22   codes.
23   A.  Yeah, and these are alpha codes.  I don't see
24   any numeric codes.  I don't know what those codes are.
25   Q.  Okay.  Did you -- did you do anything to -- to

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

---

Page 66

1 find out what the -- the codes were?

2     A.  No; however, the fee description on the two

3 lines that we were referring to are referring to taxes

4 and insurance.

5     Q.  All right.  So the first line, does this mean

6 that $7,845.60 were for taxes?

7     A.  Yes.

8     Q.  All right.  And $12,649.86 were for force-

9 placed insurance; is that correct?

10     A.  Yes.

11     Q.  Okay.  With respect to the 12,649.86, did you

12 review the file with the detailed payments from the

13 prior servicer?

14     A.  I did not.

15     Q.  But you could obtain that and review it,

16 correct?

17     A.  Yes.  We could obtain that.

18     Q.  All right.  Did you do anything to tell exactly

19 which taxes and which insurance payments were made that

20 comprise these amounts of $7,845.60 and $12,649.86?

21         THE WITNESS:  Repeat the question once

22 more, please.

23         (Requested portion was read.)

24     A.  No.  I didn't -- I didn't do anything to add up

25 those amounts or determine where they stemmed from.

---

Page 67

1     Q.  (By Ms. Kellett)  Okay.  What does -- if you

2 know, and you may not, but what does Caliber do to

3 ensure that amounts that it brings over from the prior

4 servicer are, in fact, owed by the borrower?

5     A.  We do a detailed system of checks and balances

6 during our boarding process.

7     Q.  And what does that entail?

8     A.  In a nutshell, during our boarding, we'll do

9 three quality control reviews.  During each -- each

10 review, we'll do a conference call with the previous

11 servicer.  If no discrepancies are found during the

12 first review, then we'll move on to the second review.

13 If no discrepancies are found in the second review, then

14 we'll move on to the final review.

15     Q.  Okay.  And what type of discrepancies might

16 there be?

17     A.  Something as simple as an address change or

18 a -- a phone number change.

19     Q.  Okay.  With respect to accounts for debtors in

20 bankruptcy, does Caliber review the three -- 3002.1

21 notices that have been filed by the previous servicer?

22     A.  Just a moment.

23         (Discussion off the record.)

24     A.  That would be a review that's conducted by our

25 bankruptcy department.  If their review includes a

---

Page 68

1 review of the 3002, I -- I don't know.

2     Q.  (By Ms. Kellett)  Okay.  Who would know the

3 answer to that question?

4     A.  Someone from our bankruptcy department.

5         (Discussion off the record.)

6         (Exhibit 12 marked for identification.)

7     Q.  (By Ms. Kellett)  I'm handing you what's been

8 marked as Exhibit No. 12.  Can you please review that

9 document?

10     A.  Sure.  Just a moment.  (Peruses document.)

11         (Discussion off the record.)

12     A.  Okay.

13     Q.  (By Ms. Kellett)  And do you recognize this

14 document?

15     A.  I haven't seen this one.

16     Q.  All right.

17         (Exhibit 13 marked for identification.)

18     Q.  (By Ms. Kellett)  Let me give you Exhibit No.

19 13.

20     A.  (Peruses document.)

21         (Discussion off the record.)

22     Q.  (By Ms. Kellett)  And do you recognize this

23 document?

24     A.  Just a moment.

25     Q.  Okay.  Sure.

---

Page 69

1     A.  (Peruses document.)  I haven't seen this one

2 either.

3     Q.  All right.  Did you review any of the

4 bankruptcy pleadings in the Trevinos' bankruptcy case

5 in preparation for your deposition?

6     A.  Yes.  We skimmed through it.

7     Q.  Okay.  But you didn't look at these -- either

8 of these notices?

9     A.  I -- I didn't see these notices.

10     Q.  Okay.  Which documents from the bankruptcy did

11 you look at?

12     A.  I forget what it's called.  It was -- we

13 reviewed your answer or your response or your -- the

14 affirmative defenses.

15         THE WITNESS:  Or what was name of that

16 document we reviewed?

17     Q.  (By Ms. Kellett)  Well, I'm -- I'm asking from

18 the -- the actual bankruptcy case.  Did you review any

19 of the things like the plan in the bankruptcy case or

20 the proof of claim?

21     A.  Oh, no.  I didn't review the plan.

22     Q.  Okay.  Did you review the proof of claim filed

23 by the predecessor servicer?

24     A.  No.  I didn't review the proof of claim either.

25     Q.  So going back to Exhibits 12 and 13 --

---

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 70

1    A. Okay.
2    Q. -- Exhibit No. 12 shows $3,230.43 of hazard
3    insurance from September 21st, 2012. Do you see that?
4    A. Let's see. I see -- yes, I see that.
5    Q. All right. Do you know if that amount is
6    included in the 7,840 -- I'm sorry, in the $12,649.86 in
7    force-placed insurance showing up on Exhibit 11 when the
8    loan was boarded?
9    A. (Peruses documents.) That, I don't know. To
10   my knowledge, that amount has been resolved since then,
11   though.
12   Q. I'm -- I'm just --
13        MS. KELLETT: Can you repeat the question.
14   I'm sorry.
15        (Requested portion was read.)
16   MS. KELLETT: And the response was?
17        (Requested portion was read.)
18   MS. KELLETT: Move to strike everything
19   past, "I don't know."
20   Q. (By Ms. Kellett) Okay. With respect to
21   Exhibit 13, if you could look at that.
22   A. Okay.
23   Q. All right. This is showing taxes for 2010 and
24   taxes for 2012 incurred on 4-22-2013. Do you see that?
25   A. Yes, I do.

Page 71

1    Q. Okay. Do you know if these taxes were part of
2    the 12,000 -- I'm sorry, 7,845.60 in corporate advance
3    taxes showing up on Exhibit No. 11 when the Trevinos'
4    loan was boarded with Caliber?
5    A. I don't know.
6    Q. In particular, the tax for the tax year 2010,
7    do you see it shows an amount of $2,933.83? Do you see
8    that?
9    A. I do.
10   Q. Do you know if that amount is included within
11   the $7,845.60 shown for taxes when this loan was boarded
12   with Caliber?
13   A. No. I don't have the details of -- of that
14   amount; however, to my knowledge, this tax amount for
15   2010 has been resolved.
16   Q. Okay.
17        MS. KELLETT: Move to strike everything.
18   Can you reread his question (sic).
19        (Requested portion was read.)
20   Q. (By Ms. Kellett) Okay. How do you know it's
21   been resolved?
22   A. Well, and to my knowledge, Caliber has
23   withdrawn the 3002 notice and with specific verbiage
24   in there saying that we have no interest in collecting
25   money that we're not entitled to, so that leads me to

Page 72

1    believe that it's been resolved.
2    Q. Caliber's withdrawn Exhibit No. 13, the notice
3    that was Exhibit No. 13?
4    A. The 3002 notice. I'm not sure if it -- it was
5    Exhibit No. 13. I didn't see the notice, so I couldn't
6    tell you if it was this specific exhibit.
7    Q. Well, this is the exhibit that has 2010 taxes
8    on it, correct?
9        MS. HAYWARD: Objection, form.
10   Q. (By Ms. Kellett) Well, does this exhibit show
11   2010 taxes?
12   A. It does show 2010 taxes.
13   Q. Okay. And you said you don't know whether this
14   number of $2,933.83 is included within the dollar amount
15   $7,845.60, correct?
16   A. That is correct.
17   Q. All right. And you say you believe that
18   Caliber filed a withdrawal of what is Exhibit No. 13;
19   is that correct?
20        MS. HAYWARD: Objection, form, misstating
21   the evidence.
22   A. I've never seen --
23        MS. HAYWARD: His testimony.
24   A. -- Exhibit 13 or the withdrawal.
25   Q. (By Ms. Kellett) Okay. Well --

Page 73

1    A. But it was represented to me that it -- that
2    we did withdraw the 3002.
3    Q. Okay. Who represented that to you?
4    A. Counsel.
5    Q. Okay. So did you review the docket sheet in
6    this case to see which -- at what point in time the 3002
7    notice was withdrawn?
8    A. No, I didn't.
9        (Discussion off the record.)
10   Q. (By Ms. Kellett) Okay. So you don't know
11   whether or not that this particular 3002.1 notice filed
12   on 7-24-2013, this document No. 82, was actually
13   withdrawn by Caliber, correct?
14   A. I don't know if this specific notice was
15   withdrawn by Caliber.
16   Q. Okay. And Caliber didn't file this notice,
17   did it?
18        MS. HAYWARD: Objection, form. The witness
19   has already testified that he's never seen this document
20   before.
21   Q. (By Ms. Kellett) Do you know if Caliber filed
22   this, this notice, with the Court?
23   A. To my knowledge, this was filed by the previous
24   servicer.
25   Q. All right. All right. Let's go back to

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 74

1  Exhibit No. 3.
2      A. (Complies.)
3      Q. When a loan is boarded, are there notes made
4  in Caliber's system?
5      A. Yes.  When the loan was boarding -- boarded,
6  there are notes made.
7      Q. Okay.  What kind of notes are usually made when
8  the loan is boarded?
9      A. If you can go with me to Exhibit 3, the last
10  page on 11-9?
11      Q. Yes.
12      A. That's an example of the notes that are made
13  when the loan's boarded.
14      Q. All right.  Normally, does -- are there some
15  notes made about the fees that are boarded onto the
16  account from the previous servicer?
17      A. If you can, same exhibit, same page, reference
18  to the fees are also on this page.
19      Q. Where is that?
20      A. The recoverable and nonrecoverable fees that
21  we discussed earlier.
22      Q. Okay.
23      A. I'm sorry.
24          THE WITNESS:  Can I take a break?  I need
25  to step outside for a second.

Page 75

1          MS. KELLETT:  He had finished the -- yeah,
2  sure.
3          THE VIDEOGRAPHER:  We're off the record
4  11:39 a.m.
5          (Recess from 11:39 a.m. to 11:52 a.m.)
6          THE VIDEOGRAPHER:  We're back on the record
7  at 11:52 a.m.
8          MS. KELLETT:  All right.  Can you read my
9  last question.
10          (Requested portion was read.)
11      Q. (By Ms. Kellett)  Okay.  Okay.  So if you could
12  look at Exhibit 3.
13      A. Okay.
14      Q. And also at Exhibit either 11 or 10.
15      A. I'll grab 'em both.
16      Q. Okay.
17      A. All right.
18      Q. All right.  Where on the -- where on the 9th
19  is there a discussion of the amounts of $7,845.60,
20  $12,649.86, $12.50, and $50?
21      A. Where are those discussions?
22      Q. Yes, on Exhibit No. 3.
23      A. Just a moment, please.  (Peruses document.)  If
24  you'll pardon me, I'm gonna have to go through every
25  page to see if there was a discussion.

Page 76

1      Q. Well, I'm -- I'm asking about when they were
2  boarded onto the account on November 9th, 2013.
3      A. I don't see a discussion about that amount.  I
4  would believe those -- those discussions happened during
5  the conference call, which I wasn't privy to.
6      Q. I'm sorry.  What conference call?
7      A. The conference call that we have when we're
8  boarding loans.
9      Q. All right.  Do you normally put down notes of
10  the fees that you're boarding?
11      A. I wouldn't say that's normal because here I
12  don't see notes about the fees that we're boarding.
13      Q. I think you testified earlier that when amounts
14  are added to or taken from an account, there should be
15  notations made about it in the notes; is that correct?
16      A. Right.  After the loan was boarded --
17      Q. Uh-huh.
18      A. -- and we are servicing the loan, then, yes,
19  we would begin to note the account.
20      Q. All right.  So -- so to find out the exact,
21  I guess, payments for which these fees billed are
22  comprised of, you need to look at these files that you
23  earlier testified, right, that come in when the loan
24  is boarded?
25      A. Repeat the question for me, please.

Page 77

1          MS. KELLETT:  Can you repeat the question.
2          (Requested portion was read.)
3          MS. KELLETT:  I'll withdraw the question.
4  Sorry.
5      Q. (By Ms. Kellett)  You mentioned that there's a
6  detailed payment file from the prior servicer, correct?
7      A. Yes.
8      Q. And that would detail the composition of these
9  amounts we've been discussing of the 7,845.60, the
10  12,659 -- I'm sorry, 649.86, the $12.50, and the $50,
11  correct?
12      A. Correct.  The amounts that we reviewed are
13  broken down and are able to be found within our system,
14  yes.
15      Q. All right.  And you could retrieve those for
16  us, correct?
17      A. Absolutely.
18      Q. All right.  Okay.  Let's go up now to the 11-25
19  entry on Exhibit 3, and if you look, it starts on the
20  previous page, so there's a lot of entries for 11-25-13.
21  Could you review those?
22      A. Sure.  Just a moment.  (Peruses document.)
23  Okay.
24      Q. Okay.  And if we look still on the very first
25  page or very last page of Exhibit 3, at the top of the

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 78

1  page, it's got four lines.  It says, "System updated for
2  the following event:  User has created a Process-Level
3  issue for this loan.  Issue Type: BK AACER Review.
4  I-S."
5      A.  Okay.
6      Q.  Where is the rest of the word after I-S?
7      A.  Well, just a moment.  (Peruses document.)
8  Hmmm.  Well, a couple things about that I-S:  I mean,
9  that could be someone's initials.  That's one.  Also,
10  when this particular set of notes was entered in the
11  system, sometimes the sentences are incomplete, and you
12  have to kind of decipher, you know, from one sentence
13  to the next.
14      Q.  Okay.  But the rest of the sentence is gonna
15  be somewhere in the notes, correct?
16      A.  If this is the beginning of a sentence, yes.
17      Q.  Okay.  And you can't tell from this whether
18  this is a beginning of a sentence or not?
19      A.  Well, it does say "is," I-S, but that could
20  also stand for someone's initials.  I tried to connect
21  it to some of the other lines that I see here.  I mean,
22  I can connect it to a couple of these lines here.
23      Q.  Okay.  Which ones?
24      A.  On the page before last, the second entry.
25      Q.  Okay.

Page 79

1      A.  11-25, the second entry from the top.
2      Q.  Uh-huh.
3      A.  It says, "Active," standing there by its
4  lonesome.  It could be -- it could mean is active.  A
5  couple lines down?
6      Q.  Uh-huh.
7      A.  Let's see.  One, two, three, four, five from
8  the top -- from the bottom?
9      Q.  Yeah.
10      A.  It could be -- it says, "sue Comments."  That
11  could be issue comments, so...
12      Q.  All right.  If you were looking at this on the
13  computer screen, could you tell which one it went to?
14      A.  Well, I've had my experience in putting these
15  things together, so I probably could.
16      Q.  Okay.  But you're not sure on this spreadsheet,
17  correct?
18      A.  No.  I'm not positive.  As I mentioned,
19  there's, you know, a few different explanations of why
20  that's sitting here by its lonesome.
21      Q.  All right.  If -- what's going on here with
22  these entries?  What's -- what is this describing for
23  the viewer of this information?
24      A.  I think these are -- (peruses documents.)  It
25  looks like someone's reviewing this file, just in a

Page 80

1  nutshell.
2      Q.  Well, it speaks about a transfer of claim,
3  "Transfer Agreement 3001 (e) 4."  Do you know what that
4  is?
5      A.  What line are you on?
6      Q.  The third from the bottom.
7      A.  On the last page?
8      Q.  Second-to-the-last page, four and three up.
9      A.  "Transfer Agreement 3001 (e) 4."  Well, just
10  the line below that shows, "Transferor: HSBC Mortgage
11  Services," so I'm assuming it has something do with the
12  service transfer.
13      Q.  All right.  It talks about a fee of $25.  Do
14  you see that?  And also up on 12-27 as well.
15      A.  I see that.
16      Q.  What kind of fee is this?
17      A.  I don't know what type of fee this is.
18      Q.  Okay.  Do you know if it's recoverable from the
19  borrower?
20      A.  Just a moment.  (Peruses document.)  I don't
21  know if that's recoverable from the borrower.
22      Q.  All right.  How would you find that out?
23      A.  I can review and dig a little deeper to see
24  what -- if that amount is recoverable.
25      Q.  Okay.  What would you review to determine that?

Page 81

1      A.  First I would see what the $25 is for, and then
2  I'd go from there.
3      Q.  And how would you find out what the $25 was
4  for?
5      A.  I'd speak to the teller ID that entered this
6  note.
7      Q.  Okay.  But you hadn't done that in preparation
8  for your deposition, correct?
9      A.  No, I haven't.
10      Q.  Okay.  Let's go to the entry above it on
11  December 10, 2013.
12      A.  December 10th.  Okay.
13      Q.  So going down towards the bottom, it says --
14  there's a date that's been entered, and it says
15  12-10-13, so is that when the entry was made, at 6:15,
16  or I'm sorry, 16:15?
17      A.  12-10-13, 16:15, and next to that, it says --
18  there's a line -- a number 34107, the same line?
19      Q.  Yes.
20      A.  Okay.  And I'm sorry.  Repeat the question.
21      Q.  You know what?  Let me -- let me strike that.
22  What does the 34107 mean?
23      A.  (Peruses document.)  Just to make notice that
24  I see five-digit numbers floating after several line
25  items --

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 82

1    Q. Uh-huh.
2    A. -- throughout this sheet. I don't know
3    specifically what those five-digit numbers are. I can
4    make an assumption, which I prefer not to.
5    Q. All right. Did you ask anybody in preparing
6    for the deposition what the numbers mean?
7    A. No, I did not.
8    Q. All right. With respect to what's going on, on
9    12-10-2013, what information would the reader of these
10   notes obtain about --
11   A. On which date again?
12   Q. 12-10 of 2013.
13   A. So that entire sequence of 12-10-2013? Let me
14   see. (Peruses document.) Well, I'm not a -- it seems
15   to be a bankruptcy note, and I'm not a bankruptcy
16   specialist, so I'm not sure what the details of these
17   notes are or what the meaning of these notes are.
18   Q. Okay. Did you talk to any bankruptcy person
19   about what these notes meant in preparation for your
20   deposition today?
21   A. No, I didn't.
22   Q. Okay. At the bottom, the very first entry,
23   which is the lowest one closest to the bottom on
24   12-13-2010, it says -- well, let me go up four lines,
25   "System updated for the following event: User has

Page 83

1    created a Process-Level issue for this loan. Issue
2    Type: BK Action Stop," and then a little "I" with two
3    dots and "Ot." What does that mean?
4    A. (Peruses document.) Again, I'm not a
5    bankruptcy specialist, so I'd have to reach out to that
6    teller ID to ask what that is, without assuming.
7    Q. Okay. If we go up, there's -- and let me know
8    if I'm reading this -- well, do you see a line up such
9    of towards the middle of that, that starts with, "her
10   Legal Action"?
11   A. Yes. The number 500 right before it?
12   Q. Uh-huh.
13   A. Yes, I see that.
14   Q. Do you know where the beginning of that word
15   is?
16   A. Hmmm. "Her legal Action." (Peruses document.)
17   I don't know where the beginning of that sentence is, if
18   there is a beginning, or if that is the statement in
19   itself. I don't -- I don't know.
20   Q. Do Caliber employees normally write "her Legal
21   Action" into notes?
22   A. I can't speak for all Caliber employees.
23   Q. Well, are generally the Caliber employees
24   supposed to put complete sentences in the notes?
25   A. Not necessarily. It's -- could be written in

Page 84

1    shorthand.
2    Q. In shorthand that other people could
3    understand?
4    A. Absolutely.
5    Q. Correct?
6    A. Correct.
7    MS. HAYWARD: Karen, can we go off the
8    record for a second?
9    MS. KELLETT: No.
10   Q. (By Ms. Kellett) All right.
11   MS. HAYWARD: Okay. Well, then, we can
12   have the discussion on the record if you'd like. I
13   mean, it's very --
14   MS. KELLETT: I'm -- I'm -- I'm --
15   MS. HAYWARD: Okay.
16   MS. KELLETT: -- questioning the witness,
17   Melissa. This is my deposition that I get to question
18   the witness, okay, so I'd appreciate if you don't --
19   MS. HAYWARD: If I not speak to you
20   about --
21   MS. KELLETT: Right, right.
22   MS. HAYWARD: -- to try to clarify and --
23   and short-circuit this --
24   MS. KELLETT: No.
25   MS. HAYWARD: -- so we don't spend eight

Page 85

1    hours --
2    MS. KELLETT: No, no.
3    MS. HAYWARD: -- looking through notes that
4    are quite obvious.
5    MS. KELLETT: Well, they don't seem to be
6    obvious to him.
7    MS. HAYWARD: Okay. Continue, by all
8    means.
9    MS. KELLETT: Okay.
10   Q. (By Ms. Kellett) She says the notes are
11   obvious. Can you -- I think you testified that you
12   weren't sure what was going on without talking to a
13   bankruptcy specialist, in these notes on 12-10-2013; is
14   that correct?
15   A. That is correct. I would need a specialist to
16   clarify the meaning of this --
17   Q. Right. And you --
18   A. -- section.
19   Q. And you didn't do that to prepare for your
20   deposition today; is that correct?
21   A. Correct. I did not speak with a bankruptcy
22   specialist --
23   Q. Did you --
24   A. -- in preparation for this deposition.
25   Q. Did you look at these notes at all on the

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 86

1 actual normal computer screen that you would normally
2 look at the notes on?
3      A. Yes.
4      Q. Okay.
5      A. I did review the notes on the computer screen.
6      Q. Okay. But they were notes that were not --
7 they were in a format different than this Excel
8 spreadsheet, correct?
9      A. No. Everything that you see here would be in
10 the similar format, same information, as our system.
11      Q. On your system -- so the system would also have
12 notes that are not complete; is that correct?
13          MS. HAYWARD: Objection, form.
14      A. I wouldn't say the notes are incomplete. I
15 just -- what I would say is that I would need to speak
16 with a bankruptcy specialist to clarify the notes.
17      Q. (By Ms. Kellett) Okay. Well, going up, the
18 second to the top 12-10, it says, "e dates assessed are
19 different."
20      A. The top of --
21      Q. What does that mean?
22          MS. HAYWARD: I'm sorry. What line are we
23 on?
24          MS. KELLETT: The second from the top
25 December 10, 2013.

Page 87

1      A. Again, I would have to assume what the letter
2 "e" stood for to answer that question.
3      Q. (By Ms. Kellett) Well, what do you assume it
4 stands for?
5      A. I prefer not to make a -- assumptive answers.
6      Q. Okay. Well, how -- how is somebody looking at
7 this screen supposed to know what it stands for, to
8 understand what's going on from these notes?
9      A. Right. Well, bankruptcy has bankruptcy
10 language, so if I spoke with a bankruptcy specialist,
11 they can tell me -- decipher what this language is.
12      Q. Okay.
13          MS. HAYWARD: All right. We're gonna take
14 a break.
15          MS. KELLETT: No, we're not.
16          MS. HAYWARD: Yeah. I'm requesting a
17 break.
18          MS. KELLETT: We just had a break.
19          MS. HAYWARD: Well, I'm requesting another
20 one.
21          MS. KELLETT: I'm not gonna let -- go for
22 a break at this minute.
23          MS. HAYWARD: You're not gonna go for a
24 break at this minute. Okay.
25          MS. KELLETT: So can you read the last

Page 88

1 question.
2          (Requested portion was read.)
3          MS. KELLETT: And what was his answer?
4          (Requested portion was read.)
5      Q. (By Ms. Kellett) All right.
6      A. Can I pause there? I'd like to take a break.
7      Q. I'm not -- I'm not gonna allow a break during
8 this line of questioning. We just took a break. In
9 fact, let's talk about, we've had two breaks so far; is
10 that correct?
11      A. We have had two breaks.
12      Q. Okay. Did you speak with your attorneys during
13 either of those breaks?
14      A. Yes.
15      Q. What did you say to them?
16          MS. HAYWARD: I'm sorry. Excuse me?
17 Objection.
18          MS. KELLETT: He's on the witness stand.
19          MS. HAYWARD: And you're asking the witness
20 what he spoke to his attorneys about?
21          MS. KELLETT: Yes, absolutely.
22          MS. HAYWARD: Well, I'm instructing the
23 witness not to answer.
24      Q. (By Ms. Kellett) You understand --
25          MS. HAYWARD: I'm sorry. I just got --

Page 89

1      Q. (By Ms. Kellett) -- testifying in this
2 deposition is the same as though you were on the witness
3 stand, correct?
4      A. I know there is a -- a difference to being on
5 the witness stand and to being in a deposition.
6      Q. Really?
7      A. And I would have --
8      Q. Are you sure about that?
9      A. I have rights as a witness.
10          MS. HAYWARD: Again, you're asking the
11 witness for a legal question.
12          MS. KELLETT: No, no. I'm asking him what
13 he said.
14          MS. HAYWARD: Well, then, don't ask him
15 if he's sure about something when he's answered your
16 question. He's answered your question.
17      Q. (By Ms. Kellett) Okay. What did you say to
18 your lawyers?
19          MS. HAYWARD: Again, objection, privilege.
20 Instruct the witness not to answer.
21          MS. KELLETT: You can't -- you can't talk
22 to your -- your witness while they're on the witness
23 stand.
24          MS. HAYWARD: I'm objecting on privilege
25 and --

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 94

1  topics.
2          MS. KELLETT:  Correct.  We can go off the
3  record now.
4          MS. HAYWARD:  Oh.  Now we can go off the
5  record.
6          THE VIDEOGRAPHER:  We're off the record at
7  12:20 p.m.
8          (Lunch recess from 12:20 p.m. to 1:20 p.m.)
9          THE VIDEOGRAPHER:  We're back on the record
10  at 1:20 p.m.
11      Q.  (By Ms. Kellett)  All right.  Could you look at
12  again Exhibit No. 3?
13      A.  Okay.
14      Q.  Okay.  Second-to-the-last page, sort of in the
15  middle, there is some comments that were entered on
16  December 11th, 2015.  Do you see those?
17      A.  Yes.
18      Q.  All right.  What are these notes telling us?
19      A.  Just a moment.  (Peruses document.)  Just a
20  moment, please.
21      Q.  Sure.
22      A.  Thanks.  All right.  (Peruses document.)  Well,
23  I believe I mentioned earlier that sometimes the notes
24  are entered, and when -- when they show up in the
25  system, they're transposed, so what this is reading, if

Page 95

1  we start at the very bottom?
2      Q.  Uh-huh.
3      A.  12-11?
4      Q.  Uh-huh.
5      A.  It says, "Type: BK Action Stop," then the weird
6  looking "I" thing we mentioned earlier.
7      Q.  Right.
8      A.  "Other Legal A," and then to go back up to the
9  top where it says, "C-T-I-O-N"?
10      Q.  Uh-huh.
11      A.  That's where the "A" is continued.
12      Q.  Right.
13      A.  So -- so, "Stop other Legal Action," and then
14  we can continue down from there.  "Comments: Process
15  closed - Supplemental POC.  12-11-13.  System updated
16  for the following."  That's what it's saying.
17      Q.  Okay.  What is the supplemental POC?
18      A.  I assume that the -- POC is in reference to
19  the bankruptcy, proof of claim.
20      Q.  What's the supplemental POC?
21      A.  That's an additional proof of claim.
22      Q.  Okay.  Is this saying an additional proof of
23  claim was filed?
24      A.  (Peruses document.)  It's not saying that it
25  was filed; it's just saying that there is a supplemental

Page 96

1  POC.
2      Q.  All right.  If we look at 12 -- first of all,
3  if you go back to maybe Exhibit 10.
4      A.  Okay.
5      Q.  Or -- and/or 11.
6      A.  I'll just stick with 10.
7      Q.  All right.  There's some entries in November.
8  There's a regular payment of $697.80.  Do you see that,
9  on 11-30-2013?
10      A.  11-30-2013.  Okay.
11      Q.  All right.  And then it says, "Single Item
12  Receipt, 275.23, Single Item Receipt, 68.09," and
13  "Single Item Receipt, 118.65," all on 11-30.  Do you see
14  those?
15      A.  I do.
16      Q.  Where did the single item receipts come from?
17      A.  Just a moment.  (Peruses document.)  It doesn't
18  say where they came from.
19      Q.  Okay.  Where would one go to find that out?
20      A.  I can research within the system.
21      Q.  Okay.  What would you look at to find that out?
22      A.  (Peruses documents.)  I'd review our system
23  notes, our detailed fees.  I'd look at prior servicer
24  notes, see if it was from the prior servicer, just to
25  name a few systems that I would log in to.

Page 97

1      Q.  So you'd get all the prior servicer notes?
2      A.  Not necessarily.  It's something that may need
3  to be requested.
4      Q.  Okay.  So, I mean, what computer screens would
5  you look at specifically?
6      A.  Transaction history would be one screen.  Then
7  I'd check to investigate that.
8      Q.  Okay.  And that's a screen you can look at on
9  your computer?
10      A.  Yes.
11      Q.  Okay.  And that information has not been
12  reproduced in this spreadsheet, correct?
13      A.  No.  This is pretty much what I would look at,
14  but, you know, there's a situation where it could be
15  from the previous servicer, so I'd -- I'd do a deeper
16  investigation rather than to say where this came from
17  today, so...
18      Q.  Well, where would you specifically look that
19  would tell you the origin of these dollar amounts?
20      A.  Just a moment.  Let me think about that
21  question.  (Peruses documents.)  Well, the transaction
22  history is where I would look at the -- origin of
23  this dollar amount, also the notes I would use to look
24  at the origin, but --
25      Q.  Okay.  We've got the notes.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 98

```
1     A.  Right; however, this could be part of a -- the
2  boarding still.  The fees billed could have came over
3  during the boarding.
4     Q.  I know, but what would you look at specifically
5  to tell you where this money came from?
6     A.  I -- the same thing: the notes, transaction
7  history, or --
8     Q.  Okay.
9     A.  -- we'd talk to the previous servicer.
10     Q.  Is this the transaction history that's Exhibit
11  No. 10?
12     A.  Correct.
13     Q.  Okay.  Does it tell us where -- the origin of
14  these dollar amounts?
15     A.  No.  It doesn't say where they came from, no.
16     Q.  All right.  So then if you'll look at the
17  notes, which is Exhibit No. 3, do you see any entries
18  on -- on or around November 30th, 2013, that tells you
19  the origin of these dollar amounts?
20     A.  There's no note on November 13.
21     Q.  It's November 30th, was the --
22     A.  30th?  I apologize.  There's no note on
23  November 13 -- I'm sorry, 30th of 2013, so in this
24  situation, I'd reach out to the prior servicer to see
25  if this came over during the boarding.
```

Page 99

```
1     Q.  Okay.  Okay.  What if it didn't come from the
2  prior servicer?  Where would it have come from?
3     A.  (Peruses document.)  It could have been a
4  payment made by the borrower or from the trustee.
5     Q.  Okay.  How would you know that?
6     A.  I'd have to -- you know, this is a bankruptcy
7  account, so any payments, I'd reach out to the
8  bankruptcy department to discuss those.
9     Q.  Is there anybody besides a person to talk to
10  that somebody can tell whether the money had come from
11  the borrower or the Chapter 13 trustee?
12     A.  We can also reach out to the payment processing
13  department.
14     Q.  Okay.  Are there computer screens that you can
15  look at to tell whether money came from the borrower or
16  from a Chapter 13 trustee?
17     A.  There is a system that we use for bankruptcy --
18     Q.  Okay.
19     A.  -- which may give you details on where this
20  payment came from, but as I mentioned, I'd have to do an
21  investigation.
22     Q.  Okay.  Do you know why the information from
23  that system, bankruptcy system, was not produced?
24     A.  I don't know why.
25     Q.  Okay.
```

Page 100

```
1     A.  I don't know if it was relevant to -- to this.
2  I don't know.  I have no idea.
3     Q.  You don't know if payments on a borrower's
4  account are relevant to their account?
5     A.  Of course they are.
6     Q.  Okay.
7     A.  Now, if it was -- of course they are.
8     Q.  Okay.  But as you sit here today, you can't
9  tell me where these payments came from, correct?
10     A.  The origin of the payments, no.
11     Q.  Okay.
12     A.  Not with this information in front of me.
13     Q.  Right.  But Caliber does have information
14  that -- that would explain where the payments came from,
15  correct?
16     A.  I'm sure we do.
17     Q.  Okay.  All right.  In any event, the 275.23,
18  the 68.09, and the 118.65 was placed in unapplied funds;
19  is that correct?
20     A.  On which line item are you looking at?
21     Q.  These are the bottom three entries on
22  11-30-2013.
23     A.  On Exhibit 10?
24     Q.  Yes.
25     A.  11-30.  (Peruses document.)  All right.  Now, I
```

Page 101

```
1  found the line you're looking for.  Now please repeat the
2  question.
3     Q.  I'm sorry.  There's three lines --
4     A.  Uh-huh.
5     Q.  -- of three entries, not the regular payment,
6  but the single item receipts?
7     A.  Uh-huh.
8     Q.  One's in the amount of 25 -- I'm sorry, 275 --
9     A.  Uh-huh.
10     Q.  -- 23?
11     A.  Right.
12     Q.  One's in the amount of $68.09.
13     A.  Yeah.
14     Q.  And one's in the amount of $118.65.
15     A.  Right.
16     Q.  And those were all placed in un -- unapplied
17  funds; is that correct?
18     A.  That is correct.
19     Q.  Okay.  Do you know why they were placed in
20  unapplied funds?
21     A.  Well, one reason it could be is that it wasn't
22  enough to cure the account.
23     Q.  Okay.  What does that mean, not enough to cure
24  the account?
25     A.  Enough to bring the account current.
```

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 102

1    Q. All right. Does Caliber --
2        MS. KELLETT: Well, let me strike that.
3    Q. (By Ms. Kellett) How does Caliber apply
4  payments from the Chapter 13 for the deficiency payments
5  on an account that's in bankruptcy?
6    A. Any payments that are made while the account is
7  in bankruptcy are sent to the bankruptcy department.
8    Q. The -- the monies that are paid by the Chapter
9  13 trustee for the deficiency claim on the account, how
10  are those treated by Caliber?
11    A. Just a moment. Those payments are sent to our
12  bankruptcy department to be entered manually by the
13  bankruptcy department.
14    Q. Okay. But is there a separate account set up
15  for the deficiency amount to which the Chapter 13
16  payments are applied for the deficiency?
17    A. That, I don't know, if there's a separate
18  account for trustee payments. I don't know.
19    Q. All right. So going back to Exhibit -- well,
20  no. Let's go one more item on Exhibit No. 10, or three
21  more items. Then on 12-23-2013, there's two -- two
22  entries of 697.80. Do you see those? It says, "Regular
23  Payment"?
24    A. Yes, I see those.
25    Q. Okay. Were those payments on the ongoing

Page 103

1  monthly mortgage payment?
2    A. It seems like it's a -- a regular payment,
3  which would be applied, and if we look a little further,
4  it says it was applied towards principal and interest.
5    Q. And indeed the principal balance comes
6  down after application of those payments, on the far
7  right, correct?
8    A. Yes. It does show to decrease the balance.
9    Q. Okay. But now there's a single item receipt on
10  12-23-2013 that says negative 72.73. Do you see that?
11  And that's also credited to unapplied funds. I'm sorry.
12  It's a single item reversal. Do you see that?
13    A. Yes.
14    Q. Okay. What -- what is that transaction?
15    A. It's a reversal of funds.
16    Q. Okay. Why was the reversal made?
17    A. Just a moment. (Peruses documents.) I don't
18  have the answer in front of me. I'd have to investigate
19  to get the answer to that.
20    Q. Okay. Well, what -- what would you look at to
21  investigate?
22    A. The same items we mentioned earlier: the
23  transaction history notes and also reach out to the
24  prior servicer.
25    Q. Okay. Well, we've got the transaction history

Page 104

1  in front of us as Exhibit 10; is that correct?
2    A. Yes.
3    Q. Okay. Does the transaction history that you
4  looked at on your computer screen have more information
5  than what's on Exhibit 10?
6    A. No. This contains the exact information that
7  would be in our system.
8    Q. Okay. So the transaction history doesn't, in
9  fact, tell you the reason for the reversal of the 72.73,
10  right?
11    A. No, it doesn't --
12    Q. Okay.
13    A. -- give us a reason.
14    Q. Okay. And then the notes, we have those as
15  Exhibit No. 3, correct?
16    A. Yes.
17    Q. Okay. And are there any entries on December
18  23, 2013?
19    A. I don't see any entries.
20    Q. Okay. Should there have been an entry on why
21  money was being credited out of the debtor's unapplied
22  funds balance?
23    A. Once I was able to determine where these funds
24  came with -- came from, I could answer that question,
25  so...

Page 105

1    Q. Okay. Well, you've said that the places you
2  would look would be the transaction history, which is
3  Exhibit 10, and the notes, which is Exhibit 3.
4    A. Uh-huh.
5    Q. And there's not any information about why this
6  transaction was made on either the transaction history
7  or the notes, correct?
8    A. After my review, I didn't see any notes
9  indicating why this transaction was made, but also, as
10  I mentioned, I would reach out to the prior servicer.
11  This is also a active bankruptcy account, so I would
12  reach out to the bankruptcy specialist to inquire about
13  payments.
14    Q. Okay. How would the bankruptcy specialist
15  know why this transaction was made? What would the
16  bankruptcy specialist look at?
17    A. I -- I'm not a bankruptcy specialist. I don't
18  know what they would look at or how they might be able
19  to answer that question, but I would reach out to them
20  until I got the question answered.
21    Q. Would they look somewhere in the computer
22  system?
23    A. Surely. Most of our information is housed
24  in -- within the system.
25    Q. Okay. So that information would be stored

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 106

1  somewhere electronically in the Caliber system of
2  records, correct?
3      A.  Surely, but it's a bankruptcy account, and I
4  don't have access to all of the systems that bankruptcy
5  may have.
6      Q.  But somebody in bankruptcy would have access
7  to those systems, correct?
8      A.  Surely someone at the company would have
9  access.
10      Q.  And do you understand that this account was in
11  bankruptcy the entire time it was being serviced by
12  Caliber?
13      A.  Yes.  When we got it, it was in bankruptcy,
14  correct.
15      Q.  And when it left Caliber, it was still in
16  bankruptcy, correct?
17      A.  Correct.  When it left, it was in bankruptcy.
18      Q.  All right.  Let's go back to Exhibit No. 3.
19  We're gonna start with the third-to-the-last page, and
20  about halfway down, we have a transaction starting on
21  January 6, 2014?  Do you see that?
22      A.  Yes, I -- I see it.
23      Q.  All right.  Can I just -- I'll short-circuit
24  this.  Is this just an entry reflecting the fact that we
25  had filed the lawsuit, the Trevino lawsuit, against

Page 107

1  Caliber?
2      A.  Okay.
3      Q.  Is that what this entry is discussing on
4  January 6, 2014?
5      A.  That's what I'm seeing.  It looks like a filing
6  of a lawsuit.
7      Q.  And it was, in fact, this lawsuit, correct, not
8  a different lawsuit?
9      A.  It appears to be the same lawsuit to my
10  knowledge, yes.
11      Q.  Okay.  On the -- on January 7th, which starts
12  on the -- the next previous page --
13      A.  Uh-huh.
14      Q.  -- there's some entries, and also on January 8,
15  it says, "Please open Adversary Process."  Do you see
16  those entries?
17      A.  January 7th?
18      Q.  Yes, sort of -- I'm now on the fourth page from
19  the end.
20      A.  (Peruses document.)  Okay.  "Please open
21  Adversary Process."  Okay.
22      Q.  What is the adversary process?
23      A.  This has to do with the lawsuit, and I'm not in
24  the legal department, so I don't know what the adversary
25  process is.

Page 108

1      Q.  And did you ask anybody in connection with
2  preparing for your deposition today?
3      A.  Ask anybody what again?
4      Q.  What the adversary process, what it means to
5  open the adversary process?
6      A.  No.  I did not ask what it means to open the
7  adversary process.
8      Q.  Okay.  So if we go up then to January 14th,
9  which is still on the fourth page from the end.
10      A.  Okay.  I -- I see it.
11      Q.  Okay.  There's three entries, and that says,
12  "LPI Insurance premium paid on January 13th, 2014, in
13  the amount of $2,828.38 for the 11-1-2013 to 11-21-2014
14  period.  Policy number," and then it gives the policy
15  number.  Do you see that?
16      A.  Yes, I see it.
17      Q.  All right.  Does that mean that Caliber force-
18  placed insurance on behalf of the Trevinos on that date?
19      A.  Let me see what LPI stands for.  (Peruses
20  document.)  LPI stands for lender-placed insurance.
21      Q.  Right.
22      A.  So, yes, the answer is correct.
23      Q.  Okay.  If you could look at Exhibit No. 10
24  again?
25      A.  Okay.

Page 109

1      Q.  It shows an escrow disbursement on 1-13-2014.
2  Do you see that?
3      A.  What date again, 1-13?
4      Q.  Yes, 1-13-2014.
5      A.  Escrow disbursement, yes.
6      Q.  Okay.  And it shows negative 2,828.38, correct?
7      A.  I see that.
8      Q.  Okay.  Does that reflect the amount that
9  Caliber paid for the force-placed insurance?
10      A.  Let me check something.  (Peruses documents.)
11  It appears to be the amount, but to verify that, I'd
12  have to go to our lender, our insurance screen, but,
13  yes, it appears to be the amount.
14      Q.  Okay.  There's an insurance screen you could
15  look at?
16      A.  There is an insurance screen.  I'm trying to
17  remember.  Yes, yes.  We can go to the insurance
18  screens, and it will give us a list of disbursements.
19      Q.  Okay.  And then it shows, it says amount to
20  escrow, negative 2,828.38.  Do you see that?
21      A.  What line are you looking at?
22      Q.  1-13-2014, escrow disbursement.
23      A.  You said there's a line that says amount to
24  escrow?  Okay.
25      Q.  Yeah.  There's a column that says amount to

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 110

1  escrow, and then a negative $2,828.38 appears in that
2  column on that same line.
3      A. I see it.
4      Q. Okay. Does that mean now that the borrower
5  owes the $2,828.38 that Caliber paid for the insurance?
6          MS. HAYWARD: Objection, form.
7      A. Let me check something real quick. (Peruses
8  document.) It doesn't mean the borrower owes that
9  amount, but the account owes that amount.
10     Q. Who pays the amount ultimately?
11     A. Who pays --
12         MS. HAYWARD: Objection, form.
13     Q. (By Ms. Kellett) Who pays the -- who pays the
14  account?
15     A. Well, this is a active bankruptcy, so the
16  borrower would pay the trustee; the trustee will pay the
17  account.
18     Q. So the account's gonna get paid somehow,
19  correct?
20         MS. HAYWARD: Objection, form.
21     A. Depending on the borrower.
22     Q. (By Ms. Kellett) Okay. Right, right. You're
23  not gonna release the lien, for instance, unless this
24  amount were -- were paid --
25         MS. HAYWARD: Objection, form.

Page 111

1      Q. (By Ms. Kellett) -- correct?
2      A. The lien is released once balances are zero.
3      Q. Right. So if this amount's not waived, the
4  borrower's gonna have to pay the amount, or the trustee,
5  correct?
6          MS. HAYWARD: Objection, form.
7      A. The account will be due that amount, correct.
8      Q. (By Ms. Kellett) Okay.
9      A. Before we can release the lien.
10     Q. Before you can release the lien. So if it's
11  not waived, somebody's got to pay it, correct?
12     A. Well, if the --
13         MS. HAYWARD: Object -- objection, form.
14     A. If the lien is to be released, yes, that amount
15  has to be paid.
16     Q. (By Ms. Kellett) All right. And then on 1-27,
17  2-24, 2014, and 3-21-2014, we have three amounts that
18  are entitled "Regular Payment," each in the amount of
19  697.80. Do you see those three entries?
20     A. I'm sorry. What were the dates again?
21     Q. I'm sorry. It's sort of a little above the
22  middle: January 27th, 2014; February 24th, 2014; and
23  March 21st, 2014.
24     A. Which exhibit are we looking at?
25     Q. I'm sorry. Exhibit 10, 10 or 11.

Page 112

1      A. It must be 11, 'cause they're supposed to be
2  the same. What were the dates once more, please?
3      Q. Okay. Well, let me let you find this first
4  one, January 27th, 2014.
5      A. January 27, 2014?
6      Q. Yes, the transaction effective date.
7      A. On Exhibit 10?
8      Q. Uh-huh. Well, let me skip that. There's a
9  transaction date. Do you see that?
10     A. Yes, transaction date.
11     Q. And there's one that says 1-31-2014.
12     A. I see that one.
13     Q. All right.
14     A. Oh, I see. I see where you were looking.
15     Q. Right. And then there's one that says
16  2-26-2014 and 3-27-2014, correct?
17     A. Right. I see those.
18     Q. Okay. And those are regular payments? Is that
19  how those are defined?
20     A. The transaction name is defined as a regular
21  payment, correct.
22     Q. Okay. So were those regular payments on the
23  ongoing monthly mortgage?
24     A. On this bankruptcy account through the trustee,
25  correct.

Page 113

1      Q. All right. So let's go back to Exhibit No. 3,
2  and I want to go back. I'm sorry I skipped over these,
3  but if we go back to the second-from-the-last page
4  towards the middle.
5      A. Which exhibit?
6      Q. Three.
7      A. The second-from-the-last page towards the
8  middle.
9      Q. Uh-huh.
10     A. Okay.
11     Q. On 12-16 and 12-12 of 2013.
12     A. 12-16, 12-12. Okay.
13     Q. Okay. 12-16 says, "Breach hold removed
14  manually." Do you see that?
15     A. Yes.
16     Q. What does that mean?
17     A. Just a moment. (Peruses documents.) It means
18  that the hold was removed from the breach. I mean, that
19  the account is now serviceable.
20     Q. And it could be foreclosed?
21     A. No, no. It's that during a service transfer,
22  we'll put a automatic hold on an account for 60 days,
23  approximately, to, you know, allow for any discrepancies
24  that -- that the borrower may find.
25     Q. Okay. I see. Where you're trying to get the

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 114

1 transition through --
2     A. Right, like a transition.
3     Q. -- for the next servicer?
4     A. Exactly, like a transition period.
5     Q. Okay. So going back then to four pages from
6 the end, and it looks like we have a series of
7 transactions on January 16th, 2014, and those continue
8 back going towards the front. Do you see that set of --
9 of entries?
10     A. I'm sorry. Which date?
11     Q. January 16, 2014. They start on the -- on the
12 sixth page from the end.
13     A. Okay. I see all of those entries.
14     Q. The fifth and the fourth. Okay. It's -- it's
15 discussing additional fees to be approved or denied. Do
16 you see that?
17     A. (Peruses document.) I see what -- what you're
18 referencing, yes.
19     Q. Okay. So if we go from the top down to the
20 bottom --
21     A. Uh-huh.
22     Q. -- at the very -- where it says something,
23 "Additional amount requested: 650 hourly B-R-E-A," and
24 then it says, "Per defensive litigation, place
25 foreclosure on hold." Do you see that?

Page 115

1     A. This is page four from the back or five?
2     Q. Four, four from the back.
3     A. Okay. Yeah, per -- okay. "Amount requested:
4 650 hourly B-R-E-A." I see what you're looking at.
5     Q. What does that mean?
6     A. Just a moment. (Peruses document.) Well, from
7 the B-R-E-A --
8     Q. Uh-huh.
9     A. -- the remainder of that word is at the bottom
10 of Page 5.
11     Q. Right. "Breakdown of fees requested"?
12     A. Right.
13     Q. Okay. "Flat fee," does this mean somebody's
14 requesting a $650 flat fee?
15     A. It's an amount requested, so, yes.
16     Q. Can you tell who's making the -- the request
17 for the fees?
18     A. It looks like the -- give me just a moment.
19 (Peruses document.) It looks like teller 500 made that
20 request.
21     Q. Right. Well, but was the teller dealing with
22 outside counsel?
23     A. (Peruses document.) It looks like at this
24 point, the file was with our legal department. I don't
25 know if that has to do with outside counsel 'cause I'm

Page 116

1 not in the legal department.
2     Q. All right. So going back to the fourth page
3 prior to the end up at the top on 1-16-2014?
4     A. All right. Top of the page.
5     Q. It says -- it says, "Per defensive litigation,
6 place C&D on account." Do you know what that means?
7     A. Yes, but let's look in the dictionary.
8 (Peruses document.) There it is. On Page 1 of the
9 dictionary?
10     Q. Okay.
11     A. It'll say C&D. It's alphabetical. Cease and
12 desist.
13     Q. Cease and desist. Okay. And -- all right.
14 Going to the next entries, there's a series of entries
15 beginning -- I guess the entries on 20 -- I'm sorry,
16 February 12th, 2014.
17     A. Okay.
18     Q. And there's --
19     A. It looks like it covers three pages.
20     Q. Right. And, in fact, it shows entries numbered
21 1 through 80, correct? It's sort of in the middle
22 column.
23     A. (Peruses document.) Excuse me. Right. It
24 does say notes sequence number 1 through 80.
25     Q. Okay. What do these notes represent?

Page 117

1     A. It'll take me a moment to --
2     Q. All right.
3     A. -- read through these. (Peruses document.)
4         (Discussion off the record.)
5     A. Okay. It looks like this is also in regards to
6 the legal department.
7     Q. (By Ms. Kellett) All right. Is this showing
8 that there's some confusion over who Caliber has hired
9 to represent it in this adversary proceeding?
10     A. Give me just a moment. (Peruses document.) I
11 wouldn't say confusion regarding who was handling this.
12 Maybe confirmation is needed.
13     Q. It doesn't say a referral's been made to
14 Buckley Madole, yet Franklin Skierski Hayward has filed
15 a motion to dismiss?
16     A. What line are you looking at for --
17     Q. Well, the whole 1 through 80 if you read it all
18 together.
19     A. You said -- what was the other? Like, I assume
20 it's a law firm you were referencing?
21     Q. Well, if you look at the bottom of the full
22 page of 2-12-2014, it says, about six lines up, "Please
23 confirm who is handling defense of the adversary as
24 Buckley Madole received a referral, but Frank," and then
25 if you go up further from the bottom of the page, "Lin

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 118

1  Skierski Hayward has appeared and filed a motion to
2  dismiss on the client's behalf.  Thanks.  Status:
3  Active."  Do you see that?
4      A.  Okay.  But Frank, and then you went up to
5  where again?
6      Q.  Where it says Lin, L-I-N, Skierski Hayward.
7      A.  Oh, I see.  (Peruses document.)  Again, I
8  don't think there was confusion.  We just needed
9  clarification, and we work more -- with more than one
10  attorney, so...
11      Q.  Okay.  Do you know if Buckley Madole continued
12  to represent Caliber during the pendency of the
13  adversary proceeding?
14      A.  For this particular case?
15      Q.  Yes.
16      A.  I don't know if they're a party to this case or
17  not.
18      Q.  But Buckley Madole is Caliber's outside law
19  firm.  Did you know that?
20      A.  I -- we have many, many vendors that we work
21  with, so Buckley Madole is new to me.
22      Q.  All right.  Okay.  If you could look 10 pages
23  from the back?
24          MS. HAYWARD:  Karen, can we get a date?
25          MS. KELLETT:  Yeah.  It's 3-24-2014.

Page 119

1          MS. HAYWARD:  Okay.
2      A.  Okay.
3      Q.  (By Ms. Kellett)  This discusses some -- it
4  says, "Required: Bankruptcy correspondence for BK Case
5  No. 10-70594, Scanned into," probably system.  Do you
6  know what this correspondence is?
7      A.  Let's see.  "Scanned into."  (Peruses
8  document.)  This is -- I don't know where they scanned
9  it into, which system.  It looks like it's more in
10  reference to the legal department.
11      Q.  Well, does -- does this tell us that somebody
12  at Caliber scanned some -- something from the bankruptcy
13  court into Caliber's system?
14      A.  "Scanned into," yeah.  It says, "Bankruptcy
15  correspondence for BK case," case number, "Scanned
16  into," so we scanned something.
17      Q.  Okay.  And that could be found if you needed
18  to, correct?
19      A.  Absolutely.
20      Q.  All right.  Okay.  If we go to the previous
21  page, 3-26-2014, at the bottom, there is -- the last
22  three entries, it says, "3-26-2014 Delinquent Report."
23  Do you see that?
24      A.  Yes.
25      Q.  It says, "Payee - Hidalgo County."  Do you see

Page 120

1  that?
2      A.  Yes.
3      Q.  And then it says, "3-26-14, TXID," and then
4  there's, "C112002000014900."  Do you see that?
5      A.  I do see that.
6      Q.  Do you know if that's the tax ID for Hidalgo
7  County for the Trevinos?
8      A.  I do not know if that's the tax ID for the
9  Trevinos without doing more research.
10      Q.  All right.  Can you look at the next page?
11      A.  Okay.
12      Q.  It says, "3-26-2014, TXYR=2010."  Does that
13  mean tax year 2010?
14      A.  Let's look at the definitions.  (Peruses
15  document.)  I think it's safe to say that that is tax
16  year 2010.
17      Q.  Okay.  And the TX amount is tax amount,
18  1,530.63; is that correct?
19      A.  I believe it's safe to say that -- that that is
20  the amount we're referencing.
21      Q.  Okay.  Then it says, "BILTYP."  Does that mean
22  bill type?
23      A.  Just a moment.  (Peruses document.)  I'm not
24  absolutely sure what that means.
25      Q.  Okay.  Then it says -- on the line below it, it

Page 121

1  says, "HNDLEMAN."  Do you know what that means?
2      A.  (Peruses documents.)  I do not know what that
3  means.
4      Q.  All right.  There's -- on these transactions
5  on the 26th that we've been going over, there's a
6  transaction code of NT.  What does that mean?
7      A.  Let's see.  (Peruses document.)  NT in black
8  and white here on Bates 875.
9      Q.  It says, "Notes from the Global/Notes screen.
10  (AD 650.030)," correct?
11      A.  It does say that.
12      Q.  What is the global/notes screen?
13      A.  Global/notes is one of the screens that we can
14  enter notes from within Fiserv.
15      Q.  Do the -- does the global/notes screen include
16  all kinds of notes that anybody in Caliber has entered
17  into Fiserv?
18      A.  Yes, it -- it does.
19      Q.  All right.  If we go up to the last few lines
20  of -- on Exhibit 3 of 3-28-2014, do you see there's some
21  additional NT notes?  There's five NT notes.  Do you see
22  those?
23      A.  Excuse me.  Yes, I see those.
24      Q.  Okay.  The first one says, "3-27-14 delinquent
25  tax first letter - 3-28-14."  Do you see that?

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

**Page 122**

1   A. Okay. Wait. What dates are we looking at?
2   3-27 or 3-28?
3   Q. 3-28-2014. It's sort of towards the middle of
4   the page.
5   A. Okay.
6   Q. And it's got the NT transaction code.
7   A. Okay. I do see 3-28-14, and you said it says
8   what thereafter?
9   Q. NT.
10   A. And then what after NT?
11   Q. Then there's some teller with the number 59040
12   entering some notes. Do you see those?
13   A. I see that.
14   Q. Okay. It says, the first line, "3-27-2014
15   delinquent tax first letter - 3-28-14," and then there's
16   an "S." Do you see all that?
17   A. Yes, I see that.
18   Q. Okay. Does that mean a letter was sent to the
19   borrowers about the delinquent 2010 taxes?
20   A. (Peruses document.) I believe it's safe to
21   say it was a letter regarding delinquent taxes to the
22   borrower.
23   Q. Okay. Was it a letter regarding the 2010
24   taxes?
25   A. (Peruses documents.) Within that same sequence

**Page 123**

1   of notes, there's a reference to 2010 taxes.
2   Q. Uh-huh. And tax amount, 1,530.63, correct?
3   A. However, I'd have to see the letter to tell you
4   what the actual letter states.
5   Q. Do you know why that wasn't produced?
6   A. I don't know.
7   Q. But you could find a -- a copy of the letter;
8   is that correct?
9   A. Absolutely.
10   Q. All right. If we go up to the next sequence of
11   notes, on 3-28-2014 --
12   A. Okay.
13   Q. -- there's -- it looks like there's 1, 2; 1, 2,
14   3, 4; 1, 2, 3; so there's the first seven notes.
15   A. On 3-28, 1, 2, 3; 1, 2; and 1, 2, 3, 4. Okay.
16   Q. Right. So let's start at the bottom with the
17   1, 2, 3. Do you see that?
18   A. Yes.
19   Q. Okay. "006," do you know what that means?
20   A. Okay. So what's the teller ID we're looking
21   at?
22   Q. Three -- I'm sorry, 23525.
23   A. And then I don't see that number.
24   Q. Okay. The transaction code is CIT?
25   A. Okay. Teller 23525, that's what you mentioned.

**Page 124**

1   Q. Right. And there's 1, 2, 3 transactions at the
2   bottom of that date. Do you see that?
3   A. What exhibit are you looking at?
4   Q. Three.
5   A. The same exhibit. Am I still on 3?
6   Q. It's where it says, "Please flip to investor
7   recoverable."
8   A. Okay. I see that.
9   Q. Do you see that? "If not able to flip, please
10   waive due to court order." Do you see that?
11   A. I do see that.
12   Q. And then it says, "Fee Type-164." What does
13   that mean?
14   A. Let's see if -- I think we determined earlier
15   that we don't have a numerical list of definitions. Let
16   me double-check. (Peruses document.) Unless there's
17   one in production. If there's not, I -- I haven't looked
18   what that code is for. We do have a -- list of fee
19   types that can tell you what that code is for.
20   Q. Okay. Do you know why that wasn't produced?
21   A. I don't.
22   Q. Okay. It says also, "Fee Type-164." Then it
23   says, "11-9-13, $5,111.01 of $7,845.60." Do you see
24   that?
25   A. Yes. The same line item?

**Page 125**

1   Q. Yeah, those three lines.
2   A. Uh-huh. Okay.
3   Q. All right. Who's requesting that these be
4   flipped to investor recoverable?
5   A. It looks like it's teller ID 23525.
6   Q. Do you know, would there be a way to find out
7   who that is?
8   A. There is a way.
9   Q. All right. Did you -- for purposes of this
10   deposition, did you ask anybody who that was?
11   A. I did not.
12   Q. Okay. So you haven't talked to the person that
13   entered these notes; is that correct?
14   A. No, I haven't.
15   Q. Okay. What was the court order that was
16   requiring the fees to be flipped to investor recoverable
17   or waived?
18   A. I'm sure that's housed within the legal
19   department. I don't have access to that court order.
20   Q. You didn't look at that court order to prepare
21   for today's deposition?
22   A. I reviewed the court order for a deposition and
23   the topics involved. The court order referencing a
24   waiver to these fees, I did not review.
25   Q. Okay. If we go above it to the next -- the 1,

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 126

1   2, 3, 4 right above the 1, 2, 3?
2       A.   Okay.
3       Q.   All right.  It says, "007, please flip to
4   investor recoverable.  If not able to flip, please waive
5   due to court order."
6       A.   Uh-huh.
7       Q.   "Fee Type-164, 11-9-2013, $5,111.01 of
8   7,845.60."  Do you see that?
9       A.   I do see that.
10      Q.   And underneath that, it says, "Fee Type-165,
11  11-9-2013, $12,649.86."
12      A.   I see that.
13      Q.   Okay.  And so, first of all, teller 23525, who
14  is teller 23525 or employee 23525 asking to perform this
15  flip or waiver transaction?
16      A.   It looks like this request was done with a
17  task.  A task is then sent to a department or a queue,
18  and who's handling that queue, I do not know.
19      Q.   Okay.  Did you ask in connection with your
20  deposition?
21      A.   I did not.
22      Q.   Okay.  If we go back to Exhibit No. 10, and we
23  look at the transactions on 11-9-2013 that we discussed
24  previously on Exhibit No. 10.
25      A.   11-9-2013?

Page 127

1       Q.   I'm -- I'm sorry, on Exhibit No. 10.
2       A.   Oh.  Okay.
3       Q.   All right.  So is employee 23525 asking
4   somebody to flip or waive -- this $7,845.60 that we see
5   here on Exhibit 10, somebody's asking that they waive
6   five thousand a hundred and -- I'm sorry, 5,111.01 of
7   that amount; is that correct?
8       A.   Just a moment, please.  (Peruses documents.)
9            THE WITNESS:  Please repeat the question.
10           (Requested portion was read.)
11      A.   The amounts match the amount that is on
12  Exhibit 10, so I'd say it's safe to say that they are
13  referencing the amount that's on Exhibit 10.
14      Q.   (By Ms. Kellett)  All right.  And then are they
15  asking that the dollar amount 12,649.86, that that
16  entire amount be flipped or waived?
17      A.   What was the amounted you referenced?
18      Q.   $12,649.86.
19      A.   (Peruses documents.)  I think the task that was
20  created was for both of those amounts, that is correct,
21  the $7,845 and change and also the $12,000 amount.
22      Q.   Okay.  The request was for 5,111.01 out of the
23  7,845.60; is that right?
24      A.   Right, to clarify, exactly.
25      Q.   Okay.  So let's look at Exhibit No. 10.

Page 128

1       A.   Okay.
2       Q.   And also Exhibit No. 11.  Okay.  So if we look
3   on 3-28, there's a credit in the amount of 5,111.01 to
4   the fees, correct?
5       A.   That's correct.
6       Q.   All right.  And then two lines down, there's a
7   credit of 12,649.86 to fees, correct?
8       A.   That's correct.
9       Q.   And in the middle, there's a credit of
10  $2,734.59 to the fees account, correct?
11      A.   Correct.
12      Q.   All right.  Why on 3-31 was an amount for
13  2,734.59 credited when no request had been made to
14  credit that amount?
15      A.   Which amounts again?
16      Q.   The request in the notes was to flip or waive
17  $5,111.01 and also to flip or waive $12,649.86.
18      A.   Uh-huh.
19      Q.   And that happened, correct?
20      A.   It did.
21      Q.   All right.  There was no request to waive an
22  additional $2,734.59, so why is there a credit to the
23  fees for that amount?
24      A.   Okay.  Just a moment.
25      Q.   Okay.

Page 129

1       A.   (Peruses document.)  Well, as I mentioned
2   earlier, Caliber has no intention to collect money that
3   it -- it's not entitled to, so I can say we waived those
4   fees, you know, as a good faith in this case.  The
5   additional fees, I -- I don't know.  It -- I would have
6   to speak with the legal department to see if we waived
7   those in good faith as -- as part of this case.  I don't
8   know.
9       Q.   Do you know for sure that the $2,734.59 was, in
10  fact, waived, because there's no mention of it in the
11  notes, correct?
12      A.   Just a moment, please.
13      Q.   Sure.
14      A.   (Peruses documents.)
15           (Discussion off the record.)
16      A.   All right.  That was a two-point -- part
17  question, and I don't see it in the notes; however, it's
18  on the transaction history, so I have to believe, yes,
19  it was actually -- the action was completed.  The amount
20  was waived.
21      Q.   (By Ms. Kellett)  Okay.  But somewhere there
22  would have to be a record of somebody requesting that an
23  amount that large be waived, correct?
24      A.   The entire amount is what you're referring to?
25      Q.   The 2,734.50, employees don't on their own

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 130

1  waive amounts without permission, correct?
2      A.  No, no.  That's correct.
3      Q.  Okay.  So somebody would have to request that
4  this additional $2,734.59 be waived, correct?
5      A.  Correct.
6      Q.  Okay.  Where would the record of that request
7  be?
8      A.  Just a moment.  Let me look once more here.
9  (Peruses document.)  A couple of things:  I would have
10  to see that court order to see what the details are in
11  regards to this waiver.
12      Q.  All right.
13      A.  That could be a reason to warrant the entire --
14  a waiver of the entire amount, and this is a legal
15  matter, and conversations could have been held outside
16  of this account.
17      Q.  But somebody had to physically waive the
18  transaction, correct?
19      A.  Right.
20      Q.  All right.  Can the legal department make
21  changes directly to the account as far as the -- the
22  numbers on the account?
23      A.  As far as the balances, so on and so forth?
24      Q.  For the balances, yes.
25      A.  No.  It's Caliber policy not to tamper with

Page 131

1  numbers, documents --
2      Q.  Right.
3      A.  -- so on and so forth.
4      Q.  Right.  So somebody had to make this request,
5  and somewhere there's -- somehow that request is
6  documented somewhere, correct?
7      A.  If it -- I -- I didn't find it documented here.
8  If someone was standing over someone else's shoulder and
9  said, "Hey, go ahead and waive the fees," I'd -- I don't
10  know, but the -- all the fees were waived.
11      Q.  Okay.  But you don't know why?
12      A.  I can only assume why.
13      Q.  You think there's a court order, correct?
14      A.  It could be in the court order.
15      Q.  Do you know that there is, in fact, a court
16  order ordering waiver of these fees?
17      A.  Well, they're making a reference to the court
18  order on that task.
19      Q.  Uh-huh.
20      A.  Where was it at?  So...
21      Q.  Was the court order scanned into the system?
22      A.  I haven't seen it.
23      Q.  All right.
24          MS. HAYWARD:  Karen, let's take a break
25  because he's about to leave and pack it up.

Page 132

1          MS. KELLETT:  Okay.  Sure.
2          THE VIDEOGRAPHER:  We're off the record at
3  2:39 p.m.
4          (Recess from 2:39 p.m. to 2:53 p.m.)
5          THE VIDEOGRAPHER:  We're back on the record
6  at 2:43 p.m. -- I'm sorry, 2:53 p.m.
7      Q.  (By Ms. Kellett)  All right.  Mr. Harris, if
8  you could look at Page 7 of Exhibit 3, or I should say
9  the seventh page.
10      A.  Sure.  Okay.
11      Q.  Okay.  Starting towards the bottom, there's a
12  series of transactions on 3-28-2014.  Do you see that?
13      A.  Yes.
14      Q.  All right.  And those go down, it looks like,
15  through the new -- the next page to line number 37; is
16  that correct?
17      A.  Excuse me.  Yes.
18      Q.  All right.  Does this notate that Caliber is
19  sending a check to Hidalgo County for $2,734.59 for 2010
20  taxes?
21      A.  Which line item are you looking at?
22      Q.  I'm looking at all of them.  It makes sense to
23  read them in concert.
24      A.  Sure.  Just a moment.
25      Q.  Sure.

Page 133

1      A.  (Peruses document.)
2          MS. HAYWARD:  I'm sorry.  I've got ADT
3  calling.  Can we just go off the record for a second?
4          MS. KELLETT:  We're going off the record.
5          THE VIDEOGRAPHER:  We're off the record at
6  2:55 p.m.
7          (Recess from 2:55 p.m. to 2:56 p.m.)
8          THE VIDEOGRAPHER:  We're back on the record
9  at 2:56 p.m.
10          THE WITNESS:  Repeat the question for me,
11  please.
12          (Requested portion was read.)
13      A.  Okay.  (Peruses documents.)  Yes.  According to
14  the notes, it looks like we made a disbursement payable
15  to Hidalgo County.  I see that on that 3-28 note, yes.
16      Q.  (By Ms. Kellett)  And that was for 2010 taxes,
17  correct?
18      A.  (Peruses document.)
19      Q.  It's top -- it's top of the next page.
20      A.  All right.  That's correct.  It does indicate
21  2010 taxes.
22      Q.  All right.  For $2,734.59, correct?
23      A.  Correct.
24      Q.  All right.  And if you look at Exhibit 10, if
25  you look at the date 3-31-2014, the last 3-31-2014.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 134

1    A. Okay.
2    Q. All right. There's a debit to the fee account
3  of $2,734.59, correct?
4    A. (Peruses document.) Yes, that is correct, and
5  I'd like to add that there's a credit below that also.
6    Q. There's a credit below that on January 2nd,
7  correct?
8    A. Of 2015, correct.
9    Q. Okay. Right now, we're on the debit.
10   A. Okay.
11   Q. Okay? So as of 3-31-2014, Caliber had
12  disbursed $2,734.59 for 2010 taxes and then shows the
13  borrower as owing those taxes, correct?
14   A. I'm sorry. I lost the question. Say it again.
15       MS. KELLETT: Go ahead.
16       (Requested portion was read.)
17   A. (Peruses documents.) Well, on the same day,
18  3-31-2014, I see a waiver, so I wouldn't say the
19  borrower owes those taxes.
20   Q. (By Ms. Kellett) Okay. We just discussed that
21  that was a waiver of the above amount of $7,845.60,
22  correct?
23   A. Give me just a moment, please. (Peruses
24  document.) All right? Taxes, the 7,845?
25   Q. Uh-huh, and 60 cents.

Page 135

1    A. And 60 cents? Okay. Just a moment. (Peruses
2  documents.) Okay. At this time, yes, it does appear
3  the account is due those fees.
4    Q. The 2,734.59, correct?
5    A. Yes.
6    Q. All right. Do you know why this is showing up
7  under fees instead of escrow?
8    A. I believe so. Give me just a moment.
9    Q. Sure.
10   A. (Peruses document.) It would show up under
11  fees because it was -- as we mentioned earlier, it's a
12  force-paid, a lender-paid insurance, so it would show up
13  under fee.
14   Q. All right. All right. If you go to the
15  transactions beginning on Exhibit 3, 4-15-2014?
16   A. 4-15, 20 what again?
17   Q. '14.
18   A. Okay.
19   Q. There's a mention of the 2,734.59. Do you see
20  that, at the very top?
21   A. The 2,734.59? Yes.
22   Q. Okay. Is this giving somebody instructions to
23  file a supplemental proof of claim for the 2,734.59?
24   A. Just a moment, please.
25   Q. Sure.

Page 136

1    A. (Peruses document.)
2       THE WITNESS: I'm sorry. Please repeat
3  the question.
4       (Requested portion was read.)
5    A. No. This is not giving instructions to file a
6  claim for that amount.
7    Q. Okay. What's it doing?
8    A. Do you have a copy of the supplemental proof of
9  claim?
10       (Exhibit 14 marked for identification.)
11   Q. (By Ms. Kellett) I'm introducing what's
12  been -- oh, I think I've given you two copies. Is there
13  one for Melissa?
14   A. Is there another one?
15   Q. Yeah.
16   A. In here?
17   Q. No. It's stuck together.
18       MS. HAYWARD: Thank you. What is this
19  number?
20       MS. KELLETT: 14.
21       MS. HAYWARD: 14?
22   A. (Peruses document.)
23   Q. (By Ms. Kellett) Do you recognize Exhibit 14?
24   A. I do not.
25   Q. So you didn't review it in connection with

Page 137

1  preparing for your deposition?
2    A. No, I did not.
3    Q. All right. And is this a notice of post-
4  petition mortgage fees, expenses, and charges for the
5  $2,734.59?
6    A. That's what it reads in bold at the top of the
7  page.
8    Q. All right.
9       (Exhibit 15 marked for identification.)
10       (Discussion off the record.)
11   Q. (By Ms. Kellett) Okay. I'm handing you
12  Exhibit No. 15.
13       MS. HAYWARD: Thank you.
14   Q. (By Ms. Kellett) Do you recognize Exhibit No.
15  15?
16   A. This is my first time seeing this one.
17   Q. All right. Have you seen any other notice of
18  withdrawals of postpetition fees and expenses filed by
19  Caliber?
20   A. I haven't personally seen them, no.
21   Q. All right.
22   A. May I take a moment to read this?
23   Q. Absolutely.
24   A. Thank you. (Peruses document.) All right.
25  Thank you.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 138

1    Q. Okay, okay. And you said you hadn't seen this
2  document before?
3    A. I have not.
4    Q. Okay. Is this a document withdrawing -- No. 15
5  a document withdrawing the document filed that we've
6  marked as Exhibit 14?
7    A. Yes.
8    Q. All right.
9    A. It appears to be.
10    Q. All right. And No. 15, it says -- in the first
11  paragraph at the bottom, it says, "The 2010 taxes were
12  included in the Chapter 13 Plan," correct?
13    A. That's exactly what it says.
14    Q. All right. And if you look back at Exhibit 10,
15  prior to January 2nd of 2015, did Caliber do anything in
16  its internal records to waive the $2,734.59 after it
17  filed that withdrawal in April of 2014?
18        MS. HAYWARD: Objection, form.
19    A. Did Caliber do anything after -- please repeat
20  the -- repeat the question.
21    Q. (By Ms. Kellett) Well, between 4-21-14 and
22  January 1st of 2015, did Caliber in its system waive the
23  $2,734.59?
24    A. So between 4-21-2014 and which date?
25    Q. Uh-huh, January 1st of 2015.

Page 139

1    A. So, okay. According to the transaction
2  history, there were no transactions waived at that time.
3    Q. All right. Okay. If you can look at the date
4  on Exhibit 3 of 4-21-2014, and if you can review all the
5  transactions in that series, which is 31 transactions.
6    A. (Peruses document.) Okay. I reviewed it.
7    Q. And were these notes that an attorney for
8  Caliber had asked that Caliber withdraw the notice of
9  postpetition taxes?
10    A. Yes. It's make a request to withdraw or amend
11  it, correct.
12    Q. All right. If you go above that, there's some
13  entries with respect to 2010 taxes for Hidalgo County in
14  the amount of $1,530.63. Do you see that?
15    A. In that same area?
16    Q. Yeah. I think -- I'm sorry. It's -- the date
17  is 4-25-2014.
18    A. You said if there's reference to the 2010
19  taxes?
20    Q. Yes.
21    A. Yes, there is.
22    Q. Okay. And that's in the amount of 1,530.63,
23  correct?
24    A. Correct.
25    Q. All right. And then a few lines up from that,

Page 140

1  it says, "4-24-14 delinquent tax second letter -
2  4-28-2014." Do you see that?
3    A. 4-28?
4    Q. This is in the description.
5    A. Oh, yes. Second letter, 4-28-14?
6    Q. Uh-huh.
7    A. I see it.
8    Q. Does that mean a letter was sent by Caliber to
9  the debtors regarding the delinquent 2010 taxes?
10    A. The details of that letter I don't know without
11  reviewing it.
12    Q. Okay. But you could find it and review it,
13  correct?
14    A. Absolutely.
15        MS. HAYWARD: Objection, form.
16    Q. (By Ms. Kellett) And it could be produced,
17  correct?
18    A. Yes.
19    Q. All right. And if you go up to some entries on
20  8-26-2014, do you see those?
21    A. I see them.
22    Q. All right. Is this showing that there are
23  delinquent taxes for the year 2010 in the amount of
24  $1,278.27?
25    A. (Peruses document.) I do see the amount of

Page 141

1  $1,278.27.
2    Q. Right.
3    A. Referring to the 2010 taxes.
4    Q. All right. And if you go up above to the top
5  of this page, do you see two amounts referring to the
6  2010 taxes in the amounts of 1,530.63 and 743.18?
7    A. (Peruses document.) I see those amounts.
8    Q. Okay.
9    A. But on that line, it doesn't make reference to
10  the year, or wait. Wait a minute. Right above, it does
11  say 2010. Give me just a moment, so I can --
12    Q. Sure.
13    A. -- look at the definitions. I'm not sure what
14  ELD stands for. Let's see if it's in here. (Peruses
15  document.) I don't see it in my definitions.
16    Q. All right. Okay. How were these delinquent
17  tax reports generated?
18    A. Excuse me. That, I don't know. I'm not in the
19  tax department. I don't generate tax reports.
20    Q. So you don't know how this tax information
21  appears in Caliber's notes?
22    A. I don't know if we'd reach out to the tax
23  department or if there's a website we accessed to get
24  that info. I don't know.
25    Q. All right. Does -- let's look at October 28th

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 142

1  of 2014, and does this show that, in fact, Caliber paid
2  income taxes in the amount of 1,530.63 and $743.18?
3      A.  Just a moment.  (Peruses document.)  It -- that
4  10-28 notes doesn't specify that the payment was made.
5  There's a -- it just references tax information.
6      Q.  Okay.  And it says something about DISB.  Does
7  that mean disburse?
8      A.  And disburse.  Just a moment.  (Peruses
9  document.)  Yes.  It does mean disbursed.  On the
10  transaction history, Exhibit 10 --
11      Q.  All right.
12      A.  -- you see an amount disbursed that matches the
13  amount on Exhibit 3.
14      Q.  Okay.  And in -- in here, these accounts are
15  credited to the escrow account, correct?
16      A.  (Peruses documents.)  Yes.  It's under the
17  escrow column.
18      Q.  All right.  But do you know why these taxes are
19  in the escrow column, and the previous taxes in the
20  amount of $2,734.59 were placed in the fee column?
21      A.  Give me just a moment.  (Peruses documents.)
22  Just a moment.  I don't recall the -- the reason why we
23  would put these in the escrow rather than the fee
24  screen.
25      Q.  Okay.  Who would know the answer to that?

Page 143

1      A.  I'll answer that.  Give me just a moment.  Let
2  me see if I can remember why this is placed in a
3  different column.  I don't recall.  I would have to
4  speak with someone in the escrow department for
5  clarification.
6      Q.  All right.  Okay.  Do you know if Caliber filed
7  a 3002.1 notice with the Court with respect to the taxes
8  disbursed on October 28th of 2014?
9      A.  (Peruses document.)  You're asking if we filed
10  the 3002 with respect to the taxes from 2014?
11      Q.  From -- the 3002.1 with respect to the taxes
12  that were disbursed on October 28th of 2014.
13      A.  2014.  No, I haven't seen one.
14      Q.  All right.  And going back up to on Exhibit 10,
15  the transaction dated 12-23-2013, Exhibit 10.
16      A.  Okay.
17      Q.  This was a payment for force-placed insurance
18  in the amount of $2,828.38, correct?  We established
19  that?
20      A.  You said 12-28?
21      Q.  12-20 -- I'm sorry.  It was 1 -- 1-13-2014.  I
22  apologize.
23      A.  Okay.  1-13-2014?
24      Q.  Uh-huh.
25      A.  And the question again?

Page 144

1      Q.  Okay.  We established that that was a payment
2  by Caliber for force-placed insurance, correct?
3      A.  Just a moment.  (Peruses documents.)
4  1-13-2014.  It says the escrow disbursement where we
5  found it to be a -- a force-placed, but I don't recall
6  where we found that piece of information.  Let's see.
7  1-13-2014.  (Peruses document.)  And I don't see that on
8  the --
9      Q.  On the notes --
10      A.  -- Exhibit 3.
11      Q.  On the notes on 1-14-2014.
12      A.  Right, 1-14-2014.  Oh, here we go.  1-14, yes;
13  1-14, yes.  Okay.  So 1-14, a disbursement was made, and
14  then a note was followed -- a note followed indicating
15  it was lender-placed, correct.
16      Q.  Lender-placed insurance, correct?
17      A.  Correct.
18      Q.  Okay.  Do you know if Caliber filed a Rule
19  3002.1 notice with respect to that lender-placed
20  insurance in the debtor's bankruptcy proceeding?
21      A.  I haven't seen it.
22      Q.  All right.  If we go to -- down to on Exhibit
23  10, 11 -- November 5 of 2014.
24      A.  Exhibit 10, November 5, 2014.  Okay.
25      Q.  Do you see an escrow disbursement in the amount

Page 145

1  of $2,546.17?
2      A.  Yes, I do.
3      Q.  All right.  What was that escrow disbursement
4  for?
5      A.  Just a moment.  (Peruses documents.)  It tells
6  us what it's for on Exhibit 11.  11-5-2014, it's not --
7  it says "E20," which is a code, and -- (peruses
8  document.)  And I don't recall if 20 is for taxes or
9  insurance.  I don't recall.
10      Q.  All right.  Do you know why there's not any
11  notes about that transaction in the -- the notes
12  exhibit?
13      A.  Let's double-check.  Just a moment.  (Peruses
14  document.)  That -- I don't see any notes.
15      Q.  Should there be notes?
16      A.  There just may be notes.
17      Q.  Where would those notes be?
18      A.  I'm recalling.  There different areas which
19  we're -- we're working to eliminate, but this was back
20  in 2014.  At that time, we had different places where we
21  can place notes, so I don't know if this would be under
22  that scenario.  Since then, everything goes under
23  global/notes now.
24      Q.  But back then, there could be a different notes
25  field?

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 146

1    A. Could have been, where we can sort escrow notes
2    from -- each business -- business unit may have notes.
3        Q. Okay.
4        A. I'm not sure if that's the case, but that's the
5    only thing I can come up with on that.
6        Q. Okay. You could still get the escrow notes,
7    correct?
8        A. I'm sure.
9        Q. All right.
10       A. We retain those records.
11       Q. All right. And then also on the escrow, you
12   can pull up an escrow screen, right, that shows all the
13   amounts paid out of escrow and paid into escrow?
14       A. Escrow disbursements?
15       Q. Yes.
16       A. Yes.
17       Q. All right. And these -- this transaction would
18   show up in that escrow disbursement, correct?
19       A. I'm -- I'm sure.
20       Q. Okay. Do you know if Caliber filed a Rule
21   3002.1 notice in a bankruptcy court for the escrow
22   disbursement on November 5th, 2014?
23       A. Just a moment. (Peruses document.) I haven't
24   seen any.
25       Q. Okay. If you look down at the next item below,

Page 147

1    there's a transaction on 11-21-2014 for $2,512.74. Do
2    you see that?
3        A. On Exhibit 10?
4        Q. 10, uh-huh.
5        A. 11-21-2014?
6        Q. Yes.
7        A. I see it.
8        Q. Okay. And that means there was an amount
9    disbursed out of escrow with a transaction code of E90.
10   Do you know what that's for?
11       A. E90, it could be either tax or insurance. I
12   don't recall what that one -- that one is for.
13       Q. All right. But, again, that shows as what's
14   being owed by the borrowers on -- on the escrow account,
15   correct?
16       A. Again, this is a bankruptcy account, so it is
17   owed to the account, not the borrowers, per se.
18       Q. Well, do you know how Caliber could recover
19   those monies from the borrowers --
20           MS. HAYWARD: Objection, form.
21       Q. (By Ms. Kellett) -- legally?
22       A. Legally? I'm --
23       Q. Yes.
24       A. -- not a lawyer, so I couldn't tell you
25   anything legally.

Page 148

1        Q. All right. Do you understand what the 3002.1
2    notices are for?
3        A. To my understanding, it's an amendment to the
4    proof of claim.
5        Q. Right. But do you know what they're used for,
6    the 3002.1 notices?
7        A. To amend the proof of claim, maybe amend the
8    balance, but I can --
9        Q. All right. It's to amend the claim so that --
10   so that the debtors will owe the money to be paid
11   Caliber, correct?
12       A. Well, again, I'm not a lawyer. I couldn't tell
13   you what these legal documents are about, but to my
14   knowledge, it's to make an amendment to the claim.
15       Q. Okay. So I'd like you to look for a minute,
16   there are -- during the course of while Caliber had this
17   loan, and do you -- do you remember when Caliber service
18   released this loan?
19       A. I don't remember, but maybe we can figure it
20   out by looking at the documents. (Peruses documents.)
21           (Exhibit 16 marked for identification.)
22           MS. HAYWARD: Is this 14?
23           THE REPORTER: 16.
24           MS. HAYWARD: 16. I'm way off.
25       Q. (By Ms. Kellett) Okay. We're showing you

Page 149

1    what's been marked as Exhibit 16 to your deposition.
2        A. Okay.
3        Q. It's a two-page document that I've paper-
4    clipped together. Do you recognize this document?
5        A. Yes.
6        Q. All right. If you look at the second page of
7    this document, what does the first sentence say?
8        A. "The servicing of your mortgage loan is being
9    transferred, effective January 1st, 2015."
10       Q. All right. So the loan was service released
11   effective January 1st, 2015, correct?
12       A. Right. It also says, moving forward to the
13   third paragraph, that it looks like Select Portfolio
14   will begin taking payments on January 2nd, so, yes.
15       Q. So it was service released to SPS, correct?
16       A. Correct.
17       Q. All right. During the period -- look at the
18   escrow account from the first escrow item, which was on
19   1-13-2014, correct?
20       A. 1-13-2014?
21       Q. Yes, the 2,828.38.
22       A. Exhibit 10?
23       Q. Yes.
24       A. 1-13-2014.
25       Q. Okay. There are five credits to the escrow

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 150

1  account; is that correct?
2      A.  On 1-13-2014?
3      Q.  No, during the -- during the time Caliber had
4  the loan until it was service released on January 1st.
5      A.  The total amount of escrow disbursements on
6  Exhibit 10?
7      Q.  Yeah.  There were -- there were five escrow
8  transactions, correct?
9      A.  Let me see.  (Peruses document.)  There are
10  other escrow disbursements, but those are manual, and
11  they have zero amounts next to it.  The ones with
12  amounts, yes, there are five.
13      Q.  All right.  Can you -- I've got a calculator on
14  my phone.  Can you give me the total of those five or
15  the balance of the escrow account as of January 1st?
16      A.  (Complies.)  Your phone vibrated.  Have you got
17  a pen, so I can -- is there another -- can I borrow your
18  pen for a second?
19      Q.  Yeah.  Oh, sorry.
20      A.  Can I write on the back of this?
21      Q.  No.
22          THE WITNESS:  Thank you.
23      A.  Okay.  Let me just do this again.
24      Q.  (By Ms. Kellett)  What was the number that you
25  got?

Page 151

1      A.  Well, this is -- give me just a moment, and let
2  me add it up.
3      Q.  I think you got the right number, so...
4      A.  Right.  Okay.  $10,161.10?
5      Q.  Yes.  That's what I got as well.
6      A.  Okay.
7      Q.  All right.
8      A.  You want your phone back?
9      Q.  Do you know if this is the amount of escrow
10  that was shown as being owed by the borrower that was
11  sent to SPS upon the servicing transfer?
12      A.  Just a moment.  (Peruses documents.)  I don't
13  know.  I don't know what amount was transferred to the
14  new servicer.
15      Q.  All right.  If you --
16          MR. KELLETT:  Well, let me strike that.
17      Q.  (By Ms. Kellett)  Should there be notes on the
18  servicing transfer in the -- Caliber's notes?
19      A.  Not necessarily.  I haven't seen amounts
20  indicated during the service transfer, just that the
21  service was released.
22      Q.  Well, how did -- how is it determined that a
23  recoverable balance in the escrow account will be
24  transferred to the new servicer?
25      A.  Well, that, I don't know.  I know about our

Page 152

1  boarding process, but I don't know much about our
2  release process.
3      Q.  Who would know that?
4      A.  That, I don't know.  I haven't been involved in
5  moving loans from us to another servicer.  I don't know.
6      Q.  All right.  But you do know about the boarding
7  process?
8      A.  Yes.
9      Q.  All right.  So if somebody had a negative
10  $10,161.10 from the prior servicer on their escrow
11  account, that would board into Caliber's account if it
12  were coming in as being owed by the borrower, correct?
13      A.  Once we validate the balances, yes.
14      Q.  All right.  And --
15      A.  And let me clarify.
16      Q.  Sure.
17      A.  Not the borrower, but to the account.
18      Q.  Why not the borrower?
19          MS. HAYWARD:  Objection, form.
20      A.  As I mentioned earlier, it was a active
21  bankruptcy once we got the loan, so we're not gonna
22  request money from the borrower, but the account is due
23  funds, not the borrower.
24      Q.  (By Ms. Kellett)  Okay.  Well, let me rephrase
25  it.  Pretend that this borrower was never in bankruptcy.

Page 153

1      A.  Okay.
2      Q.  Okay?  And the loan was coming to Caliber with
3  a negative $10,161.10 in the escrow account.  Would
4  Caliber consider the borrower to owe that escrow
5  account?
6          MS. HAYWARD:  Objection, form.
7      A.  Well, that scenario does not apply to this
8  account.
9      Q.  (By Ms. Kellett)  I'm asking generally.
10      A.  Generally speaking, yes, the borrowers would be
11  due that amount.
12      Q.  You mean the borrowers would owe that amount?
13      A.  I'm sorry.  Yes.  The account would be due that
14  amount, and the borrowers would owe that amount.
15      Q.  Okay.  And you don't see here under the amount
16  to escrow that at any point that any of those escrow
17  amounts were waived, correct?
18      A.  I don't see that -- I'm sorry.  Repeat the
19  question.
20          MS. KELLETT:  I'm sorry.
21          (Requested portion was read.)
22      A.  (Peruses document.)  During the course of the
23  account, or is there a specific --
24      Q.  (By Ms. Kellett)  At --
25      A.  -- date range?

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 154

1    Q.  At any time.
2    A.  At any time?
3    Q.  Yeah, yeah.
4    A.  I see a fee waiver.
5    Q.  No.  I'm looking at the -- the column entitled
6  "Amount to Escrow."  I'm sorry.
7    A.  Amount to escrow.  No.  Under that column, I
8  don't see any waivers.
9    Q.  Okay.  So you don't know if the account
10  transferred to SPS showing that the debtors owed
11  $10,161.10 on their escrow account, correct?
12    A.  No.  I don't take part in the release of loans.
13    Q.  All right.  How -- how could you find out that
14  information?
15    A.  I can reach out to some higher-ups and see how
16  that process takes place.
17    Q.  Is there anything you could look at in your
18  Fiserv system that would tell you if those amounts were
19  ever waived, for instance, the escrow screen?
20    A.  Just a moment.  (Peruses document.)  So are
21  these -- you honed in specifically on the column that
22  says "Amount to Escrow."
23    Q.  Correct.
24    A.  If we go over to the "Amount to Fees," it's
25  like --

Page 155

1    Q.  I'm -- but I'm talking about the -- what was
2  placed into the escrow account for this question.
3    A.  Well, those two columns are kind of related, as
4  we established earlier, and there is a credit amount
5  under the amount to fees on January 2nd, 2015.
6    Q.  All right.  And the loan was service released
7  on January 1st, 2015, correct?
8    A.  Correct.
9    Q.  Do you happen to know if the dollar amount of
10  $2,734.59 is shown on the SPS -- SPS's system as being
11  owed by the borrower?
12    A.  No.  I don't have access to SPS's systems.
13    Q.  All right.  If you could, I want to get you
14  to -- if you could take the escrow balance of the -- the
15  $10,161.10 --
16    A.  Uh-huh.
17    Q.  Okay.  And add the $2,734.59 from the fees?
18    A.  Okay.
19    Q.  What is the dollar amount of that?
20    A.  Without rechecking my work, it's $12,895.69.
21    Q.  Do you know if that dollar amount shows up on
22  SPS's servicing system of record as being owed by the
23  borrowers when SPS started servicing the loan?
24    A.  I don't have access to SPS's systems, so I
25  don't know.

Page 156

1    Q.  All right.  How could you find out if this fee
2  amount of $2,734.59 was actually transferred to SPS as
3  being owed by the borrower?
4    A.  We can reach out to some higher-ups or perhaps
5  SPS to see what the status is on the account.
6    Q.  All right.  Is that something you could look at
7  a computer screen and determine?
8    A.  No.  I mean, I don't have access to SPS's
9  systems.
10    Q.  No.  But what about leaving Caliber's system?
11    A.  I haven't taken part in the release of loans,
12  so I haven't seen that in our systems at all.
13    Q.  Okay.  Well, somebody would know how much fees
14  in -- in an escrow that a borrower owes is gonna be sent
15  to the next servicer, correct?
16    A.  Somebody should know, correct.
17    Q.  All right.  So somebody can find out if -- if
18  either of these amounts, the 10,161.10 and/or the
19  2,734.59, was sent to Caliber as being owed by the
20  borrower -- I mean, was sent to SPS as being owed by the
21  borrower, correct?
22    A.  Someone could find out, yes.
23    Q.  Okay.  Let's go back to Exhibit 3.
24    A.  Okay.
25    Q.  All right.  On 12-26, 2014 --

Page 157

1    A.  Okay.
2    Q.  -- there's entries regarding a check in the
3  amount of $2,273.81 being returned from Hidalgo County,
4  correct?
5    A.  12-26, return check, Hidalgo County.
6    Q.  Okay.  And then it says, "Forwarding check to
7  accounting to be made out to Caliber for deposit,"
8  correct?
9    A.  (Peruses document.)  The second sentence of
10  that note does state that, yes.
11    Q.  All right.  This was on 12-26.
12    A.  Uh-huh.
13    Q.  I'm trying -- where in the transaction history
14  does it show that $2,273.81 deposit by Caliber?
15    A.  Just a moment.  (Peruses documents.)  Okay.  It
16  doesn't say that within the transactions; however, if
17  you go to Exhibit 3 --
18    Q.  Okay.
19    A.  -- and look at the date 1-13-2015 --
20    Q.  Uh-huh.
21    A.  -- this is after the service release, and the
22  second line item on January 13, 2015, says, "Account has
23  been service released, check request to forward funds to
24  new servicer."
25    Q.  Okay.  But this is a different dollar amount.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 158

1   The dollar amount I'm talking about, the refund check on
2   the next page from the taxing authority was $2,273.81.
3       A. Two thousand.  Okay.  Let's see.  Let me
4   continue on.  Maybe there's another check forwarded.
5   (Peruses document.)  Also, above that on 2-24-14, there
6   was a payment with an invalid loan number or a missing
7   number off the loan number.  That could -- it could have
8   been that check in that case, and then also above that,
9   another payment was forwarded.  Is that the same amount?
10      Q. Yeah.  There is a payment on 2-28, so look at
11  that.  It says, "Forwarding tax payment to new servicer,
12  Check No. 220730 in the amount of $2,273.81."
13      A. Right, and --
14      Q. But I see that, but it doesn't show up on the
15  transaction history.
16      A. Just a moment.  (Peruses documents. )  I
17  apologize.  What was the amount that we're looking for
18  again?
19      Q. Two -- two thousand --
20      A. Twenty-two something.
21      Q. 2,273.81.
22      A. Yeah, and there it is there.  It was forwarded
23  to the new servicer.
24      Q. Well --
25      A. And it was dated 12-29-14, forwarded to the new

Page 159

1   servicer.
2       Q. Okay.  Well, let's look back at these two
3   transactions.  Go back to 12-26 on the Exhibit 3.
4       A. Okay.
5       Q. Okay.  It says you got a check with a Check No.
6   199644 in the amount of 2,273.81, correct?
7       A. I see that.
8       Q. All right.  And it says, "Forwarding check to
9   accounting to be made out to Caliber for deposit,"
10  correct?
11      A. Correct.
12      Q. All right.  And then on 2-28 of 2015, it says,
13  "Forwarding tax payment to new servicer, Check No.
14  220730 in the amount of 2,273.81," correct?
15      A. On which date were you looking at?
16      Q. February 28, 2015.
17      A. Okay.  The same date.  Right, "Forwarding tax
18  payment to new servicer, Check No. 220730 in the amount
19  of 2,273.81," right.
20      Q. So apparently Caliber deposited the check it
21  got from the tax department and cut its own check to the
22  new servicer, correct?
23      A. Let me see if the check number is on the -- on
24  here before I answer that.  (Peruses document.)  I don't
25  know the explanation.  That's a possible explanation.

Page 160

1       Q. All right.
2       A. But in that case, yes, it would show up in the
3   transaction history, so I can't say --
4       Q. But it doesn't, correct?
5       A. So I can't say that that's an explanation.
6       Q. All right.  We don't see either of those
7   transactions on the transaction history, correct?
8       A. That's correct, we don't.
9       Q. We don't see that that -- from here, we don't
10  see that that money was forwarded to the new servicer or
11  credited to the debtor's account in any way, correct?
12      A. I don't see it credited to the transaction
13  history; however, I'd have to reach out to SPS to see if
14  they received the check with that check number on it.
15      Q. All right.  But you don't see it being credited
16  to the debtor's account in any way, either the escrow
17  account or the fee account, correct?
18      A. Let me double-check to make sure.  (Peruses
19  document.)  No, I don't.
20      Q. All right.  Those dollar amounts are gonna be
21  in some fields other than these notes, correct?
22      A. They're gonna be in some fields over what
23  again?
24      Q. In some fields in the system of record other
25  than just in these notes, correct?  There's gonna be

Page 161

1   some credit and debit --
2       A. Right.
3       Q. -- somewhere, correct?
4       A. In the transaction history, yes.
5       Q. Yes.
6       A. If it was cashed.
7       Q. Okay.
8       A. Yeah, absolutely.
9       Q. All right.  Okay.  So let's go to one that's
10  actually easier.  If we go to 1-13-2015.
11      A. Okay.
12      Q. It's actually the second page of Exhibit 3 from
13  the front.
14      A. Oh, okay.  This is 3, right?  What did you say?
15  2013?
16      Q. No.  I'm sorry.  January 13th of 2015 on the
17  second page.  It's sort of in the middle.
18      A. Okay.  I'm there.
19      Q. All right.  There's some transactions on
20  actually 1-9, January 9, and also January 13.
21      A. Okay.
22      Q. Do you see that?
23      A. Yes.
24      Q. All right.  And what is that explaining?
25      A. 1-9-2015?  Let's see.  It says, "Hazard lender-

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 162

1  placed insurance was cancelled due to the service
2  release."
3  **Q. All right. And did Caliber get a wire transfer**
4  **in the amount of 2,121.27?**
5  A. (Peruses document.) I see that in the notes.
6  (Peruses document.) I also see that in the transaction
7  history.
8  **Q. Right. It shows up as a single item receipt,**
9  **correct?**
10  A. Correct.
11  **Q. All right. And then it also -- if we go back**
12  **to the notes, Exhibit 3, it says, "Account has been**
13  **service released, check request to forward funds to new**
14  **servicer"; is that correct?**
15  A. I'm sorry. Which date?
16  **Q. 1-13 of 2015.**
17  A. "Check to forward funds to new servicer," yes.
18  **Q. All right. So, and, in fact, it looks like a**
19  **check was, in fact, cut to the new servicer, correct, on**
20  **1-31 of 2015 for 2,121.27, correct?**
21  A. Just a moment. (Peruses document.) Yes. In
22  the same amount, there was a credit.
23  **Q. All right. So it says there's a check**
24  **requested. Do you know why there's no notes on January**
25  **31st about the check actually being issued and sent to**

Page 163

1  **SPS?**
2  A. In reference to the credit from 1-31-2015?
3  **Q. Yes.**
4  A. (Peruses documents.) I don't know why there's
5  no note indicating that transaction amount, but as I
6  mentioned earlier, we're working to consolidate our
7  notation screen, so it could have been placed on a
8  separate screen.
9  **Q. Okay. But you could find it, correct?**
10  A. Hopefully.
11  **Q. Well, if there was a -- if there was a check**
12  **sent, there's gonna be a record of the -- the check**
13  **number and the check being cashed, correct?**
14  A. There should be. I hope so.
15  **Q. All right. So let's stay on 1-27. There were**
16  **three payments that came from the trustee after the**
17  **service release, and the first one is reflected on**
18  **Exhibit 3, if we look at the transactions on 1-27-2015.**
19  A. I see on Exhibit 3, right, 1-27?
20  **Q. Yes.**
21  A. Okay. I'm on 1-27-2015.
22  **Q. Uh-huh. It says, "Posted 697.80 from trustee**
23  **check 1055657 to 3z due to account being service**
24  **released. Will issue check request to forward funds."**
25  **Does that mean forward funds to SPS?**

Page 164

1  A. (Peruses documents.) Yes. We would be
2  forwarding -- forwarding these funds to SPS, correct.
3  **Q. Okay. And so, in fact, the transaction history**
4  **shows a single item receipt on January 26th of 2015 in**
5  **the amount of 697.80 and then a credit in the amount of**
6  **697.80 on January 31st, 2015; is that correct?**
7  A. Please repeat the question, and then I'll need
8  a five-minute break after this, please.
9  **Q. Yeah.**
10  A. Or 10.
11  **Q. We're almost done with this part.**
12  (Requested portion was read.)
13  A. I'm so sorry. I might need you to repeat that
14  again. January 26, 2015?
15  MS. KELLETT: Let me -- let me strike that.
16  A. Okay.
17  **Q. (By Ms. Kellett) So on -- the notes indicate**
18  **that a check came from the trustee for the monthly**
19  **mortgage payment in the amount of 697.80, correct?**
20  A. On -- I did see that, 697.80. On which date?
21  **Q. One -- the notes are on 1-27 of 2015.**
22  A. 1-27-2015. I do see posted 697.80 from
23  trustee.
24  **Q. Right. And then again on the transaction**
25  **history, that same 697.80 shows up on 1-26-2015 as a**

Page 165

1  **single item receipt, correct?**
2  A. Let me see. (Peruses document.) Yes, it does.
3  **Q. All right. And then right below that, there's**
4  **a -- it says, "Escrow disbursement manual" in the amount**
5  **of 697.80. Do you see that?**
6  A. Yes.
7  **Q. Okay. So that -- is that disbursing the -- the**
8  **697.80 to SPS?**
9  A. It says "manual," so it could be going to SPS.
10  I would -- well, I don't want to assume where it's
11  going. I'd have to check and see where that check
12  actually went.
13  **Q. Okay.**
14  A. But, yes.
15  **Q. So you don't know if Caliber cashed the check**
16  **and wrote a separate check to SPS or they just sent the**
17  **check on to SPS; is that correct?**
18  A. Without doing further investigation, or wait.
19  Yeah. In -- for that amount, I don't know.
20  **Q. All right.**
21  A. I need five, 10, please.
22  **Q. Yeah. That's fine. That's fine.**
23  A. Thank you.
24  THE VIDEOGRAPHER: We're off the record at
25  4:18 p.m.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 166

1      (Recess from 4:18 p.m. to 4:35 p.m.)
2      THE VIDEOGRAPHER:  We're back on the record
3   at 4:35 p.m.
4      Q.  (By Ms. Kellett)  All right.  So if you could
5   go to Exhibit No. 10, please?
6      A.  Okay.
7      Q.  All right.  If you look down on 2-24 and 25,
8   there's three entries for 697.80, correct: a debit, a
9   credit, and then a debit again?
10     A.  In 2015?
11     Q.  No.  I'm sorry.  Yeah, 2-24 and then 2-25, and
12  I'm sorry, and then there's a final credit again.  Do
13  you see that?
14     A.  We're referring to the year 2015?
15     Q.  Yes.
16     A.  Yes.
17     Q.  On February 24th and 25th.
18     A.  Yes.  I see that.
19     Q.  All right.  So let's go to the notes for that
20  time period.
21     A.  Okay.  Okay.
22     Q.  Okay.  So it says -- if we go to 3-25 and
23  3-26 --
24     A.  On Exhibit 3?
25     Q.  Yeah.  Does this show you getting two payments

Page 167

1   from the trustee, or is this getting a payment,
2   reversing it, then saying you got it again, and then
3   sending it to maybe the new servicer?  Maybe you can
4   tell me what's going on with this, these transactions.
5      A.  Okay.  So we're referring to -- you just
6   mentioned 3-25?
7      Q.  Yeah, 3-24 and 25.  There's a series of
8   transactions involving $697.80.
9      A.  Are you meaning 2-24 and 25?
10     Q.  I'm sorry, yeah, February 24 and 25.
11     A.  Okay.  I see that series of transactions.
12  Let's see.  (Peruses documents.)  So it looks like --
13  I'm sorry.  Please repeat the question before I --
14     Q.  Well, I guess what I'm trying to figure out
15  is:  There's four transactions on February 24th and 25
16  involving the amount of $697.80.
17     A.  Okay.
18     Q.  And I'm trying to figure out what those four
19  transactions mean.
20     A.  Let's see.  (Peruses documents.)  Well,
21  it seems that a single item was received, and we
22  reversed it the very next day.
23     Q.  And what does "reversed" mean?
24     A.  So if there was a balance added to the account,
25  it was then removed from the account or vice versa:  If

Page 168

1   there was a credit added to the account, then it was
2   then removed from the account.  That's what I mean by a
3   reversal.
4      Q.  Okay.  And but then it shows another receipt
5   and then a manual escrow disbursement.
6      A.  Right.  I see that.
7      Q.  But I don't see any notes with respect -- I see
8   one line that says on Exhibit 3, "697.80 reversed-funds
9   reallocated."
10     A.  Right.  I see that.
11     Q.  But if there was a disbursement, where are the
12  notes related to the disbursement, and to whom was the
13  payment disbursed?
14     A.  (Peruses documents.)  I don't see notes
15  indicating why or to whom it was disbursed to.
16     Q.  Does that information exist somewhere?
17     A.  I'm hopeful that it does.  As I mentioned
18  earlier, there -- there may be a few different areas
19  that we may make -- make notations, which has since been
20  corrected, so I would have to investigate.
21     Q.  Okay.  And you understand that these are -- are
22  payments still coming in from the Chapter 13 trustee on
23  the Trevinos' account?
24     A.  Yes.  I do see payments coming in.
25     Q.  All right.  And if we go up to 3-26-2015 --

Page 169

1      A.  Okay.
2      Q.  -- there's another 697.80 that says "trustee
3   check"?
4      A.  Are we looking at 3 or 10?
5      Q.  I'm looking at 3, Exhibit 3.
6      A.  Okay.  So 3-26-15?
7      Q.  Yes.
8      A.  I see the note that says, "Posted 697.80,
9   trustee check."
10     Q.  Right.  And this check was actually returned to
11  the trustee, correct?
12     A.  That's -- yes.  That's what the note indicates.
13     Q.  Okay.  Do you know why the trustee wasn't
14  sending the money to SPS?
15     A.  I don't.  Other than it being a fairly recent
16  transfer at that time, maybe the -- there's some lag
17  time in the system.  I -- I don't have a explanation.
18     Q.  All right.  Do you know if SPS ever filed a
19  3002.1 notice for any of the escrow amounts that were
20  added by Caliber to the account while Caliber had the
21  loan?
22     A.  If SPS filed a 3002, I don't know.  I don't
23  work for SPS.
24     Q.  Okay.  Okay.  If we go back to Exhibit 10 --
25     A.  Okay.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 170

1    Q. -- there's an entry on -- well, there's two
2  entries:  One is on March 2nd, 2015, and one is on March
3  6, 2015.  Do you see those?
4    A. March 2nd and 6th, 2015, yes.
5    Q. Okay.  In there, it says the receipt of
6  2,502.58 --
7    A. Uh-huh.
8    Q. -- on the 2nd of March and a disbursement of
9  2,502.58 on the 6th of March.  Do you see that?
10    A. Yes.
11    Q. All right.  What are those transactions?
12    A. Just a moment.  (Peruses documents.)  I don't
13  see any notes indicating what these transactions are
14  for.
15    Q. Okay.  Would there be information somewhere in
16  the Fiserv system that would explain those transactions?
17    A. Right; however, as I mentioned earlier, notes
18  could be housed in different areas of Fiserv, and so,
19  yes, there quite possibly could be an explanation of
20  where these funds came from.
21    Q. Right.  And where they went?
22    A. And where they went as well.
23    Q. Okay.  If you -- on Exhibit 10, if you look
24  across to the right, for everything after January 2nd,
25  there are a bunch of debits and one credit to the

Page 171

1  unapplied funds account.  Do you see that?
2    A. January 2nd, 2015.
3    Q. After January 2nd.
4    A. After?  Okay.  I see a bunch of credits and one
5  debit.
6    Q. All right.  Why don't the -- other than the one
7  case, why don't the credits under the transaction
8  amounts and the debits match as credits or debits in the
9  unapplied funds account?
10    A. If I'm understanding the question, I'm looking
11  across each line item, and they match.
12    Q. Well, if we look at -- the dollar amounts
13  match, but if you look at the transaction dated January
14  31st, 2015?
15    A. Uh-huh.
16    Q. All right.  That shows there's a negative
17  transaction amount, but it shows as a positive in the --
18    A. Okay.  I see what you're saying.
19    Q. -- unapplied funds.
20    A. Just a moment.  Let me see.  (Peruses
21  documents.)  I'm sorry.  Give me just a moment.
22  (Peruses documents.)  I would have to see if there is
23  a -- do a further investigation and see if there's notes
24  under this screen that would give me details of why
25  these transactions are taking place like this.

Page 172

1    Q. All right.  But there's a place in Fiserv you
2  could find out why these are all showing up as positive
3  amounts?
4    A. I do have -- we do have access to records that
5  can explain these amounts, correct.
6    Q. Okay.  All right.  Going back to -- well, let
7  me just ask one follow-up question:  So do you have any
8  idea what the amount of unapplied funds was that was
9  sent to SPS?
10    A. No.  I don't have any idea of the -- the amount
11  of unapplied funds.
12    Q. Okay.  But you could figure that out with
13  internal records of Caliber, correct?
14    A. Yes.  We can inquire and figure that out.
15    Q. All right.  And let's go back to the late
16  charges, the late charge column.  There were two credits
17  to the late charge when the loan was boarded, and then
18  on the 2nd, there's a $1,024.80 debit to the account; is
19  that correct?
20    A. Just a moment.  (Peruses document.)
21    Q. This is on January 2nd of 2015.
22    A. (Peruses documents.)  When the loan was
23  boarded, we released it January 2015.
24    Q. Right.  But there's a credit on January 2nd to
25  the account.  Do you know if this credit was made prior

Page 173

1  to the time that the late charges were released to SPS?
2    A. What's the amount of the credit you're
3  referring to?
4    Q. $1,024.80.
5    A. In January of 2015.
6    Q. January 2nd of 2015.
7    A. Which exhibit are you looking at?
8    Q. 10, sort of in the middle of the page, lower
9  middle of the page, on January 2nd, 2015.
10    A. Oh, okay.  I see it.  I'm not -- I'm unaware of
11  any amounts that are -- that were sent to SPS.
12    Q. All right.  Is there a way you could find out
13  what amounts were sent to SPS for late charges being
14  owed?
15    A. I'm sure.
16    Q. All right.  One more question for now on
17  Exhibit 3 -- well, Exhibit 3 and 10, so let's go to
18  Exhibit 10.  On 12-22 of 2014, there's -- in the far
19  right -- right column, there's a principal balance in
20  the amount of 81,989.01.  Do you see that?
21    A. Exhibit 10, 12-22-2014?
22    Q. 12-24.
23    A. All right.  In the far right column, which
24  amount?
25    Q. 81,989.01.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 174

1      A. Yes. I see it.
2      Q. All right. Where are the transactions in
3  releasing the loan that bring this balance down to zero?
4      A. (Peruses documents.) I don't see transactions
5  that bring the balance down to zero.
6      Q. Should there be some transactions with the code
7  of SV for service release?
8      A. Just a moment. (Peruses document.) Well, I
9  don't see SD on my list of --
10     Q. It's SV. I'm sorry.
11     A. S?
12     Q. SV, as in Victor.
13     A. V? As I mentioned earlier, I don't take part
14  in the release of servicing from us to another servicer.
15  I would have to inquire.
16     Q. All right. But you could find out that
17  information, correct?
18     A. Yes.
19     Q. All right. If we go back to Exhibit 10 and if
20  we look at the date of January 2nd, 2015.
21     A. Okay.
22     Q. All right. There were 16 line entries done.
23  Do you know what any of these mean?
24         MS. HAYWARD: I'm sorry. Are we on Exhibit
25  3 or 10?

Page 175

1         MS. KELLETT: Exhibit 3.
2      A. What date was that again?
3      Q. (By Ms. Kellett) January 2nd of 2015.
4      A. (Peruses document.) And you're asking how many
5  lines were on for that date?
6      Q. But I'm asking do you know what any of these
7  lines mean? Do you know what line No. 1 means on
8  January 2nd of 2015?
9      A. Sure. One from the top. Let's see. Let's see
10  if any of these are in our definitions. (Peruses
11  document.) No. I don't wanna guess at what those stand
12  for. I don't know.
13     Q. All right. Do you know what any of these lines
14  mean on January 2nd, 2015, on Exhibit 3?
15     A. No. I don't know exactly what they mean, no.
16     Q. All right. Do you know if Caliber's outside
17  counsel can enter notes into Fiserv?
18     A. I don't know. I would assume not since they're
19  technically not an employee of Caliber, but I don't
20  know.
21     Q. Do you know if any other kind of vendors can
22  enter notes into Fiserv?
23     A. I've never come across a vendor that had access
24  to our Fiserv system.
25     Q. Right. But, for instance, the tax information,

Page 176

1  you don't know if that was by a Caliber employee or an
2  outside vendor that entered information about delinquent
3  taxes, correct?
4      A. I don't know if our tax vendor has access to
5  Fiserv.
6      Q. Okay. Who would know the answer to that?
7      A. I guess I can reach out to the tax department.
8      Q. Okay. What about insurance? Who discovers
9  that a particular debtor insurance is lapsing such that
10  Caliber would need to force-place insurance?
11     A. I'm sure our insurance department would get the
12  first information.
13     Q. But how do they -- how do they get that
14  notification? How do they know the insurance is about
15  to run out?
16     A. I don't know how they know. I can -- besides a
17  letter in the mail, I don't know.
18     Q. All right. Other than the notes, and you said
19  there's different types of notes that Caliber's used in
20  the past, correct?
21     A. I said there's different screens that notes
22  could be entered on.
23     Q. Okay.
24     A. Okay.
25     Q. Can employees also communicate with each other

Page 177

1  via e-mail or some other communication system that's an
2  electronic system?
3      A. Absolutely.
4      Q. Okay. Did you review any e-mails regarding the
5  Trevinos or this case in connection with your deposition
6  today?
7      A. Yes.
8      Q. Okay. What e-mails did you review?
9      A. Just the e-mail with the attached of the
10  production, a copy of the order for deposition, the
11  items to review for this deposition.
12     Q. All right. Did you review any e-mails on the
13  account that were about the Trevinos or about the case
14  that went from an employee to another employee?
15     A. I only received one e-mail, maybe two e-mails,
16  regarding this case, and they came directly from the
17  legal department.
18     Q. Okay. You didn't see any e-mails from an
19  employee to another employee about the Trevinos'
20  account, correct?
21     A. No, I -- I haven't.
22     Q. Okay. Could there be e-mails about the
23  Trevinos' account between employees at Caliber?
24     A. It's possible.
25     Q. Okay.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 178

1    A. I haven't seen any, though.
2    Q. Okay. If an employee sent another employee an
3    e-mail about the Trevinos' account, how would you find
4    that out?
5         (Discussion off the record.)
6    A. We were trying to hone in on e-mails from the
7    Trevino account for some reason?
8    Q. (By Ms. Kellett) Yes.
9    A. I would call IT myself.
10   Q. Okay.
11   A. Other than that, I don't know how to determine
12   if other employees were having conversations about this
13   account.
14   Q. Okay. And if you wanted to know whether any
15   outside vendor, including law firms, could enter
16   information into the Fiserv system, would you also call
17   IT?
18   A. That would be an -- an avenue to take to see if
19   they have access to those systems.
20   Q. Okay. Is there a particular person in IT that
21   you would call?
22   A. No particular person. I would just call the IT
23   hotline.
24   Q. Okay.
25   A. And go from there.

Page 179

1    Q. All right. Do you know who -- who the head of
2    the IT department is?
3    A. I do not.
4    Q. All right. Do you know any of the employees in
5    the IT department?
6    A. Not personally.
7    Q. All right. Do you know their names, any of
8    their names?
9    A. I know a couple names, first names, not last
10   names.
11   Q. Okay. That's fine. Other than e-mail and
12   entering notes, do you know of any other communication
13   systems that Caliber employs or vendors use in
14   connection with mortgage loan servicing?
15   A. Do I know of any other vendor systems that
16   Caliber uses?
17   Q. Yes.
18        THE WITNESS: Please repeat the question.
19   Thank you.
20        (Requested portion was read.)
21   A. That vendors use, there's two that I can come
22   up with off the top of my head.
23   Q. (By Ms. Kellett) Okay.
24   A. As I mentioned, I was in property preservation.
25   Q. Right.

Page 180

1    A. So there's a system called M&M.
2    Q. Okay.
3    A. But that's for inspections.
4    Q. Okay. Is that how you order inspections?
5    A. There's a couple ways to order 'em.
6    Q. Okay.
7    A. That's one way.
8    Q. Okay. And do you receive the inspections back
9    through M&M?
10   A. Through that system?
11   Q. Yes.
12   A. Yes.
13   Q. Okay. And what's the other?
14   A. The other vend -- vendor system I can think of
15   that outside people may have access to is LPS.
16   Q. Okay. Does Caliber use LPS?
17   A. Yes, we do.
18   Q. Okay. What does Caliber use LPS for?
19   A. LPS is our system that we use to communicate
20   with attorneys. Attorneys can put in their request
21   through LPS, so any request they have on the account.
22   Q. Okay. Did you review the LPS records in
23   connection with the Trevino account?
24   A. Vaguely.
25   Q. Okay. Do you know why those haven't been

Page 181

1    produced?
2    A. The same information that's in the LPS is
3    within Fiserv, for the most part. There's
4    communications between the company and the attorneys
5    that may not be in Fiserv.
6    Q. All right. Okay. But -- but there are some
7    LPS records with respect to the Trevinos, correct?
8    A. Absolutely there's records.
9    Q. What other kind of systems or software does
10   Caliber use in its mortgage servicing business that you
11   know of?
12   A. I can only tell you the ones I use. We use way
13   more than what I use. For default servicing, in my
14   role, LPS, Fiserv. There's another system called Core.
15   Q. What does Core do?
16   A. Core is just like an assistance tool to tell us
17   how to help mitigate this account or help the customer.
18   It kind of gives us an idea of where to start.
19   Q. Were there any Core records with respect to the
20   Trevinos?
21   A. I didn't look at Core. Core is usually when
22   you have an active account that we're currently
23   servicing, would you have Core.
24   Q. You mean one that's not in default servicing?
25   A. When we're actually servicing. It's been

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 182

1  service released.  You know, when I got the -- the file,
2  it was serviced released, so there's no need -- no need
3  for me to go into Core.
4      Q.  Okay.  What other systems?
5      A.  CarbonCopy.
6      Q.  What is that?
7      A.  It's our imaging system.
8      Q.  Okay.  Did you review all the documents that
9  have been imaged with respect to the Trevinos?
10     A.  No.  I just reviewed the documents in
11  prepara -- preparization -- preparation for the
12  disposition (sic).
13     Q.  All right.  That were sent by counsel, correct?
14     A.  Correct.
15     Q.  All right.  We saw some references to some
16  documents being scanned.  Would they have been scanned
17  into this CarbonCopy system?
18     A.  You said you saw some -- what was the first
19  part of that question?
20     Q.  We saw some notes about correspondence being
21  scanned, and my question is:  Does that mean whether you
22  scanned into the CarbonCopy system?
23     A.  Yes.  That is our primary system of housing
24  documents.
25     Q.  Okay.  So if you wanted to find all the

Page 183

1  documents imaged with respect to the Trevinos, could you
2  pull those up using CarbonCopy?
3      A.  Yes.  It's our primary imaging system.
4      Q.  Do you have a secondary imaging system?
5      A.  I haven't -- yes, we do.  I haven't used it in
6  ages.
7      Q.  Is it a -- is it a system that was only used up
8  to a certain date in time?
9      A.  Exactly, and then Caliber created CarbonCopy to
10  take over.
11     Q.  Okay.  So the Trevinos wouldn't be in that
12  earlier system because that's a fairly recent account;
13  is that correct?
14     A.  We got the loan in --
15     Q.  It was --
16     A.  Well, it's been a few years.
17     Q.  -- November of 2013, is when Caliber got the
18  loan.
19     A.  That, I don't know.  I can't recall when
20  CarbonCopy was launched.
21     Q.  Okay.  What's the name of the legacy system?
22     A.  I believe it's called Venture.
23     Q.  Okay.  Can you access that Venture system?
24     A.  It's been so long, I've probably been revoked.
25  I don't know.

Page 184

1      Q.  All right.  Could you talk to someone in IT or
2  somewhere to figure out if you could access the Venture
3  system?
4      A.  Absolutely.  If it's still available, yeah, I
5  can talk to someone in IT.
6      Q.  Okay.  Let me go ahead and --
7          (Discussion off the record.)
8          MS. KELLETT:  What's it gonna be?
9          MS. CLONTZ:  17.
10         (Exhibit 17 marked for identification.)
11     Q.  (By Ms. Kellett)  Okay.  We're showing you
12  what's been marked as Exhibit 17 to your deposition.  Do
13  you recognize this document at all?
14     A.  (Peruses documents.)  This is all one document?
15     Q.  Yes.  This was a document we filed with the
16  Court, with exhibits.  If you'll keep looking on that
17  page that you're on right now --
18     A.  Uh-huh.
19     Q.  -- what page number does it have at the bottom?
20     A.  Seven.
21     Q.  Okay.  Could you go ahead to -- is this
22  Plaintiff's First Request for Production of Documents?
23  Is that what it says at the bottom?
24     A.  Yes.
25     Q.  All right.  Could you go to page No. 10 -- I

Page 185

1  mean, I'm sorry, page No. 8, and these are front and
2  back pages.
3      A.  Okay.
4      Q.  All right.  Do you see request for production
5  No. 10?
6      A.  I see it.
7      Q.  All right.  Have you seen this request for
8  production before?
9      A.  Let me see.  (Peruses document.)  This looks a
10  little more detailed than what I got.
11     Q.  All right.  Did you review any policies and
12  procedures with respect to the filing of 3002.1 notices
13  in preparation for your deposition?
14     A.  No, I didn't.
15     Q.  And did you review any policies or procedures
16  in connection with how Caliber accepts funds from any
17  filed 3002.1 notices?
18     A.  Not specifically the 3002.1 notice.
19     Q.  Okay.  And if you could look on Page 9, request
20  for production No. 13.
21     A.  Okay.
22     Q.  All right.  Did you look at any policies or
23  procedures with respect to request for production No.
24  13?
25     A.  Let me read through it?

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 186

1    Q. Sure.
2       A. (Peruses document.)  Do you have a copy of the
3    order for deposition?
4    Q. The deposition notice?
5       A. Uh-huh.
6    Q. It's Exhibit No. 1.
7       A. 1? (Peruses document.)  So I haven't seen this
8    one.
9    Q. All right.
10      A. This one's a little -- this one's a little
11   wordier.
12      Q. Well, look at topic 7 (d).  What did you do to
13   prepare for your deposition with respect to topic 7 (d)?
14      A. This is, as you mentioned, the
15   acceptance of funds for a 3002.1.  I did -- we did reach
16   out to the payment department.
17      Q. Okay.
18      A. And inquired about the acceptance of funds.
19      Q. Okay.  And what did they say?
20          MS. HAYWARD: I'm going to object. These
21   were all attorney-client privileged communications.
22      Q. (By Ms. Kellett) Did you talk to an attorney
23   in the payment department?
24      A. My attorney and I spoke with the payment
25   department.

Page 187

1    Q. Your attorney and you spoke with the payment
2    department?
3       A. Yes.
4    Q. Okay.  So did you speak to anybody other than
5    an attorney to prepare for topic 7 (d) for your
6    deposition today?
7       A. No, just with my attorney when we talked about
8    this topic.
9    Q. Did you -- did you ask -- well, let me ask
10   this: What did you, as opposed to your attorney, ask
11   the payment department?
12          MS. HAYWARD: I'm going to object to the
13   extent of any communications between me, this witness,
14   and anybody else with Caliber in preparation of this
15   deposition.  Those are attorney-client privileged
16   communications.  Whether he was the one asking them or
17   I was the one asking them, they're attorney-client
18   privileged communications.
19      Q. (By Ms. Kellett) Was the subject of the
20   communication legal advice from your payment department
21   person?
22          MS. HAYWARD: Again, first off, that's a --
23   a legal question, and I'm going to object to that as
24   well.  I'm gonna instruct the witness not to disclose
25   any communications that he had with me and anybody else

Page 188

1    at Caliber in preparing for his deposition at the same
2    time.  You're welcome to ask him whether he spoke to
3    somebody without me present, but any communications and
4    conversations in which I was involved and that we were
5    preparing for this deposition are privileged.
6          MS. KELLETT: No, Melissa.  Not every
7    conversation is privileged.  The only thing that's
8    privileged is whether you were seeking legal advice or
9    giving legal advice.
10          MS. HAYWARD: Well, obviously, we were
11   preparing for a deposition.
12          MS. KELLETT: That doesn't mean you were
13   seeking legal advice.
14          MS. HAYWARD: Then it was certainly
15   attorney-client work product.
16      Q. (By Ms. Kellett) Okay.  What is the expense of
17   accessing Caliber's policies and procedures with respect
18   to filing 3002.1 notice -- notices?
19      A. You're asking -- when you say "expense" --
20      Q. Yeah.
21      A. -- what do you mean?
22      Q. The expense of accessing Caliber's policies and
23   procedures with respect to filing 3002.1 notice --
24   notices and accepting funds from any filed 3002.1
25   notice.

Page 189

1       A. When you say "expense," are you asking how much
2    it costs?
3       Q. Yes.
4       A. That, I don't know.  I don't know.  I'm not an
5    attorney.  I don't file the 3002.1 notices.  I don't
6    know.
7       Q. All right.  Do -- do you know if Caliber has
8    any policies and procedures with respect to Rule 3002.1
9    notices?
10      A. We do.
11      Q. Okay.
12      A. I -- I did look up -- I did see something
13   regarding 3002.1 notices, but I couldn't given you the
14   details of it.
15      Q. When you say you saw something, were you
16   looking at some policies or procedures with respect to
17   3002.1 notices?
18      A. Correct.
19      Q. Okay.  And where did you -- where did you view
20   that information?
21      A. Within the policies and procedures.
22      Q. Okay.  Are those online or in hard copy?
23      A. Online.
24      Q. Did you print any of that information out?
25      A. No, I did not.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 190

1    Q.  Okay.  Could you print it out?
2    A.  It's printable.
3    Q.  Do you know how much it would cost to -- to
4  print out the policies and procedures of Caliber with
5  respect to Rule 3002.1?
6    A.  How much it would cost to print out policies
7  and procedures?
8    Q.  Yes.
9    A.  The cost of ink and paper.
10    Q.  Not much, correct?
11    A.  Fairly low costs.
12    Q.  Okay.  All right.  What did you do with respect
13  to finding out information for your deposition in
14  connection with topic 7 (e)?
15    A.  With respect to (e), I reviewed Caliber's
16  retention policies.
17    Q.  Okay.  And where are Caliber's retention
18  policies?
19    A.  We retain documents, account information, for
20  a minimum of seven years unless the account's in
21  litigation --
22    Q.  Uh-huh.
23    A.  -- in which we could retain the documents
24  longer.
25    Q.  Okay.  And with respect to matters in

Page 191

1  litigation, how does Caliber store information about
2  matters in litigation within its computer systems?
3    A.  Well, which topic is that in regards to?
4    Q.  7 (e).
5    A.  Everything is stored on the server.  There's a
6  constant data backup, and at the end of the day, we also
7  do another data backup.
8    Q.  Okay.  Do you know particular software that
9  Caliber uses or its legal department uses to store
10  information about lawsuits against Caliber?
11    A.  All I know is that there's a system they use to
12  track lawsuits, but beyond that, I don't know.  I'm not
13  in the legal department.
14    Q.  Okay.  Well, so you didn't discuss with anybody
15  in the legal department topic 7 (e)?
16    A.  I did.
17    Q.  Okay.  Well, how does Caliber know, for
18  instance, if a lawsuit alleges a violation of bankruptcy
19  Rule 3002.1?
20    A.  Which one is that?
21    Q.  7 (e).
22    A.  The same one.  Again, I'm not in the legal
23  department.  I don't have access to the systems they
24  use, so...
25    Q.  Did you ask somebody extensive information

Page 192

1  about the systems they use?
2    A.  I asked about the -- the systems that -- that
3  was used.  I don't remember the name of the system.  I
4  just know that it tracks these lawsuits.  If it tracks
5  violations as well, I don't know.
6    Q.  Okay.  Did you ask anybody?
7    A.  That specific question, I don't recall if I
8  asked that one.
9    Q.  All right.  Do you know, does Caliber store the
10  pleadings in the lawsuit in the system that it uses?
11    MS. HAYWARD:  Objection, form.
12    A.  I don't know to what extent of information that
13  is stored in that -- that system.  I don't have access
14  to it.  I'm not in the legal department.
15    Q.  (By Ms. Kellett)  Right.  And you didn't ask
16  with respect to your deposition today, correct?
17    A.  I didn't ask that specific question, no.
18    Q.  All right.  And did you ask specifically about
19  what it would cost to extract information out of the
20  legal department's computer system?
21    MS. HAYWARD:  Objection, form.
22    A.  Which topic is that?
23    Q.  (By Ms. Kellett)  7 (e).
24    A.  The same topic.  And ask that specific question
25  again.

Page 193

1    Q.  All right.  All right.  So the topic was any
2  expense associated with retrieving information regarding
3  such lawsuits or complaints, but you didn't ask anybody
4  about what it would cost to retrieve that information,
5  correct?
6    A.  I mean, retrieving information should be a
7  fairly low cost.  No, I did not ask.
8    Q.  All right.  Okay.  With respect to 7 (g), what
9  did you do to prepare for topic 7 (g) with respect to
10  your deposition today?
11    A.  I don't recall my whole preparation.  Give me
12  just a moment.
13    Q.  Sure.
14    A.  Thank you.  I apologize.  I remember talking
15  about it, but I don't recall exactly what we discussed
16  on that topic.
17    Q.  Okay.  Do you -- do you recall if there have
18  been any external analysis, reviews, or audits regarding
19  Caliber's enforcement of 3002.1 notices?
20    A.  Not that I'm aware of.
21    Q.  And you're not aware of, but you don't remember
22  what you spoke to someone with about 7 (g)?
23    A.  Well, I spoke to counsel about 7 (g).
24    Q.  All right.  And counsel --
25    A.  Uh-huh.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 194

1   Q. -- gave you the information, so --
2       MS. HAYWARD:  I'm gonna again object --
3       MS. KELLETT:  Okay.
4       MS. HAYWARD:  -- to anything that counsel
5   spoke or told him as part of this deposition.
6       MS. KELLETT:  All right.
7       A. And I spoke with legal.
8       MS. HAYWARD:  And --
9       Q. (By Ms. Kellett)  Right.  So -- so legal told
10  you whether or not there was any internal or external
11  analysis, review, or audit?
12      A. Which --
13          MS. HAYWARD:  I'm gonna again object to
14  what legal may or may not have told this witness.  I'd
15  instruct you not to answer.
16      Q. (By Ms. Kellett)  It -- are you gonna take your
17  counsel's advice on that?
18      A. Yes, I'm gonna take my counsel's advice on
19  that.
20      Q. All right.  The question of whether there is
21  any analysis or audit, were you seeking legal advice on
22  that or factual information?
23      MS. HAYWARD:  Objection.  I'm going to --
24  this, first off, calls for a legal conclusion.  Any
25  discussions that this witness had with counsel in

Page 195

1   preparation of this deposition is privileged and work
2   product.
3       MS. KELLETT:  That's not true, Melissa.
4       MS. HAYWARD:  Well, then, take it to the
5   Court.
6       MS. KELLETT:  We will.
7       Q. (By Ms. Kellett)  All right.  Did you ask
8   anybody besides a lawyer whether or not Caliber has had
9   any internal or external analysis, reviews, or audits
10  concerning Caliber's enforcement of 3002.1 notices?
11      A. No, I did not.
12      Q. Okay.  So the only thing you know about topic
13  7 (g) is what a lawyer told you, correct?
14      A. As I mentioned, I can't recall the details of
15  topic (g) at this moment.
16      Q. Did you talk about topic (g) only with
17  Ms. Hayward or with any other counsel?
18      A. With legal and Ms. Hayward.
19      Q. Okay.  Was that -- what other attorneys in
20  internal legal?
21      A. With Clint.
22      Q. Clint.  Okay.
23      (Discussion off the record.)
24      (Exhibit 18 marked for identification.)
25      Q. (By Ms. Kellett)  All right.  I'm showing you

Page 196

1   what has been marked as Exhibit 18 to your deposition.
2   Do you know if you've ever seen this document before?
3       A. (Peruses document.)  I don't recall seeing this
4   specific document.
5       Q. All right.  Did you say that Caliber has access
6   to all of HSBC's transaction history with respect to the
7   Trevino account?
8       A. We don't necessarily have access, but we may be
9   able to get transaction history.
10      Q. All right.  Have you ever seen Fiserv
11  transaction history in this format before?
12      A. I've seen many transaction histories.
13      Q. All right.
14      A. And this looks like similar to some -- one that
15  I've seen before in the past.
16      Q. Okay.  So the transaction history, you can run
17  out a report that's in this format rather than in Excel,
18  correct?
19      A. I've only dabbled with two formats: PDF and
20  Excel, so I don't know what format this is.
21      Q. Right.  But you've seen this format for the
22  transaction, correct?
23      A. Yes.  I've seen something similar.  If it's
24  actually this format, I don't know.
25      Q. But if you wanted to know the different ways

Page 197

1   that you could pull reports of account information out
2   of Fiserv, who would you discuss that with?
3       A. If I wanted to see what information I can pull
4   out of Fiserv?
5       Q. Any information in the account, how you could
6   pull it out other than into Excel, who would you
7   discuss?
8       A. Other than into Excel?
9       Q. Yes.  Who would you discuss the capabilities of
10  the Fiserv system with respect to report generation?
11      A. Before I discuss anything with anyone, I'd just
12  go back to the same tool I used to generate the Excel.
13      Q. Right.  But if you wanted to see if information
14  could be pulled in a different way other than Excel,
15  would you talk to somebody in the IT department?
16      A. No.  I would go back to the same tool I used
17  to generate the Excel.  As I mentioned earlier, it
18  generates more than Excel and PDF.  It has other
19  formats, so if I wanted to know what other formats were
20  available, I -- I'd go there and try that --
21      Q. Okay.
22      A. -- before I reached out to anyone.
23      Q. Okay.  Is -- is Exhibit 18 one of the formats?
24      A. I don't know.  This is not Excel.
25      Q. Okay.

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

Page 214

1    A.  No.

2    Q.  Looking at these documents, or let's look at
3  21 since -- well, does Exhibit 21 give you information
4  about the Trevinos' account?

5    A.  (Peruses document.)  Yes, it does.

6    Q.  Okay.  Do Exhibits 8, 4, 5, 6, and 7, when put
7  in proper order, also give you information about the
8  Trevinos' account then?

9    A.  After reviewing those two line items --

10        MS. KELLETT:  Objection, form, leading.

11    A.  -- it appears to give me the same exact
12  information as Exhibit 21.

13    Q.  (By Ms. Hayward)  I'd like to talk briefly
14  about Exhibit 21 and Exhibit 22.  Are these Caliber's
15  records?

16    A.  These are records prior to Caliber acquiring
17  the loan.

18    Q.  Whose records are these, if you know?

19    A.  I'd say HSBC's records.

20    Q.  Are these records accessible to Caliber in
21  Caliber's Fiserv software?

22    A.  No.

23    Q.  Okay.  Can Caliber access HSBC's screenshots
24  in its Fiserv software?

25    A.  No.

Page 215

1    Q.  Okay.  To your knowledge, has Caliber produced
2  all documents that it had in CarbonCopy?

3        MS. KELLETT:  Objection, leading, calls for
4  speculation.

5    Q.  (By Ms. Hayward)  I'll repeat the question:  To
6  your knowledge, has Caliber produced all documents in
7  its possession in CarbonCopy?

8        MS. KELLETT:  Objection, leading.  It calls
9  for speculation.

10        MS. HAYWARD:  Are you objecting on both
11  grounds?

12        MS. KELLETT:  Yes.

13        MS. HAYWARD:  Okay.

14    A.  Still answer that?

15    Q.  (By Ms. Hayward)  Yes, please.

16    A.  Have we provided the documents as part of
17  production for today's disposition (sic)?

18    Q.  Yes.

19    A.  All of the documents?

20    Q.  In -- in CarbonCopy.

21    A.  I -- I don't know if we provided all of the
22  documents in CarbonCopy.  That could be a pretty robust
23  download if we did.

24    Q.  What kind of documents generally would be found
25  in CarbonCopy?

Page 216

1    A.  All -- all documents regarding servicing a
2  loan.  You could find documents from the previous
3  servicer.  You'll find documents from Caliber, like
4  mortgage, copies of the mortgage, copies of the note,
5  copies of breach letters, copies of correspondence sent
6  to the borrower.

7    Q.  Okay.  Origination files?

8    A.  Yes.

9    Q.  Credit reports?

10    A.  Yes.

11    Q.  Original inspection reports?

12    A.  Yes.

13    Q.  Closing files?

14    A.  Yes.

15    Q.  Okay.  Do you recall how many pages of
16  documents that Caliber produced to the Trevinos in this
17  case in 2014?

18    A.  How many documents --

19        MS. KELLETT:  Objection, speculation.  The
20  witness testified he had nothing to do with this case in
21  2014.

22    Q.  (By Ms. Hayward)  Did you review --

23        MS. HAYWARD:  Well, let me strike that then
24  and reask the question.

25    Q.  (By Ms. Hayward)  Did you review a copy of the

Page 217

1  documents that Caliber produced in 2014 to the Trevinos?

2    A.  A copy of the -- where -- has these documents
3  that were produced in 2014, all of these?

4    Q.  Yes, the Bates --

5        MS. KELLETT:  Objection, response.

6    Q.  (By Ms. Hayward)  The -- did you review
7  documents that were Bates numbered at the bottom?

8    A.  Yes, I did.

9    Q.  Okay.  And do you recall how many Bates-
10  numbered documents were in that file?

11    A.  More than 800.

12    Q.  Were there copies of the note and mortgage in
13  that file?

14    A.  Not that I recall.

15    Q.  Okay.  If you'd look at Exhibit 2.

16    A.  Okay.

17    Q.  I believe you previously testified that these
18  are HSBC's screenshots, is that correct, or are these
19  Caliber's screenshots?

20    A.  Well, this is redacted, so I can't tell whose
21  screenshots they are.

22    Q.  I believe you testified that Caliber's Fiserv
23  system and servicing notes looks similar to this.

24    A.  I did.

25    Q.  Assuming that Caliber's Fiserv system servicing

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
07/27/2016

---

Page 222

1  it.
2      A.  Is this what you're referring to?
3      Q.  You said 4-25-14?
4      A.  Yes.
5      Q.  Yeah.  Perfect example.  Do you see where on
6  4-25-14 it states, "Delinquent tax second letter
7  4-28-14"?
8      A.  Right.
9      Q.  Are you aware of whether that letter was
10  actually sent to the borrowers?
11      A.  No.  I don't have a postage for that letter or
12  an address.
13      Q.  Do you know whether Caliber continues to send
14  delinquent letters to borrowers in bankruptcy?
15      A.  We --
16      MS. KELLETT:  Objection, speculation.
17      MS. HAYWARD:  I asked him whether he knows
18  something.  How is that speculation?
19      MS. KELLETT:  He said he didn't know very
20  much about what the bankruptcy department does.  I
21  remember.
22      Q.  (By Ms. Hayward)  I'll ask again:  Do you know
23  whether Caliber sends tax delinquency letters to
24  borrowers who are in bankruptcy?
25      A.  I don't know.

---

Page 223

1      Q.  Okay.  Do you know whether Caliber sends
2  delinquency tax notices to borrowers who are involved
3  in lawsuits with Caliber?
4      A.  I'm not in the legal department.  I don't know.
5      Q.  So then would it be safe to say you don't know
6  whether this tax letter exists or not?
7      A.  I haven't seen it.
8      Q.  What documents would you look at to determine
9  what fees HSBC assessed on the Trevinos' loan before it
10  was transferred to Caliber?
11      MS. KELLETT:  Objection, asked and
12  answered.
13      MS. HAYWARD:  By me?
14      MS. KELLETT:  By me.
15      MS. HAYWARD:  How is that a valid objection
16  to my redirect of -- of a witness?
17      MS. KELLETT:  You can answer the question.
18      A.  I would review prior service -- blah, blah,
19  excuse me, prior servicer documents that we acquired
20  during the boarding process.  That would be one way.
21      Q.  (By Ms. Hayward)  Would you look at the
22  transaction history?
23      A.  That would be the other way.
24      Q.  Would you look at servicing notes?
25      A.  Yes.

---

Page 224

1      Q.  If you wanted to, do you believe you would be
2  able to determine from Exhibits 19 and 20, with a
3  magnifying glass and a calculator, what fees HSBC
4  assessed against the loan?
5      A.  Repeat that question again.
6      Q.  Do you think you could, if you had time and a
7  calculator, sit down and use Exhibits 19 and 20 to
8  determine what fees HSBC assessed against the loan
9  before it was transferred to Caliber?
10      MS. KELLETT:  Objection, calls for
11  speculation, but there's a calculator.  Where's the
12  magnifying -- here's a magnifying glass.
13      A.  It would be -- with the calculator and a
14  magnifying glass, it -- I don't believe it to be
15  impossible, but it would be a challenging task.
16      Q.  (By Ms. Hayward)  Do you think you would
17  probably need to sit down and create a accounting of
18  some kind?
19      A.  Absolutely.
20      Q.  What documents would you use to create that
21  accounting?
22      A.  The documents would be the transaction history.
23  I'd also use the notes.
24      Q.  Okay.  To your knowledge -- well, let's --
25  let's look at Exhibit 3 one more time.

---

Page 225

1      A.  Okay.
2      Q.  And let's start with -- let's look at the 12-10
3  of 2013 note, which is two pages, the second-to-last
4  page.
5      A.  12-10-2013?
6      Q.  Yes.
7      A.  Okay.
8      Q.  Okay.  Where does that note start?  And you can
9  take a second to read it.
10      A.  Okay.  (Peruses document.)  It starts at the
11  bottom.  It says, "System updated for the following
12  event."  It starts there.
13      Q.  Okay.  Would you read the note as it should be
14  read, you know, as it should be read?
15      A.  Sure.  "System updated for the following event:
16  User has created a Process-Level issue for this loan.
17  Issue Type: BK Action Stop," a weird "I" with two dots
18  on top.  It looks like it may be a typo.  It says, "Ot,"
19  and then, "her Legal Action.  Issue Comments:  Please
20  close one BK support process as it appears to be two
21  referrals for the same county, and the dates assessed
22  are different.  Please advise which referral should the
23  NFC be for.  Thank you.  Status: Active."
24      Q.  Why -- why do the notes appear that way, kind
25  of backwards, if you will?

---

In Re: Jose Trevino, Sr., et al vs.
HSBC Mortgage Services, Inc., et al

Jamar Harris (Caliber Home Loans)
Index: visit..yesterday07/27/2016

**visit** 29:24

---

**W**

**wait** 122:1 141:10 165:18 228:4

**waive** 124:10 126:4 127:4,5
128:16,17,21 130:1,17 131:9
138:16,22

**waived** 5:3 62:2 64:5 111:3,11
125:17 127:16 129:3,6,10,20,23
130:4 131:10 139:2 153:17 154:19

**waiver** 125:24 126:15 130:11,14
131:16 134:18,21 154:4

**waivers** 154:8

**wake** 209:24

**wanna** 175:11

**wanted** 17:11 91:20 178:14 182:25
196:25 197:3,13,19 198:8,12 219:9
224:1 229:23 230:9

**warrant** 130:13

**watch** 206:19,22

**water** 91:20

**ways** 30:12 180:5 196:25 198:4,5,
9,10,12

**Web** 15:12,13,14,15,19

**website** 141:23

**week** 20:9,21,23,25 21:1,25 205:22

**weird** 95:5 225:17

**whatsoever** 209:9

**When's** 205:20

**white** 46:7 121:8

**wire** 162:3

**withdraw** 73:2 77:3 139:8,10

**withdrawal** 72:18,24 138:17

**withdrawals** 137:18

**withdrawing** 138:4,5

**withdrawn** 71:23 72:2 73:7,13,15

**word** 51:22 78:6 83:14 115:9 221:3

**wordier** 186:11

**work** 7:4,13 11:21,22 12:7 21:3,5
118:9,20 155:20 169:23 188:15
195:1 207:19

**worked** 20:21 35:2

**working** 5:22 6:2 145:19 163:6

**write** 83:20 150:20

**written** 83:25

**wrote** 165:16

---

**Y**

**y'all** 199:20

**year** 7:9 21:6 71:6 120:13,16
140:23 141:10 166:14

**years** 6:4 7:25 8:15 21:2 183:16
190:20

**yellow** 229:4

**yesterday** 34:5 46:1,2 48:14 54:11
65:20 199:23 200:1,2,12,20 201:5
203:13,16,22 205:18,25 230:16,19,
20